RECORD NO. 12-7101

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

## For The District of Columbia Circuit

**Fran Heiser, Individually and as Co-Administrator of the Estate of Michael Heiser; Gary Heiser, Individually and as Co-Administrator of the Estate of Michael Heiser; Ibis Haun, Individually and as Administratrix of the Estate of Leland Timothy Haun; Richard Lee Wood, Individually and as Administrator of the Estate of Justin R. Wood; Denise M. Oehmann, Individually and as Administratrix of the Estate of Earl F. Cartrette, Jr.; Sandra Wetmore, Individually and as Co-Administrator of the Estate of Brian McVeigh; James Wetmore, Individually and as Co-Administrator of the Estate of Brian McVeigh,**

*Plaintiffs – Appellants*,

v.

**Islamic Republic of Iran; Iranian Ministry of Information and Security; Iranian Islamic Revolutionary Guard Corps,**

*Defendants – Appellees*,

**Bank of America N.A., doing business as Bank of America Corporation; Wells Fargo Bank, N.A., doing business as Wells Fargo & Company,**

*Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

### BRIEF OF APPELLANTS

———————————

Richard M. Kremen
Dale K. Cathell
David B. Misler
Lauren Genvert
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209
(410) 580-3000

*Counsel for Appellants*

## IN THE UNITED STATES COURT OF APPEALS FOR THE
## DISTRICT OF COLUMBIA CIRCUIT

ESTATE OF MICHAEL HEISER, *et al.*

Appellants,

v.

ISLAMIC REPUBLIC OF IRAN, *et al.*

Appellees.

**Appeal No. 12-7101**

(D. Ct. Case No.: 00-CV-02329 (RCL)

**Consolidated with**

D. Ct. Case No.: 01-CV-02104 (RCL))

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for the Appellants certify as follows:

**A.    Parties, Intervenors, and *Amici Curiae***

The following is a list of all parties, intervenors and *amici* who appeared in the United States District Court for the District of Columbia, and all persons who are parties or *amici* in this Court.

**1.    Parties**

<u>Plaintiffs/Appellants:</u>

(1) the Estate of Michael Heiser, deceased; (2) Gary Heiser; (3) Francis Heiser; (4) the Estate of Leland Timothy Haun, deceased; (5) Ibis S. Haun; (6) Milagritos Perez-Dalis; (7) Senator Haun; (8) the Estate of Justin R. Wood, deceased; (9) Richard W. Wood; (10) Kathleen M. Wood; (11) Shawn M. Wood; (12) the Estate of Earl F. Cartrette, Jr., deceased; (13) Denise M. Eichstaedt; (14) Anthony W. Cartrette; (15) Lewis W. Cartrette; (16) the Estate of Brian McVeigh, deceased; (17) Sandra M. Wetmore; (18) James V. Wetmore; (19) the Estate of Millard D. Campbell, deceased; (20) Marie R. Campbell; (21) Bessie A. Campbell; (22) the Estate of Kevin J. Johnson, deceased; (23) Shyrl L. Johnson;

(24) Che G. Colson; (25) Kevin Johnson, a minor, by his legal guardian Shyrl L. Johnson; (26) Nicholas A. Johnson, a minor, by his legal guardian Shyrl L. Johnson; (27) Laura E. Johnson; (28) Bruce Johnson; (29) the Estate of Joseph E. Rimkus, deceased; (30) Bridget Brooks; (31) James R. Rimkus; (32) Anne M. Rimkus; (33) the Estate of Brent E. Marthaler, deceased; (34) Katie L. Marthaler; (35) Sharon Marthaler; (36) Herman C. Marthaler III; (37) Matthew Marthaler; (38) Kirk Marthaler; (39) the Estate of Thanh Van Nguyen, deceased; (40) Christopher R. Nguyen; (41) the Estate of Joshua E. Woody, deceased; (42) Dawn Woody; (43) Bernadine R. Beekman; (44) George M. Beekman; (45) Tracy M. Smith; (46) Jonica L. Woody; (47) Timothy Woody; (48) the Estate of Peter J. Morgera, deceased; (49) Michael Morgera; (50) Thomas Morgera; (51) the Estate of Kendall Kitson, Jr., deceased; (52) Nancy R. Kitson; (53) Kendall K. Kitson; (54) Steve K. Kitson; (55) Nancy A. Kitson; (56) the Estate of Christopher Adams, deceased; (57) Catherine Adams; (58) John E. Adams; (59) Patrick D. Adams; (60) Michael T. Adams; (61) Daniel Adams; (62) Mary Young; (63) Elizabeth Wolf; (64) William Adams; (65) the Estate of Christopher Lester, deceased; (66) Cecil H. Lester; (67) Judy Lester; (68) Cecil H. Lester, Jr.; (69) Jessica F. Lester; (70) the Estate of Jeremy A. Taylor, deceased; (71) Lawrence E. Taylor; (72) Vickie L. Taylor;(73) Starlina D. Taylor; (74) the Estate of Patrick P. Fennig, deceased; (75) Thaddeus C. Fennig; (76) Catherine Fennig; (77) Paul D. Fennig; and (78) Mark Fennig.

Defendants/Appellees:

The Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Islamic Revolutionary Guard Corps.

Third-Parties/Appellees:

Bank of America, N.A.; Wells Fargo Bank, N.A.

Additional Parties in the District Court:

Sprint Nextel Corporation also known as Sprint Communications Company, LP, United States of America, and the Office of Foreign Assets Control, each appeared as interested parties/third-parties.

**2.     Intervenors**

None.

**3.     *Amici Curiae***

The United States of America filed a Statement of Interest in the district court.

**B.    Rulings under Review**

The ruling under review is the district court's (the Honorable Royce C. Lamberth) August 31, 2012 Order denying with prejudice the Heisers' Motion for Judgment Against Garnishees and for Turnover of Funds with respect to all of the Contested Accounts listed therein.  The August 31, 2012 Order is accompanied by the district court's August 31, 2012 memorandum opinion reported at 2012 WL 3776705 (D.D.C. Aug. 31, 2012).

**C.    Related Cases**

This case has not previously been before this Court or any other court.  Several appeals which may be related are pending before the United States Court of Appeals for the Second Circuit:

- *Hausler v. JPMorgan Chase Bank, N.A.*, appeal nos. 12-1264, 12,1384, 12-1945

- *Calderon-Cardona v. The Bank of New York Mellon*, appeal no. 12-75.

Respectfully submitted,

Dated:   November 5, 2012

_____/s/ Richard M. Kremen_____
Richard M. Kremen
David B. Misler
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209-3600
410-580-3000 *telephone*
410-580-3047  *facsimile*
richard.kremen@dlapiper.com
david.misler@dlapiper.com

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY......................................................................................... viii

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ......................................................1

STATEMENT OF THE ISSUES...............................................................1

STATUTES AND REGULATIONS..........................................................2

STATEMENT OF THE FACTS ...............................................................2

    I.     The Underlying Proceedings Against Iran...........................................2

    II.    Post-Judgment Collection Efforts Against Bank of America,
          N.A. and Wells Fargo Bank, N.A .......................................................3

SUMMARY OF THE ARGUMENT ......................................................7

STANDARD OF REVIEW .................................................................8

ARGUMENT ........................................................................................9

    THE DISTRICT COURT ERRED BY HOLDING THAT THE
    CONTESTED ACCOUNTS ARE NOT SUBJECT TO EXECUTION
    UNDER TRIA § 201 AND 28 U.S.C. § 1610(g)..........................................9

    I.     STATUTORY FRAMEWORK GOVERNING EXECUTION
          OF PROPERTY OF TERRORIST STATES.......................................9

          A.    TRIA ...................................................................................10

          B.    Section 1610(g) .....................................................................10

i

II. TRIA § 201 AND 28 U.S.C. § 1610(g) DO NOT REQUIRE AN "OWNERSHIP INTEREST" BY THE TERRORIST STATE.................................................................................11

  A. The District Court Improperly Applied *Stanford* ....................13

  B. Congress Relied Upon the Definitions in OFAC's Sanctions Regimes When Drafting Terrorism Victim Legislation and OFAC's Sanctions Govern Broad Interests That do not Require Ownership .................................18

III. EVEN IF TRIA § 201 AND 28 U.S.C. § 1610(g) REQUIRE THE TERRORIST STATE TO HOLD AN "OWNERSHIP INTEREST", IRAN HAS AN OWNERSHIP INTEREST IN THE CONTESTED ACCOUNTS .....................................................26

  A. The District Court Improperly Relied Upon Article 4A to Determine Whether Iran has an Ownership Interest in the Contested Accounts ................................................................27

    1. The District Court's holding that the FSIA preempts state law cannot be squared with the District Court's reliance on State Law and U.C.C. Article 4A ....................................................................28

    2. Even if the District Court did not Err by Applying State Law, the District Court Erred by Relying Upon Article 4A Because the Contested Accounts are Blocked Monies and not EFTs .................................31

  B. Iran has an Ownership Interest in the Contested Accounts ......32

CONCLUSION ........................................................................................36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ark. Dairy Coop. Ass'n v. Dep't of Agriculture*,
  573 F.3d 815 (D.C. Cir. 2009)......................................................19

*Bd. Of Trustees of the Leland Stanford Junior Univ. v.*
*Roche Molecular Sys., Inc.*,
  131 S. Ct. 2188 (2011)..............................................12, 13, 14, 33

*Bennett v. Islamic Republic of Iran*,
  618 F.3d 19 (D.C. Cir. 2010).....................................................17

*Burgess v. United States*,
  553 U.S. 124 (2008)...................................................................18

*Calderon Cardona v. JPMorgan Chase Bank, N.A.*,
  867 F. Supp. 2d 389 (S.D.N.Y. 2011) .......................................15

*Custis v. United States*,
  511 U.S. 485 (1994)...................................................................20

*Davis v. Michigan Dep't of Treasury*,
  489 U.S. 803 (1989)...................................................................12

*Estate of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006).............................................3

*Estate of Heiser v. Islamic Republic of Iran*,
  807 F. Supp. 2d 9 (D.D.C. 2011)...............................................19

*Estate of Heiser v. Islamic Republic of Iran*,
  00-CV-2329 RCL,
  2012 WL 3776705 (D.D.C. Aug. 31, 2012).........................12, 26, 28, 32, 33

*Chief Authorities are Designated with an Asterisk*

*Geier v. Am. Honda Motor Co.*,
    166 F.3d 1236 (D.C. Cir. 1999)....................................................................27

*Giove v. Stanko*,
    49 F.3d 1338 (8th Cir. 1995) .......................................................................1

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988)....................................................................................20

*Hausler v. JPMorgan Chase Bank, N.A.*
    740 F. Supp. 2d 525 (S.D.N.Y. 2010) ............................ 18, 19, 20, 21, 27, 28

*\*Hausler v. JPMorgan Chase Bank, N.A.*,
    845 F. Supp. 2d 553 (S.D.N.Y. 2012) ............................ 14, 20, 21, 25, 30, 34

*Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*,
    case no. 11-cv-1601 (PKC) (MHD) (S.D.N.Y. 2011)....................................21

*Heiser v. Commerzbank AG*,
    case no. 11-cv-1596 (JPO/MHD) (S.D.N.Y. 2011) ......................................21

*Heiser v. Mashreqbank PSC*,
    case no. 11-cv-1609 (SAS) (MHD) (S.D.N.Y. 2011) ....................................21

*Holy Land Foundation for Relief and Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003)....................................................................21

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009)..........................................................25, 30

*Levin v. Bank of New York*,
    No. 09-5900 (RPP) (MHD),
    2011 WL 812032 (S.D.N.Y. Mar. 4, 2011)......................................20, 21, 25

*Massachusetts School of Law at Andover, Inc. v. United States*,
    118 F.3d 776 (D.C. Cir. 1997)......................................................................8

*Meditronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)....................................................................................27

*Miller v. Alamo*,
    975 F.2d 547 (8th Cir. 1992) .......................................................1

*Ministry of Defense and Support for the Armed Forces of the
Islamic Republic of Iran v. Elahi*,
    556 U.S. 366 (2009)................................................................16, 17

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ..................................................11

*Poe v. Seaborn*,
    282 U.S. 101 (1930)...............................................................33, 34

*Roberts v. Sea-Land Services, Inc.*,
    132 S. Ct. 1350 (2012).................................................................12

*Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*,
    346 F.3d 264 (2d Cir. 2003) .......................................................18

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006) .......................................10

*Weinstein v. Islamic Republic of Iran*,
    609 F.3d 43 (2d Cir. 2010) ........................................... 15-16, 27

## **STATUTES**

22 U.S.C. § 2656g....................................................................................22

28 U.S.C. § 1291........................................................................................1

28 U.S.C.§ 1331.........................................................................................1

28 U.S.C. § 1367........................................................................................1

28 U.S.C. §§ 1602, *et seq.*......................................................................1, 7

28 U.S.C. § 1603(a) ...................................................................................9

28 U.S.C. § 1603(b)(1)-(3) ........................................................................9

28 U.S.C. § 1605(a)(7) ...................................................................3, 10

28 U.S.C. § 1605A .......................................................................3, 10

28 U.S.C. § 1608(e) .......................................................................3, 4

28 U.S.C. § 1609 ...............................................................................9

28 U.S.C. § 1610 ...............................................................2, 8, 9, 10

28 U.S.C. § 1610(c) .......................................................................3, 4

28 U.S.C. § 1610(g) ............................... 1, 2, 6, 7, 8, 9, 10, 11, 12, 13,14,
16, 17,18, 19, 20, 21, 22, 23, 24,
25, 26, 27, 28, 30, 33, 34

28 U.S.C. § 1611 ...............................................................................9

28 U.S.C. § 1963 ...............................................................................1

35 U.S.C. §§ 200 *et seq.*.................................................................13

35 U.S.C. § 201(e) ..........................................................................14

D.C. Code § 28:4A-102 ...................................................................31

D.C. Code § 28:4A-107 ...................................................................28

D.C. Code § 28:4A-108 ...................................................................28

D.C. Code § 28:4A-502 ...................................................................29

## REGULATIONS

31 C.F.R. 501.603 ......................................................................22, 31

31 C.F.R. 501.801 ...........................................................................35

31 C.F.R. 501.806 ........................................................................ 34-35

31 C.F.R. 510 ...............................................................................................24

31 C.F.R. 515 ...............................................................................................24

31 C.F.R. 538 ...............................................................................................24

31 C.F.R. 544 ...............................................................................................24

31 C.F.R. 544.201 .......................................................................................19

31 C.F.R. 544.305 ...............................................................................19, 29

31 C.F.R. 595 ...............................................................................................24

## **<u>OTHER AUTHORITIES</u>**

148 Cong. Rec. S11524 (Nov. 19, 2002) ...................................................16

*Black's Law Dictionary* ......................................................................16, 17

H.R. Conf. Rep. No. 107-799 (2002),
2002 U.S.C.C.A.N. 1430 ....................................................................10, 15

*Merriam-Webster Dictionary*......................................................................16

Notice, Rescission of Determination Regarding North Korea,
73 Fed. Reg. 63540-01 (Oct. 24, 2008) ....................................................24

N.Y. C.P.L.R. § 5225 ...................................................................................21

*Oxford Dictionaries* (April 2010) ..............................................................16

REST. (FIRST) PROPERTY § 5 (1936).........................................................32

REST. (FIRST) PROPERTY § 10 (1936).......................................................32

Terrorism Risk Insurance Act of 2002,
Pub. L. No. 107-297, 116 Stat. 2322 (2002)................ 1, 2, 6, 7, 8, 9, 10, 11, 12, 13,
14, 15, 16, 17, 18, 19, 20, 21,
22, 23, 25, 26, 27, 28, 30,
33, 34

U.C.C. Article 4A ...................................................................... 2, 20, 26, 27, 28, 29,
30, 31, 32

*Webster's Third New International Dictionary* .......................................................17

# **GLOSSARY**

| | |
|---|---|
| Add. | Addendum |
| Contested Accounts | Certain contested blocked deposit accounts identified on p.6 of the Appellant Brief |
| EFT | Electronic Funds Transfers |
| FSIA | Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602, *et seq.* |
| Garnishee Banks | The Appellees Bank of America, N.A. and Wells Fargo Bank, N.A. |
| Heisers | The Appellants, the Estate of Michael Heiser, *et al*. |
| IEEPA | International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1702 |
| IRGC | Iranian Islamic Revolutionary Guard Corps |
| J.A. | Joint Appendix |
| MOIS | Iranian Ministry of Information and Security |
| OFAC | United States Department of Treasury's Office of Foreign Assets Control |
| Section 1610(g) | 28 U.S.C. § 1610(g) |
| TRIA | Terrorism Risk Insurance Act of 2002 § 201, Pub. L. No. 107-297, 116 Stat. 2322 (2002) |

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1602, *et seq.*, 28 U.S.C. §§ 1331, 1367, and 1963, and the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002).

This Court has jurisdiction over the appeal from the district court's order denying with prejudice the Heisers' Motion for Judgment Against Garnishees and for Turnover of Funds with respect to certain contested funds in connection with post-judgment writs of attachment on judgment other than wages, salary and commissions served on two garnishees, which constitutes a final judgment under 28 U.S.C. § 1291.  *See Giove v. Stanko*, 49 F.3d 1338 (8th Cir. 1995); *Miller v. Alamo*, 975 F.2d 547 (8th Cir. 1992).

The District Court's order was entered on August 31, 2012, and the Heisers timely filed a notice of appeal on September 28, 2012.

## STATEMENT OF THE ISSUES

1.     Did the District Court err by holding that TRIA requires that a foreign state or agency or instrumentality thereof must have an "ownership interest" in an asset in order to subject such asset to execution?

2.     Did the District Court err by holding that 28 U.S.C. § 1610(g) requires that a foreign state or agency or instrumentality thereof must have an "ownership interest" in an asset in order to subject such asset to execution?

1

3.      Did the District Court err by holding that the Contested Accounts  are not subject to execution under TRIA?

4.      Did the District Court err by holding that the Contested Accounts are not subject to execution under 28 U.S.C. § 1610(g)?

5.      Did the District Court err by applying standards of the Restatement (First) of Property and state decisional law, including Article 4A of the Uniform Commercial Code, to determine whether the Contested Accounts are subject to execution?

6.      Did the District Court err by finding that Iran and/or its agencies and instrumentalities do not have an ownership interest in the Contested Accounts?

## STATUTES AND REGULATIONS

The pertinent statutes are the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002), and 28 U.S.C. § 1610, *et seq*. which are reproduced in the Addendum.

## STATEMENT OF THE FACTS

**I.      The Underlying Proceedings Against Iran**

The Heisers, all citizens of the United States residing in the United States, are family members and the personal representatives of the estates of seventeen of the nineteen U.S. Air Force officers and airmen killed in the June 25, 1996 terrorist bombing of the Khobar Towers in Khobar, Saudi Arabia in consolidated cases

before the United States District Court for the District of Columbia captioned *Heiser v. Iran* (Case No. 00-CV-2329 RCL) and *Campbell v. Iran* (Case No. 01-CV-2104 RCL). *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 251-52 (D.D.C. 2006). The Heisers hold a total unsatisfied judgment in the amount of $591,089,966.00, plus post-judgment interest at the legal rate, against Iran, MOIS, and IRGC under 28 U.S.C. §§ 1605(a)(7) and 1605A (the "Heiser Judgment"). (J.A. 41-50) The Heiser Judgment is comprised of two parts: (1) a judgment dated December 22, 2006 in the original principal amount of $254,431,903.00 (the "December 2006 Judgment"); and (2) a judgment dated September 30, 2009 in the original principal amount of $336,658,063.00 (consisting of $36,658,063.00 in compensatory damages and $300,000,000.00 in punitive damages) (the "September 2009 Judgment"). (J.A. 41-50)

## II. Post-Judgment Collection Efforts Against Bank of America, N.A. and Wells Fargo Bank, N.A.

On February 7, 2008, the United States District Court for the District of Columbia entered an order pursuant to 28 U.S.C. § 1610(c): (a) finding that a reasonable period of time had elapsed following the entry of the December 2006 Judgment and the giving of notice thereof under 28 U.S.C. § 1608(e); and (b) authorizing the Heisers to pursue attachment in aid of execution and execution of the December 2006 Judgment. (J.A. 46A) On May 10, 2010, the United States District Court for the District of Columbia entered an order pursuant to 28 U.S.C.

§ 1610(c): (a) finding that a reasonable period of time had elapsed following the entry of the September 2009 Judgment and the giving of notice of the September 2009 Judgment under 28 U.S.C. § 1608(e); and (b) authorizing the Heisers to pursue attachment in aid of execution and execution of the September 2009 Judgment.  (J.A. 51)

On June 14, 2011, the Heisers served Appellee Bank of America, N.A. ("Bank of America") with a Writ of Attachment on Judgment Other Than Wages, Salary and Commissions (the "BOA Writ"), seeking property or credits of Iran, its agencies or instrumentalities, and any separate juridical entities in which Iran may have an interest, direct or indirect.  (J.A. 52)  On July 19, 2011, Bank of America filed an answer to the BOA Writ.  (J.A. 53)  On August 4, 2011, the Heisers served Appellee Wells Fargo Bank, N.A. ("Wells Fargo" and together with Bank of America, collectively, the "Garnishee Banks") with a Writ of Attachment on Judgment Other Than Wages, Salary and Commissions (the "Wells Fargo Writ" and together with the BOA Writ the "Writs"), seeking property or credits of Iran, its agencies or instrumentalities, and any separate juridical entities in which Iran may have an interest, direct or indirect.  (J.A. 64)  On September 8, 2011, Wells Fargo filed an answer to the Wells Fargo Writ.  (J.A. 63)

In connection with discovery issued to the Garnishee Banks, the Heisers were informed that the Garnishee Banks are holding monies blocked pursuant to

sanctions regulations implemented by the United States Department of Treasury's Office of Foreign Assets Control ("OFAC"), which monies were blocked due to a nexus with Iran and certain of Iran's agencies and instrumentalities (the "Blocked Assets"). (J.A. 53-71) On November 21, 2011, the Heisers moved for judgment against the Garnishee Banks and a turnover of the Blocked Assets. (J.A. 72) The Garnishee Banks opposed the Turnover Motion as to certain contested blocked deposit accounts (the "Contested Accounts") and filed a counter-motion for judgment as to the Contested Accounts which are as follows:

Bank of America, N.A. Contested Accounts:

| Amount | Iranian Entity(ies) |
|---|---|
| $5,939.97 | Bank Sepah |
| $38,469.57 | Bank Melli Iran |

Wells Fargo Bank, N.A. Contested Accounts:

| Amount | Iranian Entity(ies) |
|---|---|
| $50,000.00 | Bank Mellat, Korea |
| $13,000.00 | Bank Mellat, London |
| $71,673.70 | Bank Mellat Iran |
| $11,907.00 | Bank Saderat Iran |
| $6,500.00 | Bank Saderat Iran |

| $34,298.81 | Bank Saderat Iran |
|------------|-------------------|
| $105,000.00 | Export Dev. Bank of Iran |
| $6,300.00 | Export Dev. Bank of Iran |
| $10,000.00 | Bank Mellat, Turkey |

(J.A. 153, 160-61)  The Garnishee Banks also sought leave to file an interpleader action as to certain uncontested accounts holding blocked monies in which the Garnishee Banks conceded Iran had an ownership interest (the "Uncontested Accounts").  (J.A. 321)

The Heisers opposed the Counter-Motion, but took no position on the Garnishee Banks' request to file an interpleader action.  On August 3, 2012, after solicitation from the District Court, the United States of America filed a Statement of Interest expressing its views on certain issues.  (J.A. 379, 381)

On August 31, 2012, the District Court entered its order granting the Counter-Motion, including the Garnishee Banks' request to file an interpleader action, and denying the Turnover Motion with respect to the Contested Accounts with prejudice.  (J.A. 400)  The District Court held that under TRIA and 28 U.S.C. § 1610(g), the word "of" in the phrases "of that terrorist party" and "of a foreign state," respectively, require that Iran or its agencies and instrumentalities have an "ownership interest" in an asset in order to subject such asset to execution.  While the District Court held that TRIA and Section 1610(g) preempt state law, it

6

nevertheless relied upon state law, in particular, U.C.C. Article 4A, to define the "ownership interest" that Iran holds in the Contested Accounts and determined that Iran and its agencies and instrumentalities do not have the required ownership interest. The Heisers timely noticed their appeal on September 28, 2012. (J.A. 437)

## SUMMARY OF THE ARGUMENT

Congress enacted TRIA and Section 1610(g) as part of the overarching and comprehensive statutory scheme of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602, *et seq.* (the "FSIA"). Congress's goal with TRIA and Section 1610(g) could not be clearer – to provide terrorism victims with more robust statutory enforcement provisions to aid their efforts in executing on the assets of terrorist states and their agencies and instrumentalities. When it enacted TRIA and Section 1610(g), Congress understood that many of the scarce terrorist assets held in the United States were blocked pursuant to OFAC's sanctions regulations that govern the broad interests held by the terrorist parties in those assets, and which many times fell short of titled ownership. Under TRIA and Section 1610(g), Congress intended to send a message that judgments obtained by terrorism victims against terrorist states and parties are to be enforced and that these statutes preempt any need for consideration of state law.

The District Court's holding runs contrary to Congress' express goals by assigning a dispositive significance to the word "of" that inserts a limitation on the collection of terrorist assets that Congress did not include (nor did it intend to include) when it enacted TRIA and Section 1610(g).

Furthermore, even if TRIA and Section 1610(g) require an "ownership interest" in property by the terrorist state, the District Court should be reversed because an Iranian ownership interest exists.  The Contested Accounts all hold blocked monies in which the Garnishee Banks themselves concede Iran and its agencies and instrumentalities hold a sufficient interest to block such assets under OFAC's sanctions regulations.  Multiple parties may hold shared ownership interests in property even though those ownership rights may vest in different manners.  No legal basis exists for negating the ownership interests Iran and its agencies and instrumentalities have in the Contested Accounts without them or any other parties appearing to assert their claims.

Accordingly, the judgment of the District Court should be reversed.

## **STANDARD OF REVIEW**

This Court reviews a district court's interpretation of the FSIA, including interpretations of 28 U.S.C. § 1610 and TRIA, which is a pure issue of law, *de novo*.  *See Massachusetts School of Law at Andover*, *Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997).

8

# ARGUMENT

## THE DISTRICT COURT ERRED BY HOLDING THAT THE CONTESTED ACCOUNTS ARE NOT SUBJECT TO EXECUTION UNDER TRIA § 201 AND 28 U.S.C. § 1610(g)

## I.  STATUTORY FRAMEWORK GOVERNING EXECUTION OF PROPERTY OF TERRORIST STATES

The FSIA broadly designates all foreign-owned property as immune, and then articulates limited exceptions to that immunity.  *See* 28 U.S.C. § 1609 ("[T]he property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611 of this chapter.").  Under the FSIA a "foreign state" "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  The FSIA defines "agency or instrumentality" as any entity that (1) is a "separate legal person, corporate or otherwise," (2) is "an organ of a foreign state" or "whose shares or other ownership interest is owned by a foreign state," and (3) is "neither a citizen of a State of the United States … nor created under the laws of any third country."  28 U.S.C. § 1603(b)(1)-(3).  Before the District Court, the Heisers relied upon two exceptions to immunity found in 28 U.S.C. § 1610, *et seq.* that apply to Iranian assets, including the Blocked Assets, in order to enforce their Judgments – 28 U.S.C. § 1610(g) and TRIA § 201.

### A.    TRIA

Section 201 of TRIA, codified as a note to 28 U.S.C. § 1610, provides:

> In every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).   Congress enacted TRIA "to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'"   *Weininger v. Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (*quoting* H.R. Conf. Rep. 107-779, at 27 (2002)).

### B.    Section 1610(g)

28 U.S.C. § 1610(g) ("Section 1610(g)"), permits the Heisers and other terrorism victims holding judgments entered under 28 U.S.C. § 1605A to enforce their judgments by executing against property of Iran and its agencies and instrumentalities, and it removes the defense of sovereign immunity afforded to the assets of Iran and its agencies and instrumentalities for execution purposes. Section 1610(g)(1) provides that the Heisers may execute upon property of Iran,

10

property of an agency or instrumentality of Iran, and also property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity in which Iran has an interest, direct or indirect.  *See* 28 U.S.C. § 1610(g). Section 1610(g) "expand[s] the category of foreign sovereign property that can be attached; judgment creditors can now reach any U.S. property in which Iran has any interest..."  *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1123 n.2 (9th Cir. 2010).

Moreover, OFAC's regulation and blocking of Iranian assets does not exempt them from execution under Section 1610(g).  *See* 28 U.S.C. § 1610(g)(2) (providing that the property of a foreign state and its agencies and instrumentalities "shall not be immune from … execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.").

## II.     TRIA § 201 AND 28 U.S.C. § 1610(g) DO NOT REQUIRE AN "OWNERSHIP INTEREST" BY THE TERRORIST STATE

Neither TRIA nor 28 U.S.C. § 1610(g) require an "ownership interest" in order to subject an asset to execution by judgment creditors of a terrorist state.  The District Court erred because it interpreted a single word, "of", to mean that in order for the Contested Assets to be subject to execution, Iran must have an "ownership interest" in those assets because "of" can only mean "owned by" or "belonging to."

11

*Estate of Heiser v. Islamic Republic of Iran*, 00-CV-2329 RCL, 2012 WL 3776705, at *7-*8 (D.D.C. Aug. 31, 2012) ("*Heiser III*").   To reach that conclusion, the District Court parsed the phrase "blocked assets of that terrorist party" into two components – "blocked assets" and "of that terrorist party" – although normal rules of statutory interpretation demand a more holistic approach to the statute and Congress' intent in adopting it.   *E.g.*, *Roberts v. Sea-Land Services*, *Inc.*, 132 S. Ct. 1350, 1357 (2012) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (*quoting Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

As discussed below, the District Court's holding greatly expands the Supreme Court's limited holding in *Bd. Of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, *Inc.*, 131 S. Ct. 2188 (2011) ("*Stanford*") by ignoring that *Stanford*'s interpretation of the word "of" was based on various factors unique to the legal regime at issue in that case and which have no relationship to TRIA, Section 1610(g), or the enabling regulations governing terrorists.

Moreover, the District Court's interpretation of TRIA and Section 1610(g) ignores the text that directly follows the words that the court found dispositive. Specifically, TRIA § 201(a) provides that "the blocked assets *of that terrorist party*

[*i.e.*, the one against whom the Heisers hold a judgment] (including the blocked assets of any agency or instrumentality *of that terrorist party*) shall be subject to execution …." TRIA § 201(a) (emphasis added).[1] The District Court concluded that the word "of" in the first emphasized prepositional phrase could only signify a Congressional requirement of an "ownership interest" of the relevant blocked assets. That interpretation crumbles, however, when one considers that the second highlighted prepositional phrase – which is worded *identically* to the first – cannot possibly support the District Court's construction of the first phrase. That is, the word "of" in the second phrase unquestionably does not indicate a Congressional intent to require terrorism victims to demonstrate that the referenced agency or instrumentality is "owned" by the terrorist party. Accordingly, the plain texts of both TRIA and Section 1610(g) demonstrate that the word "of" carries a far more flexible meaning than the rigid definition assigned to it by the District Court, especially in light of the remedial purposes underlying both statutes.

### A.     The District Court Improperly Applied *Stanford*

In *Stanford*, the Supreme Court was confronted with interpreting the phrase "invention of the contractor" in the University and Small Business Patent Procedures Act of 1980, 35 U.S.C. §§ 200, *et seq.* (the "Bayh-Dole Act"), which

---

[1] Similarly, Section 1610(g) uses the language "the property of a foreign state … and the property of an agency or instrumentality of such state." 28 U.S.C. § 1610(g)(1).

allocates ownership rights in federally funded inventions between the Federal Government and federal contractors. 131 S. Ct. at 2196. While the Supreme Court noted that the word "of" may denote "ownership," its interpretation of the statute in *Stanford* relied upon a number of other factors, including (1) the distinct nature of patent law, (2) the lack of interpretative guidance from Congress or the Executive Branch, and (3) the purpose of the Bayh-Dole Act. 35 U.S.C. § 201(e); 131 S. Ct. at 2196. The Court expressly recognized that, although a separate interpretation of the phrase "of the contract" was plausible in other contexts, "patent law has always been different … " 131 S. Ct. at 2196.[2] Moreover, the *Stanford* Court held that a contrary interpretation of the phrase "invention of the contractor" would have rendered the prepositional phrase a nullity within the context of the relevant patent statute. *Id*. In contrast, the phrases "of that terrorist party" and "of a foreign state" in TRIA and Section 1610(g), respectively, limit the assets (both blocked and unblocked) that judgment creditors may execute upon to those assets in which the particular terrorist state found liable to the judgment creditor has an interest. At least one district court has analyzed *Stanford* in the context of TRIA and recognized that *Stanford* does not apply. *See Hausler v. JPMorgan Chase Bank*, *N.A.*, 845 F. Supp. 2d 553, 567-69 (S.D.N.Y. 2012)

---

[2] In dissent, Justice Breyer, joined by Justice Ginsburg, disagreed with the majority's interpretation of "invention of the contractor." *Id*. at 2202 (Breyer, J., dissenting) ("Moreover, I do not agree that the language to which the majority points – the words 'invention of the contractor' and 'retain' – requires its result.").

14

("*Hausler II*") (recognizing that "[t]he Court's conclusion was based on several characteristics of the patent statutes at issue there that are materially absent in the TRIA," including both matters of statutory context and the historical framework of patent law more generally, that would make "view[ing] the TRIA in the expansive Anglo–American history of the execution of judgments and ignor[ing] the more relevant and recent federal statutory context regarding judgments against foreign and terrorist entities . . .  [a failure to effect] the purposes of the statute"); *but see Calderon Cardona v. JPMorgan Chase Bank*, *N.A.*, 867 F. Supp. 2d 389 (S.D.N.Y. 2011).

Moreover, Congress' expressed intent in enacting TRIA was to "establish that such judgments [against terrorist states] are to be enforced . . . [and] are enforceable against any assets or property" referenced by TRIA.  H.R. Conf. Rep. No. 107-799 (2002), 2002 U.S.C.C.A.N. 1430, 1434.  The United States Court of Appeals for the Second Circuit has noted TRIA's broad remedial purpose, holding that any ambiguity in TRIA's language should be "resolved in plaintiff's favor by [reference to] the legislative history," which emphasizes that the statute is intended to eliminate any obstacles to the ability of terror victims to collect the blocked assets of terrorist states and their agencies and instrumentalities and that TRIA "establishes once and for all, that such judgments are to be enforced against any assets available in the U.S."  *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50

15

(2d Cir. 2010) (*quoting* 148 Cong. Rec. S11524 at S11528 (Nov. 19, 2002) (Statement of Sen. Harkin)).

A brief survey of a number of the world's authoritative dictionaries indicate that "of" in TRIA and Section 1610(g) may be interpreted in any number of ways. *See Merriam-Webster Dictionary* (assigning twelve different definitions to the term); *Oxford Dictionaries* (April 2010) (providing nine distinct definitions of the term). Although possession or ownership is a potential fit, it is not necessarily the best fit in this situation, or even the only possible fit, in evaluating the wide variety of meanings one may assign to it. *See Merriam-Webster* (providing both of the following definitions: "relating to" and "used as a function word to indicate belonging or a possessive relationship"); *Oxford Dictionaries* (April 2010) (offering the following as one possible definition: "indicating an association between two entities, typically one of belonging, in which the first is the head of the phrase and the second is something associated with it").

Because the word "of" has many different meanings in different contexts, it is necessary to look to the statute's legislative history and remedial purpose to determine the proper scope intended by Congress. Reading TRIA and Section 1610(g) in this straightforward fashion and with reference to the statute's legislative history and remedial purpose comports with the Supreme Court's reliance upon *Black's Law Dictionary* to assist in interpreting TRIA in *Ministry of*

*Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 382 (2009) (*citing Black's* in interpreting the meaning of the term "at issue" in TRIA and concluding that "the language of the statute suggests that Congress meant the words 'at issue' to carry the ordinary meaning just described").[3]  In addition, the *Elahi* Court bolstered its conclusion regarding the meaning of the phrase "property that is at issue" by emphasizing that the "statute's purpose leans in the direction **of a broader interpretation of the words 'at issue' than that proposed by Elahi**."  *Id*. at 383.  This Court has also looked to the *Webster's Third New International Dictionary* to assist it in interpreting provisions of TRIA.  *See Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010) (*utilizing Webster's Third New International Dictionary* to interpret TRIA's language regarding property that "is being used exclusively for diplomatic and consular purposes") (citations omitted).

*Elahi* and *Bennett* demonstrate that this Court should interpret TRIA and Section 1610(g) based upon a straightforward, common sense meaning, rather than engage in the hypertechnical analysis that mistakenly assigns dispositive meaning

---

[3] In *Elahi*, the Supreme Court was examining § 201(c)(4) of TRIA which required those who received compensation from a statute enacted in 2000 to relinquish "*all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal,* [or] that is the subject of awards rendered by such tribunal."  556 U.S. at 379 (internal quotations and citations omitted).  However, the same interpretation principles apply with equal force to TRIA § 201(a) and Section 1610(g).

17

to one preposition in the statute's text to the exclusion of Congress' overall purpose for enacting TRIA and also places unduly burdensome restrictions upon recovery for victims of Iran-sponsored terrorism. Accordingly, the District Court's assumption that the term "of" necessarily means "ownership," should be reversed.

**B.      Congress Relied Upon the Definitions in OFAC's Sanctions Regimes When Drafting Terrorism Victim Legislation and OFAC's Sanctions Govern Broad Interests That do not Require Ownership.**

Congress drafted both TRIA and Section 1610(g) well-aware of the broad property interests (and interests in property) that are governed by OFAC's sanctions programs. Accordingly, Section 1610(g) and TRIA mandate that "blocked assets" are to be determined by reference to OFAC's sanctions programs. *See* TRIA § 201(d)(2) ("The term "blocked asset" means … *any* asset seized or frozen by the United States under … sections 202 and 203 of the IEEPA.") (emphasis added); 28 U.S.C. § 1610(g)(2) (discussing property regulated by the IEEPA); *see also Burgess v. United States*, 553 U.S. 124, 129-30 (2008) (holding that statutory definitions control the meaning of a statute's terms); *Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F. 3d 264, 271 (2d Cir. 2003) (blocked assets in TRIA to be interpreted by reference to assets blocked under IEEPA). Because OFAC's sanctions governing Iran and its agencies and instrumentalities were enacted under the IEEPA, they are clearly referenced in TRIA and Section 1610(g). *See Hausler v. JPMorgan Chase Bank*, *N.A.* 740 F.

18

Supp. 2d 525, 532 (S.D.N.Y. 2010) ("*Hausler I*") ("[T]he Court finds that Congress explicitly directed that TRIA and [OFAC's sanctions programs] are to be considered in tandem, which establishes a comprehensive statutory scheme that eschews any need for the consideration of state definitions of property."). These definitions are plainly intended to demarcate the scope of and establish the terrorist entities' interest in specified assets and not simply attach consequences to property interests defined elsewhere. *See* 31 C.F.R. § 544.201 (blocking "all property and interests in property that are in the United States," in which a terrorist entity has an interest), 31 C.F.R. § 544.305 (defining "property" and "property interest"), 544.308 (defining "Interest"); *see also Hausler I*, 740 F. Supp. 2d at 532.

These broad property interests are made subject to execution under Section 1610(g) and TRIA and include the interests that terrorist states (including Iran) have in monies from EFTs placed in blocked deposit accounts. "Congress passed the 2008 Amendments – including § 1610(g) – well-aware of the complex regime of Executive Orders, regulations and statutes which permitted – and, unfortunately, more often prevented – FSIA plaintiffs from enforcing judgments." *Estate of Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9, *25 (D.D.C. 2011) (*citing Ark. Dairy Coop. Ass'n v. Dep't of Agriculture*, 573 F.3d 815, 829 (D.C. Cir. 2009) ("Courts 'generally presume that Congress is knowledgeable about existing law

pertinent to the legislation it enacts.'") (*quoting Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988)).

Congress, in enacting Section 1610(g) and TRIA, is presumed to know that under OFAC's sanctions regimes, the category of assets subject to blocking include EFTs in which a terrorist state, including Iran, has any interest whatsoever. Therefore, even if Congress was aware of state property law, including U.C.C. Article 4A, when it drafted TRIA, Congress's express reference to OFAC's sanctions regulations more accurately reflects the legal framework and concepts of property interests that should apply when dealing with the enforcement of terrorism-based judgments. *Cf. Custis v. United States*, 511 U.S. 485, 499 (1994) (declining to adopt the circuit court's reading of a statute because the reading ignored the legal framework within which Congress drafted the statute and was presumed to be familiar). Congress did not restrict TRIA or Section 1610(g) to require "ownership" by the terrorist state. *See Hausler II*, 845 F. Supp. 2d at 567-68 (finding that the "of" in TRIA does not require ownership but rather "provides the necessary, though perhaps perfunctory, instruction that the 'blocked assets' available for execution are only those assets blocked pursuant to the particular regulation or administrative action directed at the particular terrorist-party judgment debtor"); *Hausler I*, 740 F. Supp. 2d at 537 ("[W]here Congress wished to except [blocked] property from execution under TRIA, it did so."); *Levin v.*

*Bank of New York*, No. 09-5900 (RPP) (MHD), 2011 WL 812032, *17 (S.D.N.Y.

Mar. 4, 2011) ("The language of TRIA is broad, subjecting *any asset* to execution

that is seized or frozen pursuant to the applicable [OFAC] sanctions schemes.  The

breadth of this language is unsurprising in light of TRIA's remedial purpose.")

(Add. 21).[4]  Moreover, Congress included in Section 1610(g)(2), a reference to the

IEEPA[5], which demonstrates further that Congress relied upon the broad property

definitions contained in OFAC's sanctions regimes when crafting the legislation.

*See* 28 U.S.C. § 1610(g)(2) (noting that property shall not be immune "because the

property is regulated by the United States Government by reason of action taken

against that foreign state under the … [IEEPA].").   The Garnishee Banks'

---

[4] In addition to the district courts in *Hausler II*, *Hausler I*, and *Levin*, a number other district courts have directed a turnover of blocked EFTs, the proceeds of which were being held in blocked deposit accounts at financial institutions.  *See*, *e.g.*, *Heiser v. Bank of Tokyo Mitsubishi UFJ*, *New York Branch*, case no. 11-cv-1601 (PKC) (MHD) (S.D.N.Y.) (ECF Dkt. No. 50) (Memorandum and Order dated January 29, 2013 directing turnover of EFTs held in blocked deposit accounts) (Add.26); *Heiser v. Mashreqbank PSC*, case no. 11-cv-1609 (SAS) (MHD) (S.D.N.Y.) (ECF Dkt. No. 34) (Judgment and Order Granting Motion for Summary Judgment and Turnover Order Pursuant to N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) and TRIA § 201(a)) (Add. 46); *Heiser v. Commerzbank AG*, case no. 11-cv-1596 (JPO/MHD) (S.D.N.Y.) (ECF Dkt. No. 45) (Judgment and Order Granting Motion for Summary Judgment and Turnover Order Pursuant to N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) and TRIA § 201(a) and Discharging Respondent) (Add. 49).
[5] Under the IEEPA, the President delegates to OFAC the authority to create its sanctions programs.  *See Holy Land Foundation for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (discussing how Congress authorized the Executive Branch to define the statutory terms of IEEPA, which OFAC is in charge of administering).

interpretations of Section 1610(g) and TRIA inserts limiting language into the statute that Congress did not intend to include.

Because Congress was well aware of the broad nature of the property interest blocked by OFAC's sanctions regimes, so too was it aware of the extent of the interests held by terrorist parties which many times falls short of traditional notions of titled ownership. Upon blocking, each and every blocked account must be reported to OFAC in accordance with the applicable sanctions regulations. *See* 31 CFR § 501.603; *see also* (J.A. 169) (Declaration of John E. Smith) ("OFAC regulations require that holders of blocked property file an Annual Report of Blocked Property as of June 30 of each year."). In turn, as required by statute, 22 U.S.C. § 2656g, the Treasury Department reports "the nature and extent of assets held in the United States by terrorist countries [including Iran] and any organization engaged in international terrorism," in the annual "Terrorism Asset Report." ("TAR")

TARs play an important role in providing Congress with background regarding the sanctions programs administered by OFAC and the assets impacted by such sanctions. In the 2001 TAR, as in every prior TAR available on the public record annually since 1991, OFAC explained to Congress that included within the term "blocked assets of state sponsors of terrorism," as used in the reports, are **all** assets reported by the Garnishee Banks as having been blocked, regardless of

whether other persons may have an interest in such assets.  OFAC, *Terrorist Assets Report Calendar Year 2001*, at 1-2 (J.A. 366-367).  Specifically, OFAC explained to Congress that "blocked assets of" these terrorist parties:

> represent amounts frozen under United States sanctions programs, which, in most cases, block all property in which the target (including entities owned or controlled by it and persons acting for or on behalf of it) is believed to have any interest of any nature whatsoever, direct or indirect.  In many instances the interest may be partial, or may fall short of title to the property.  Determinations concerning these interests are made based on all relevant information before OFAC.

2001 TAR at 3 (J.A. 368).  In all, the 2001 TAR uses the phrase "blocked asset of" a terrorist state at least eight times to refer, in context, to any and all assets of any type in which the terrorist party was believed to have **any** interest, deemed sufficient to require that those assets be blocked, regardless of how ephemeral.

In the wake of the 2001 TAR, and similarly worded TARs in each subsequent year, Congress enacted (and the President signed) TRIA and section 1610(g) which authorize the Heisers to execute their judgment against any of the "blocked assets of" Iran.  For example, the 2007 TAR, provided to Congress shortly before the enactment of 28 U.S.C. § 1610(g), informed Congress that "[b]ecause the blocked assets discussed in this report include assets not actually owned by designated parties, they are described throughout as assets "relating to" a

23

designated party. **Many of the assets may be owned by or subject to claims by third parties**.” *See* 2007 TAR at 1 (Add. 56).[6]

The phrases “property of a foreign state” and “property of a terrorist state” are attributable to Congress’s recognition that OFAC’s sanctions programs involve the blocking of the property of several countries (and different terrorist organizations). *See*, *e.g.*, Weapons of Mass Destruction Proliferators Sanctions, 31 C.F.R. part 544; Specially Designated Global Terrorist Sanctions, 31 C.F.R. part 595; North Korea Sanctions Regulations, 31 C.F.R. part 510;[7] Cuban Assets Control Regulations, 31 C.F.R. part 515 (Cuba); Sudanese Sanctions Regulations 31 C.F.R. part 538. Therefore, Congress wanted to ensure that victims were only permitted to enforce their judgment against the blocked assets in which the terrorist state responsible had an interest, preserving the assets of other terrorist states or entities for the victims of acts of those states. Thus, Congress did not want judgment creditors of Cuba relying upon TRIA and section 1610(g), to attach the

---

[6] Although OFAC did alter its word usage changing the term “blocked assets” from “of” to “relating to” in the year 2007, this alteration only further clarifies the “interest” contemplated by OFAC for assets subject to its sanctions regimes. *See* OFAC, Terrorist Assets Report Calendar Year 2007, at 1 (Add. 56). In using the terms “of” and “relating to” interchangeably, OFAC recognizes that the terrorist entity’s relationship to the property need truly only be one of an interest holder, not an “owner.” As discussed, Congress was aware of and relied upon the TARs when crafting its legislation to expand the assets available for execution by terrorism victims and understood that “of” means “relating to” and not “owned by”.

[7] North Korea, however, is no longer designated a state sponsor of terrorism. *See* Notice, Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540-01 (Oct. 24, 2008).

already limited blocked assets of Iran.  *See Hausler II*, 845 F. Supp. 2d at 566-67;

*cf. In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 53 (D.D.C.

2009) (discussing the scarcity of blocked Iranian assets available to terrorist

victims).

Congress' intent and understanding regarding the meaning of the term

"blocked assets of that terrorist party" and "property of a foreign state" as used in

TRIA and Section 1610(g), respectively, could not be clearer because Congress

relied upon OFAC's reports and existing regulations when drafting its terrorism

victim legislation.  These terms have been used continuously within the context of

OFAC's sanctions programs, creating clear and customary usages.  As utilized by

OFAC, these terms include **any** property in which Iran is believed to have an

interest, regardless of who owned the property, who held title to the property, or

who else might claim the property, as long as that property had been blocked under

OFAC's sanctions programs (and was not unblocked by issuance of an OFAC

license).  *Levin*, 2011 WL 812032, at *18 ("It is plainly the intention of TRIA and

the FSIA to make blocked assets available to plaintiffs.… The nature and wording

of TRIA … indicate[s] that Congress intended all blocked assets to be available for

attachment by victims of terror.… TRIA and the FSIA employ language subjecting

*any* blocked assets to attachment in these circumstances.")  (Add. 22).   It is

undisputed that the Contested Accounts meet this definition, and that OFAC has issued no license unblocking any of these accounts.

Accordingly, Congress enacted TRIA and Section 1610(g) with a clear mandate that the phrases "of a terrorist party" and "of a foreign state" subject to execution the broad property interests held by terrorist states in property blocked and governed by OFAC's sanctions programs and the District Court erred by requiring the Heisers to prove Iran's ownership interest.

## III. EVEN IF TRIA § 201 AND 28 U.S.C. § 1610(g) REQUIRE THE TERRORIST STATE TO HOLD AN "OWNERSHIP INTEREST," IRAN HAS AN OWNERSHIP INTEREST IN THE CONTESTED ACCOUNTS.

Iran has a sufficient ownership interest in the Contested Accounts to subject them to execution under TRIA and Section 1610(g). The District Court erred by relying upon state law, in particular U.C.C. Article 4A, in attempting to define Iran's interests in the Contested Accounts. *See Heiser III*, 2012 WL 3776705 at *17-*18. The District Court failed to take into consideration that even a future interest is an interest in property sufficient to satisfy the "ownership interest" test it created.

26

**A.    The District Court Improperly Relied Upon Article 4A to Determine Whether Iran has an Ownership Interest in the Contested Accounts.**

Although the District Court properly determined that the FSIA, including TRIA and Section 1610(g) preempt the field, so as to prevent the application of state law, it failed to heed the constant standard of this Court in preemption cases, that "the purpose of Congress is the ultimate touchstone." *Geier v. Am. Honda Motor Co.*, 166 F.3d 1236, 1247 (D.C. Cir. 1999) (*quoting Meditronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Under these principles, TRIA's declaration that it applies "*[n]otwithstanding any other provision of law*," together with both TRIA and Section 1610(g)'s unmistakable intention to make all blocked assets available for execution by terrorism victims, preempts any contrary state law principles regarding collecting, attaching, and garnishing terrorist assets. *See Weinstein*, 609 F.3d at 49 (the "[n]otwithstanding any other provision of law" language of TRIA "ma[es] plain that the force of the section extends everywhere" and, therefore, TRIA trumps any conflicting provisions of a treaty between the United States and Iran); *Hausler I*, 740 F. Supp. 2d at 535-543 (TRIA preempts the provisions of U.C.C. Article 4A). However, instead of properly considering the intent of Congress, the District Court incorrectly looked to state law, including U.C.C. Article 4A to determine Iran's ownership interest in the Contested Accounts.

      1.    *The District Court's holding that the FSIA preempts state law cannot be squared with the District Court's reliance on State Law and U.C.C. Article 4A.*

Article 4A's preemption by federal law and, therefore, its inapplicability to TRIA and Section 1610(g), is expressly recognized in the U.C.C., as adopted by the District of Columbia.  For example, D.C. Code § 28:4A-107, cmt. 3, states: "Although the terms of Article 4A apply to funds transfers involving Federal Reserve Banks, **federal preemption would make ineffective any Article 4A provision that conflicts with federal law**." (emphasis added).  Likewise, D.C. Code § 28:4A-108 excludes consumer transactions governed by federal law from the scope of Article 4A.  The official comments provide that "Section 4A-108 excludes a funds transfer from Article 4A if any part of the transfer is covered by federal law."  D.C. Code § 28:4A-108, cmt. 1.  Accordingly, Article 4A does not apply if federal law preempts, which it does here.

The District Court reasoned that under Article 4A neither a beneficiary nor a beneficiary bank have an ownership interest in a blocked EFT.  *Heiser III*, 2012 WL 3776705, at *17-*18.  However, the Contested Accounts all involve EFTs in which the beneficiary banks (*i.e.*, the Iranian Banks) were determined by the Garnishee Banks to hold a property interest sufficient to require blocking in accordance with federal law.  *See Hausler I*, 740 F. Supp. 2d at 532 (noting that upon blocking an EFT the bank has determined that the prohibited entity possessed

a sufficient property interest to require blocking under applicable OFAC regulations).  It is illogical to believe that Congress intended to grant the President and OFAC the authority to require banks to block these monies based upon a broad interest held by the terrorist party, and then not permit terrorism victims to collect upon those assets based upon those very same property interests.  To do so would permit the funds to continue to sit in blocked accounts, ostensibly waiting for OFAC's lifting of its sanctions, which may never occur.

Moreover, a direct conflict exists between U.C.C. Article 4A (under which no interest exists when funds are temporarily in possession of an intermediary bank) and OFAC's sanctions programs (which recognize the interests held by all parties to an EFT even when temporarily in possession of an intermediary bank). *Compare* D.C. Code § 28:4A-502, cmt. 4 (stating that under Article 4A, originators and beneficiaries have no property interest in funds located at an intermediary bank), *with* 31 C.F.R. § 544.305 (defining "property" and "property interest"). Here, all of the Contested Accounts are governed by federal law (*i.e.*, OFAC's sanctions programs) which bars the application of U.C.C. Article 4A.  It is undisputed that U.C.C. Article 4A is preempted by OFAC's sanctions programs due to this conflict in the definitions of property interests.  Otherwise, the Garnishee Banks would not have blocked the Blocked Assets and placed them in the Contested Accounts. Accordingly, U.C.C. Article 4A's ownership concepts

cannot apply to TRIA and Section 1610(g) which apply to property regulated by OFAC's sanctions programs, and the only law that may apply is federal law. *See also Hausler II*, 845 F. Supp. 2d. at 563-64 (discussing the possible catastrophic effects if state law were to apply in determining the range of assets executable under TRIA, including "manipulat[ion] by intermediary banks . . . who appear unconstrained in determining where to locate the accounts created when they block an EFT pursuant to [OFAC sanctions] and, therefore, could prevent assets from turnover under the TRIA simply by placing such accounts in states with favorable property law").

That is why under Section 1610(g) and TRIA Congress created a comprehensive statutory scheme whereby the "federal policy aimed at deterring foreign state sponsors of terror should now fall squarely under federal law and control." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 82. Congress has spoken directly to how "property" and "interests" should be defined under section 1610(g) and TRIA – by looking to the broad property interests defined in OFAC's sanctions programs. *Hausler II*, 845 F. Supp. 2d at 562-63. Therefore, the District Court erred by relying upon U.C.C. Article 4A (*i.e.*, state law) which directly contradicts the comprehensive statutory scheme of the FSIA and pervasive OFAC regulations that, together, govern the dominant federal interests of national security and regulating foreign policy.

30

2.    *Even if the District Court did not Err by Applying State Law,*
*the District Court Erred by Relying Upon Article 4A Because*
*the Contested Accounts are Blocked Monies and not EFTs.*

The blocked monies held in the Contested Accounts have been repeatedly mischaracterized as EFTs instead of what they really are – deposit accounts.  Each of the underlying transactions in this matter went through an identical process.  After a money transfer was initiated and reached the Garnishee Banks, the transaction was identified as one in which Iran and/or its agencies and instrumentalities have an interest.  (J.A. 163)  As a result, the Garnishee Banks stopped the transaction, created new deposit accounts, and then took specific sums of money which was deemed to be property of Iran, and deposited those funds in these newly created deposit accounts.  *See* 31 CFR § 501.603; J.A. 160-61.  Presently, these monies remain in deposit accounts located at the Garnishee Banks.  (J.A. 160-61)  The underlying EFTs no longer exist.

U.C.C. Article 4A has no applicability to deposit accounts.  D.C. Code § 28:4A-102 (defining subject matter of U.C.C. Article 4A and limiting it only to "funds transfers").  Moreover, U.C.C. Article 4A does not even begin to address the property rights of parties to illegal transactions of terrorist entities that are blocked by federal OFAC regulations.  Plainly, U.C.C. Article 4A was not intended to attempt to define the rights of parties to blocked deposit accounts of terrorist parties that are governed solely by federal law.

31

### B.     Iran has an Ownership Interest in the Contested Accounts.

Before the District Court erred by relying upon state law and U.C.C. Article 4A, it looked at the definition of ownership found in the RESTATEMENT OF PROPERTY § 10 (1936), which states that a party is deemed to own property if it has at least one interest in that property, *i.e.*, one indicia of ownership: "The word 'owner,' as it is used in this Restatement, means the person who has one or more interests." REST. PROPERTY § 10 (1936). Section 5 of the RESTATEMENT OF PROPERTY states that "interest" "generically . . . include[s] varying aggregates of rights, privileges, powers and immunities and distributively . . . any one of [the former]." REST. PROPERTY § 5 (1936).

It is undeniable that Iran holds an ownership interest in the Contested Accounts sufficient to satisfy the Restatement. The District Court, erroneously, reasoned that Iran's contingent, future, interest in the Contested Accounts is too "indefinite [and] ephemeral . . . [to] rise to the level that would typically be considered "of," "belonging to," or "owned by" Iran." *Heiser III*, 2012 WL 3776705 at *16. However, the District Court's reasoning, in relying heavily upon a single comment, ignored the plain language of the Restatement of Property which defines ownership of property as when a party holds a single interest, any interest. REST. PROPERTY § 10 (1936) ("The word 'owner,' as it is used in this Restatement, means the person who has one or more interests."). Had the monies not been

32

blocked and proceeded to the beneficiary banks (which are indisputably agencies and instrumentalities of Iran), then these terrorist entities would have had a present possessory ownership interest in the monies. The District Court fails, however, to explain why the future ownership interest held by beneficiary banks is any less sufficient than the ownership rights held by the originators and originating banks, which all parties concede have an interest in the Blocked Assets sufficient to subject the Blocked Assets to execution under TRIA and Section 1610(g). Indeed, under the District Court's own analysis, under U.C.C. Article 4A, legal title (*i.e.*, present ownership) vests in the beneficiary bank when it accepts the payment order. *Heiser III*, 2012 WL 3776705 at *18.

The Supreme Court, in *Poe v. Seaborn*, 282 U.S. 101, 51 S. Ct. 58, 75 L. Ed. 239 (1930), the very case quoted by the Court in reaching its decision in *Stanford*, provided a much broader interpretation of the term "of" than that used by the District Court. *Id.* at 109. In *Poe*, the Court addressed the issue of whether a husband, where a husband and wife file separate tax returns, need claim all of the income earned on "community property," including his "salary, interest on bank deposits and on bonds, dividends, and profits on sales of real and personal property," or whether such income may be equally divided between the separate returns filed by husband and wife. *Id.* at 108. Even though certain of the property at issue was undeniably earned solely by the husband, the Court relied upon

statutes and decisions to find that "save for property acquired by gift, bequest, devise or inheritance, all property however acquired after marriage, by either husband or wife, or by both, is community property." *Id.* at 110. Under the Supreme Court's analysis in *Poe*, "ownership" turns on a party's possession of an interest in the property, no matter how small or short-lived.

Moreover the District Court's reasoning cannot be squared with the end result that the Garnishee Banks will continue to hold the blocked monies indefinitely. *See Hausler II*, 845 F. Supp. 2d at 564 ("[T]he application of state property law . . . would lead to the Blocked Funds remaining as such until unforeseen future events might allow the return of funds to [the terrorist country], its agencies, instrumentalities or business creditors."). Congress clearly did not intend such a result when it enacted TRIA and Section 1610(g) to facilitate the problems terrorism victims had in collecting upon their judgments. *See id.* ("[Perpetual freezing of the terrorist funds] cannot be mandated by the TRIA because it would frustrate its core objective, to satisfy judgments held by victims of . . . terrorism, and would stymie Congress's broader purpose in permitting suits against state sponsors of terrorism by diminishing the costs of doing business with known terrorist states or their agents and instrumentalities."). If the originators and originating banks assert a claim to the Contested Accounts, a direct process is available to them through OFAC's administrative procedures. *See* 31 C.F.R.

§ 501.801 (detailing procedures for obtaining a general or specific license); 31 C.F.R. § 501.806 (procedures for unblocking funds believed to have been blocked due to mistaken identity). However, the Garnishee Banks submitted no evidence before the District Court that any of the originators or originating banks availed themselves of OFAC's administrative procedures to assert an ownership claim to the monies. Moreover, the Garnishee Banks have not alleged that any of the originators or originating banks contacted them to assert a claim to the Contested Accounts. No evidence exists that proves that the originators and originating banks have any greater ownership interest in the Contested Accounts than the beneficiary banks and beneficiaries.

Furthermore, to the extent that the Court is concerned about the impact a turnover may have on the rights of any of the parties to the underlying EFTs, the District Court may permit those parties to intervene, or authorize the garnishees (here, the Garnishee Banks) to file an interpleader action to bring those parties before the District Court to assert a claim. Indeed, the District Court permitted the Garnishee Banks to file an interpleader action with respect to the Uncontested Accounts. No valid justification exists for not also permitting all parties whom the Garnishee Banks believe assert an interest in the Contested Accounts to appear and explain why their interests are superior to the Heisers.

35

# **CONCLUSION**

Based on the foregoing, the Heisers respectfully request that the Judgment of

the District Court be reversed.

Respectfully submitted,

Dated: February 1, 2013

/s/ Richard M. Kremen
Richard M. Kremen
Dale K. Cathell
David B. Misler
Lauren Genvert
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209-3600
410-580-3000

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

     [ X ] this brief contains [*8,426*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

     [     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

     [     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>February 1, 2013        </u>          <u>/s/ Richard M. Kremen   </u>
                                                   *Counsel for Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 1st day of February, 2013, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Karen E. Wagner
> James L. Kerr
> DAVIS POLK & WARDWELL LLP
> 901 15th Street N.W.
> Washington, DC  20005
> (212) 450-4404
>
> *Counsel for Appellees*

I further certify that on this 1st day of February, 2013, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Joint Appendix to be served, via U.P.S. Gound Transportation, to the Appellees at the above address.

> /s/ Richard M. Kremen
> *Counsel for Appellant*

# **ADDENDUM**

# <u>ADDENDUM TABLE OF CONTENTS</u>

<u>**Page**</u>

28. U.S.C.A. § 1610 ........................................................................Add. 1

Levin v. Bank of New York,
    2011 WL 812032 (S.D.N.Y Mar. 4, 2011)............................................Add. 9

Memorandum and Order of
The Honorable P. Kevin Castel
Re:  Granting Petitioners' Motion for Summary Judgment
    filed January 29, 2013 .......................................................................Add. 26

Judgment and Order
Granting Motion for Summary Judgment and
Turnover Pursuant to N.Y.C.P.L.R. § 5225,
28. U.S.C.A. § 1610(g), and TRIA § 201(a)
    filed May 4, 2012.................................................................................Add. 46

Judgment and Order
Granting Motion for Summary Judgment and
Turnover Pursuant to N.Y.C.P.L.R. § 5225,
28. U.S.C.A. § 1610(g), and TRIA § 201(a) and
Discharging Respondent
    filed August 6, 2012 .........................................................................Add. 49

Terrorist Assets Report
Calendar Year 2007 .......................................................................Add. 52

Westlaw.

28 U.S.C.A. § 1610                                                      Page 1

▷

**Effective: August 10, 2012**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States
        →→ **§ 1610. Exceptions to the immunity from attachment or execution**

**(a)** The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

  **(1)** the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

  **(2)** the property is or was used for the commercial activity upon which the claim is based, or

  **(3)** the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

  **(4)** the execution relates to a judgment establishing rights in property--

    **(A)** which is acquired by succession or gift, or

    **(B)** which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

  **(5)** the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

  **(6)** the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

  **(7)** the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

**(b)** In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

**(1)** the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

**(2)** the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

**(3)** the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

**(c)** No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

**(d)** The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if--

**(1)** the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

**(2)** the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

**(e)** The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

**(f)(1)(A)** Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

**(B)** Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

**(2)(A)** At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

executing against the property of that foreign state or any agency or instrumentality of such state.

**(B)** In providing such assistance, the Secretaries--

    **(i)** may provide such information to the court under seal; and

    **(ii)** should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

**(3) Waiver.**--The President may waive any provision of paragraph (1) in the interest of national security.

**(g) Property in certain actions.**--

    **(1) In general.**--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

        **(A)** the level of economic control over the property by the government of the foreign state;

        **(B)** whether the profits of the property go to that government;

        **(C)** the degree to which officials of that government manage the property or otherwise control its daily affairs;

        **(D)** whether that government is the sole beneficiary in interest of the property; or

        **(E)** whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

    **(2) United States sovereign immunity inapplicable.**--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

    **(3) Third-party joint property holders.**--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2896; amended Pub.L. 100-640, § 2, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 3, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(9), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(b), Apr. 24, 1996, 110 Stat. 1243; Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(a)], Oct. 21, 1998, 112 Stat. 2681-491; Pub.L. 106-386, Div. C, § 2002(g)(1), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26, 2002, 116 Stat. 2337; Pub.L. 110-181, Div. A, Title X, § 1083(b)(3), Jan. 28, 2008, 122 Stat. 341; Pub.L. 112-158, Title V, § 502(e)(1), Aug. 10, 2012, 126 Stat. 1260.)

HISTORICAL AND STATUTORY NOTES

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

28 U.S.C.A. § 1610                                                                                    Page 4

Revision Notes and Legislative Reports

1976 Acts. House Report No. 94-1487, see 1976 U.S. Code Cong. and Adm. News, p. 6604.

1988 Acts. House Report No. 100-823, see 1988 U.S. Code Cong. and Adm. News, p. 4511.

1990 Acts. Senate Report No. 101-416, House Report Nos. 101-123, 101-512, 101-514, 101-734, and 101-735, and Statement by President, see 1990 U.S. Code Cong. and Adm. News, p. 6802.

1996 Acts. Senate Report No. 104-179 and House Conference Report No. 104-518, see 1996 U.S. Code Cong. and Adm. News, p. 924.

1998 Acts. Statement by President, see 1998 U.S. Code Cong. and Adm. News, p. 582.

2000 Acts. House Report No. 106-939, see 2000 U.S. Code Cong. and Adm. News, p. 1380.

2002 Acts. House Conference Report No. 107-779 and Statement by President, see 2002 U.S. Code Cong. and Adm. News, p. 1430.

2008 Acts. Statement by President, see 2008 U.S. Code Cong. and Adm. News, p. S3.

References in Text

The effective date of this Act, referred to in subsecs. (a) and (b), is 90 days after Oct. 21, 1976, see section 8 of Pub.L. 94-583, set out as an Effective and Applicability Provisions note under section 1602 of this title.

The enactment of section 1605A, referred to in subsec. (f), is Jan. 28, 2008, the approval date of National Defense Authorization Act for Fiscal Year 2008, Pub.L. 110-181, 122 Stat. 3, which enacted 28 U.S.C.A. § 1605A.

Amendments

2012 Amendments. Subsec. (a)(7). Pub.L. 112-158, § 502(e)(1)(A), inserted "or section 1605(a)(7) (as such section was in effect on January 27, 2008)" following "section 1605A".

Subsec. (b)(2). Pub.L. 112-158, § 502(e)(1)(B)(i), struck out "(5), 1605(b), or 1605A" and inserted "(5) or 1605(b)"; and struck out the period at the end and inserted ", or".

Subsec. (b)(3). Pub.L. 112-158, § 502(e)(1)(B)(ii), added par. (3).

2008 Amendments. Subsec. (a)(7). Pub.L. 110-181, § 1083(b)(3)(A), struck out "1605(a)(7)" and inserted "1605A".

Subsec. (b)(2). Pub.L. 110-181, § 1083(b)(3)(B), struck out "(5), or (7), or 1605(b)" and inserted "or (5), 1605(b), or 1605A".

Subsec. (f)(1)(A). Pub.L. 110-181, § 1083(b)(3)(C), inserted "(as in effect before the enactment of section 1605A) or section 1605A" after "1605(a)(7)".

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subsec. (f)(2)(A). Pub.L. 110-181, § 1083(b)(3)(C), inserted "(as in effect before the enactment of section 1605A) or section 1605A" after "1605(a)(7)".

Subsec. (g). Pub.L. 110-181, § 1083(b)(3)(D), added subsec. (g).

2002 Amendments. Subsec. (f)(2)(A). Pub.L. 107-297, § 201(c)(3), redesignated Pub.L. 106-386, § 2002(f) as 2002(g), resulting in no change in text. See 2000 Amendments notes, post.

Subsec. (f)(2)(B)(ii). Pub.L. 107-297, § 201(c)(3), redesignated Pub.L. 106-386, § 2002(f) as 2002(g), resulting in no change in text. See 2000 Amendments notes, post.

Subsec. (f)(3). Pub.L. 107-297, § 201(c)(3), redesignated Pub.L. 106-386, § 2002(f) as 2002(g), resulting in no change in text. See 2000 Amendments notes, post.

2000 Amendments. Subsec. (f)(2)(A). Pub.L. 106-386, § 2002(g)(1)(A), struck "shall" each place it appeared and inserted "should make every effort to".

Subsec. (f)(2)(B)(ii). Pub.L. 106-386, § 2002(g)(1)(A), struck "shall" each place it appeared and inserted "should make every effort to".

Subsec. (f)(3). Pub.L. 106-386, § 2002(g)(1)(B), added par. (3).

1998 Amendments. Subsec. (f). Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(a)], added subsec. (f).

1996 Amendments. Subsec. (a)(7). Pub.L. 104-132, § 221(b)(1), added par. (7).

Subsec. (b)(2). Pub.L. 104-132, § 221(b)(2), substituted "section 1605(a)(2), (3), (5), or (7)," for "section 1605(a)(2), (3), or (5)," and "involved in the act" for "used for the activity".

1990 Amendments. Subsec. (a)(6). Pub.L. 101-650, § 325(b)(9)(A), substituted "foreign state" for "foreign State".

Subsec. (e). Pub.L. 101-650, § 325(b)(9)(B), substituted "foreign state" for "foreign State".

1988 Amendments. Subsec. (a)(5), (6). Pub.L. 100-669, § 3(1), (2), substituted ", or" for the period at the end of par. (5) and added par. (6).

Subsec. (e). Pub.L. 100-640 added subsec. (e).

Effective and Applicability Provisions

1998 Acts. Pub.L. 105-277, § 101(h) [Title I, § 117(c)], provided that: "The amendments made by subsections (a) and (b) [amending this section and section 1606 of this title] shall apply to any claim for which a foreign state is not immune under section 1605(a)(7) of title 28, United States Code, arising before, on, or after the date of enactment of this Act [Oct. 21, 1998]."

1996 Acts. Amendment by Pub.L. 104-132 to apply to any cause of action arising before, on, or after Apr. 24, 1996, see section 221(c) of Pub.L. 104-132, set out as a note under section 1605 of this title.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

28 U.S.C.A. § 1610                                                                 Page 6

1988 Acts. Amendment to this section by section 2 of Pub.L. 100-640, enacting subsec. (e) of this section, to apply to actions commenced on or after Nov. 9, 1988, see section 3 of Pub.L. 100-640, set out as a note under section 1605 of this title.

1976 Acts. Section effective 90 days after Oct. 21, 1976, see section 8 of Pub.L. 94-583, set out as a note under section 1602 of this title.

Application of Pub.L. 110-181, Div. A, § 1083 to Pending Cases

For application of amendments made by Pub.L. 110-181, Div. A, § 1083 to pending cases and treatment of prior actions, see Pub.L. 110-181, Div. A, § 1083(c), set out as a note under 28 U.S.C.A. § 1605A.

Application of Pub.L. 110-181, Div. A, § 1083 to Iraq

For application of amendments made by Pub.L. 110-181, Div. A, § 1083 to Iraq, see Pub.L. 110-181, Div. A, § 1083(d), set out as a note under 28 U.S.C.A. § 1605A.

Severability

If any provision of Pub.L. 110-181, Div. A, § 1083, or the amendments made by that section, or the application of such provision to any person or circumstance, is held invalid, the remainder of that section and such amendments, and the application of such provision to other persons not similarly situated or to other circumstances, shall not be affected by such invalidation, see Pub.L. 110-181, Div. A, § 1083(e), set out as a note under 28 U.S.C.A. § 1605A.

Treatment of Terrorist Assets

Pub.L. 107-297, Title II, § 201(a), (b), (d), Nov. 26, 2002, 116 Stat. 2337, as amended Pub.L. 112-158, Title V, § 502(e)(2), Aug. 10, 2012, 126 Stat. 1260, provided that:

"(a) In general.--Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

"(b) Presidential waiver.--

"(1) In general.--Subject to paragraph (2), upon determining on an asset-by-asset basis that a waiver is necessary in the national security interest, the President may waive the requirements of subsection (a) [of this note] in connection with (and prior to the enforcement of) any judicial order directing attachment in aid of execution or execution against any property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

"(2) Exception.--A waiver under this subsection shall not apply to--

"(A) property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations that has been used by the United States for any nondiplomatic purpose (including use as rental prop-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

erty), or the proceeds of such use; or

    **"(B)** the proceeds of any sale or transfer for value to a third party of any asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations."

**"(d) Definitions.**--In this section [this note] the following definitions shall apply:

    **"(1) Act of terrorism.**--The term 'act of terrorism' means--

        **"(A)** any act or event certified under section 102(1) [Pub.L. 107-297, Title I, § 102(1), Nov. 26, 2002, 116 Stat. 2323, which is set out in a note under 15 U.S.C.A. § 6701]; or

        **"(B)** to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

    **"(2) Blocked asset.**--The term 'blocked asset' means--

        **"(A)** any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

        **"(B)** Does not include property that--

        **"(i)** is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

        **"(ii)** in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

    **"(3) Certain property.**--The term 'property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' and the term 'asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' mean any property or asset, respectively, the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

    **"(4) Terrorist party.**--The term 'terrorist party' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)."

Waiver of Exception to Immunity from Attachment or Execution

Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(d)], Oct. 21, 1998, 112 Stat. 2681-491, which had provided authority for the President to waive the requirements of section 117 of Pub.L. 105-277 [amending this section and section 1606 of this title and enacting provisions set out as notes under this section] in the interest of national security, was repealed by Pub.L. 106-386, Div. C, § 2002(g)(2), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

28 U.S.C.A. § 1610                                                                    Page 8

2002, 116 Stat. 2337.

DETERMINATION OF PRESIDENT

PRESIDENTIAL DETERMINATION NO. 2001-03

<Oct. 28, 2000, 65 FR 66483>

DETERMINATION TO WAIVE ATTACHMENT PROVISIONS RELATING TO BLOCKED PROPERTY OF
TERRORIST-LIST STATES

**Memorandum for the Secretary of State [and] the Secretary of the Treasury**

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 2002(f) of H.R. 3244, "Victims of Trafficking and Violence Protection Act of 2000 [section 2002(f) of Pub.L. 106-386, Div. C, Oct. 28, 2000, 114 Stat. 1543, amending this section]," (approved October 28, 2000), I hereby determine that subsection (f)(1) of section 1610 of title 28, United States Code, which provides that any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S. App. 5(b), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701--1702), and proclamations, orders, regulations, and licenses issued pursuant thereto, be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state claiming such property is not immune from the jurisdiction of courts of the United States or of the States under section 1605(a)(7) of title 28, United States Code, would impede the ability of the President to conduct foreign policy in the interest of national security and would, in particular, impede the effectiveness of such prohibitions and regulations upon financial transactions. 5Therefore, pursuant to section 2002(f) of H.R. 3244, the "Victim's [sic; probably should be "Victims"] of Trafficking and Violence Protection Act of 2000," I hereby waive subsection (f)(1) of section 1610 of title 28, United States Code, in the interest of national security. This waiver, together with the amendment of subsection (f)(2) of the Foreign Sovereign Immunities Act [probably means subsec. (f)(2) of this section] and the repeal of the subsection (b) of section 117 of the Treasury and General Government Appropriations Act, 1999 [Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(b)], Oct. 21, 1998, 112 Stat. 2681-491; see Tables for classification] [amending section 1606 of this title], supersedes my prior waiver of the requirements of subsections (a) [amending this section] and (b) of said section 117, executed on October 21, 1998 [Presidential Determination No. 99-1, Oct. 21, 1998, 63 f.R. 59201, formerly set out as a note under this section].

The Secretary of State is authorized and directed to publish this determination in the **Federal Register.**

WILLIAM J. CLINTON

Prior similar determinations of the President were as follows:

Presidential Determination No 99-1, Oct. 21, 1998, 63 FR 59201.

LAW REVIEW COMMENTARIES

   Challenges to enforcing arbitral awards against foreign states in the United States. Molly Steele and Michael Heinlen, 42 Int'l Law. 87 (Spring 2008).

   Default on foreign sovereign debt. 18 Ind.L.Rev. 959 (1985).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Mr. Jeremy LEVIN and Dr. Lucille Levin, Plaintiffs
v.
BANK OF NEW YORK, JP Morgan Chase, Société
Générale and Citibank, Defendants.
Bank of New York Mellon, JP Morgan Chase, Société
Générale and Citibank, Third–Party Plaintiffs
v.
Steven M. Greenbaum, et al. Third–Party Defendants.
Bank of New York, JP Morgan Chase, Société Gé-
nérale and Citibank, Third–Party Plaintiffs
v.
Estate of Michael Heiser, et al., Third–Party De-
fendants.

No. 09 CV 5900 RPP.
March 4, 2011.

*OPINION AND AMENDED ORDER*
PATTERSON, J.

**\*1** Plaintiffs Jeremy and Dr. Lucille Levin move
for partial summary judgment and a turnover order as
to certain accounts blocked pursuant to regulations
issued by the Office of Foreign Asset Control or the
United States Department of Treasury (the "Phase
One Assets") held by several banks: Bank of New
York Mellon ("Bank of New York"), Société Gé-
nérale, Citibank, N.A. ("Citibank"), and JP Morgan
Chase Bank, N.A. ("JP Morgan") (collectively, the
"New York Banks"). Plaintiffs also seek summary
judgment as to certain third party defendant Iranian
Judgment Creditors, namely the Heiser Creditors and
the Greenbaum and Acosta Creditors, designating the
Plaintiffs as the holders of a first priority lien interest
in the Phase One Assets. The Heiser Creditors cross
move for summary judgment designating the Heisers
as the holders of a first priority lien interest in three
blocked wire transfers held at the Bank of New York.
The Greenbaum and Acosta Creditors similarly
cross-move for summary judgment designating them
as the holders of a first priority lien interest in assets
held by JP Morgan and Citibank.

BACKGROUND

Plaintiff Jeremy Levin was the CNN bureau chief
in Lebanon during a period when the Islamic Republic
of Iran ("Iran") was using the organization Hizbollah
directly and indirectly to commit terrorist acts against
American civilians. (Plaintiffs' Statement of Undis-
puted Facts Pursuant to Local Rule 56.1 ("Pls.' 56.1
Statement") at ¶ 1.) FN1 Mr. Levin was taken hostage
and tortured during 1983–84, when he was held by
Hizboliah in a house directly across from the Iranian
Revolutionary Guard headquarters in the Bekka Val-
ley of Lebanon. (Pls.' 56.1 Statement at ¶ 2.) After his
escape from his captors, Mr. Levin returned to the
United States. (*Id.* at ¶ 3.) The effects of Mr. Levin's
torture and imprisonment caused severe and ongoing
harm to both Mr. Levin and his wife Dr. Levin. (*Id.*)

> FN1. Unless otherwise noted, citations to the
> parties Statements of Undisputed Facts are
> admitted by all opposing parties.

On February 6, 2008, following a trial, the United
States District Court for the District of Columbia
entered judgment in favor of the Levins, and against
the Islamic Republic of Iran, the Iranian Ministry on
Information and Security, and the Iranian Islamic
Revolutionary Guard Corp (collectively, the "Iranian
Judgment Debtors"). (*Id.* at ¶ 4.) *See Levin v. The
Islamic Republic of Iran,* 529 F.Supp.2d 1
(D.D.C.2007). The judgment awards the Levins
$28,807,719. (*Id.*) Upon receiving this award, the
Levins served information subpoenas on the Office of
Foreign Asset Control ("OFAC"), which produced
government records identifying certain assets in which
Iran or its instrumentalities have an interest, and that
were accordingly blocked by OFAC from January 1,
2007 to June 30, 2008 ("Blocked Assets"). (*Id.* at ¶ 5.)
OFAC responded via a letter to Plaintiffs dated Oc-
tober 6, 2008, which disclosed information regarding
certain Iranian assets held in the United States pur-
suant to various blocking regulations. (Declaration of
Suzelle Smith, ("Smith Decl.") Ex. 2.) The Levins
then proceeded to serve additional information sub-
poenas on the New York Banks, and in response,
further identifying information related to OFAC
Blocked Assets was disclosed from the New York
Banks' business records. (Pls.' 56.1 Statement at 5.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

**\*2** On April 20, 2009, the Levins registered their judgment with the United States District Court for the Southern District of New York, and on October 14, 2009, the Levins served their judgment on the Iranian Judgment Debtors through court and diplomatic channels. (*Id.* at ¶¶ 6–7.) On June 19, 2009, the Levins delivered Writs of Execution, issued by the Clerk of this Court to the United States Marshal for the Southern District of New York for service on the New York Banks. (*Id.* at ¶ 8.) The Marshal served the New York Banks with the Writs. (*Id.*) On June 26, 2009, the Levins filed their complaint in this Court. (*Id.* at ¶ 9.)

On January 11, 2010, this Court entered an Order authorizing Third–Party Interpleader Complaints and divided the proceeding into two phases. In Phase One, the Court would determine the right of Plaintiffs to execute and collect certain assets selected by Plaintiffs (the Phase One Assets). (Smith Decl., Ex. 12.) Phase Two would involve other assets within the scope of the Complaint. On February 1, 2010, Defendants Bank of New York, JP Morgan, Société Générale and Citibank filed an Interpleader Complaint pursuant to Rule 22 of the Federal Rules of Civil Procedure against a number of parties that held judgments against the Iranian Judgment Debtors, as well as commercial entities with connections to the blocked assets, in order to determine whether any of these parties had priority interests to the assets sought by the Levins. (*See* Interpleader Complaint. February 1, 2010, ECF No. 60.) The Greenbaum and Acosta Judgment Creditors were served with the Interpleader Complaint on February 19, 2010. (Pls.' Rule 56.1 Statement at ¶ 19.) The Heiser Judgment Creditors were served with the Interpleader Complaint on June 1, 2010. (*Id.*)

The Greenbaum Judgment Creditors hold a judgment issued by the U.S. District Court for the District of Columbia for $19,878,023.00 against the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("MOIS"). (The Greenbaum and Acosta Judgment Creditors' Counterstatement of Undisputed Facts Pursuant to Local Rule 56.1 ("Greenbaum/Acosta 56.1 Counterstatement") at ¶ 68; Declaration of James L. Bernard, Ex. 3.) This judgment was awarded on August 10, 2006 in satisfaction of a suit brought by the Greenbaum Judgment Creditors under 28 U.S.C. § 1605(a)(7) against Iran and the MOIS for damages the Greenbaum Judgment Creditors suffered in conjunction with the death of a woman killed in an August 9, 2001 terrorist attack on a res-

taurant in Jerusalem, Israel. (Greenbaum/Acosta 56.1 Counterstatement at ¶¶ 66–67.) The Greenbaum Judgment Creditors served Iran and MOIS with their judgment on April 22, 2007 through court and diplomatic channels. (*Id.* at ¶ 69.) On December 10, 2008, the Greenbaum Judgment Creditors registered their judgment in the Southern District of New York. (*Id.* at ¶ 70.) On December 14, 2009, the Greenbaum Judgment Creditors obtained an order from this court (Jones, J.) pursuant to 28 U.S.C. § 1610(c) permitting them to obtain a writ of execution to levy against property of Iran held by Citibank in this District. (*Id.* at ¶ 71.) On December 21, 2009, the Greenbaum Judgment Creditors obtained the writ of execution from the Clerk of the Court and delivered it to the U.S. Marshal for the Southern District of New York. (*Id.* at ¶ 72.) On April 5, 2010, the Greenbaum Judgment Creditors obtained an amended writ of execution from the Clerk of Court and delivered it to the U.S. Marshal for the Southern District of New York on April 6, 2010. (*Id.* at ¶ 73.) The U.S. Marshal levied by service of the amended execution upon Citibank on April 15, 2010. (*Id.*) On April 15, 2010, the Greenbaum Judgment Creditors filed their Answer to the Third Party Complaint and Counterclaims in response to the interpleader complaint. (*Id.* at ¶ 74.)

**\*3** On August 26, 2008, the Acosta Judgment Creditors obtained a judgment in the U.S. District Court for the District of Columbia against the Islamic Republic of Iran and the MOIS in the amount of $350,172,000. (*Id.* at ¶ 77.) This judgment was awarded in satisfaction of a lawsuit filed by the Acosta Judgment Creditors against Iran and the Ministry under 28 U.S.C. § 1605A to compensate the Acosta Judgment Creditors for damages suffered from the assassination of Rabbi Meier Kahane and the shooting of Irving Franklin and U.S. Postal Officer Carlos Acosta on November 5, 1990. (*Id.* at ¶¶ 75–76.) On September 28, 2009, the Acosta Judgment Creditors served Iran and the MOIS with their judgment through court and diplomatic channels. (*Id.* at ¶ 78.) The Acosta Judgment Creditors registered their judgment in the Southern District of New York on December 1, 2008, and on December 14, 2009, obtained an order from this this Court (Jones, J.), pursuant to 28 U.S.C. § 1610(c) permitting them to obtain writs of execution to levy against property of Iran held by Citibank and JP Morgan Chase in this District. (*Id.* at ¶ 80.) On December 21, 2009, the Acosta Judgment Creditors obtained Writs of Execution from the Clerk of the Court and delivered them to the U.S. Marshal. (*Id.* at ¶

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

81.) On April 5, 2010, the Acosta Judgment Creditors obtained amended Writs of Execution from the Clerk of Court and delivered them to the U.S. Marshal for the Southern District of New York on April 6, 2010. (*Id.* at ¶ 82.) The U.S. Marshal levied by service of the amended writs on April 15, 2010. (*Id.*) On April 15, 2010, the Acosta Judgment Creditors filed their Answer to the Third–Party Complaint and Counterclaims in response to the New York Banks' interpleader complaint. (*Id.* at ¶ 83.)

On September 29, 2000 and October 9, 2001, two groups of plaintiffs Filed claims in the United States District Court for the District of Columbia against Iran, the Ministry of Information and Security and the Iranian Revolutionary Guard. (The Heiser Judgment Creditors' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Heiser 56.1 Statement") at ¶¶ 3–4.) These suits sought compensation for damages suffered in conjunction with the June 25, 1996 bombing of the Khobar Towers complex in Saudi Arabia. (Heiser 56.1 Statement at ¶¶ 1–2.) On February 1, 2002, the two actions were consolidated, and on December 22, 2006, the Heiser Judgment Creditors obtained a judgment pursuant to 28 U.S.C. § 1605(a)(7) in the amount of $254,431,903 against Iran, the MOIS, and the Iranian Revolutionary Guard. (*Id.* at ¶¶ 5–6.) On February 7, 2008, the D.C. District Court issued an order pursuant to 28 U.S.C. § 1610(c) permitting the Heiser Judgment Creditors to pursue attachment in aid of execution of the December 2006 judgment. (*Id.* at ¶ 7.) On January 13, 2009, the D.C. District Court converted the Heiser Judgment Creditors' December 2006 judgment issued under 28 U.S.C. § 1605(a)(7) into a judgment pursuant to 28 U .S.C. § 1605A. (*Id.* at ¶ 8.) On August 27, 2008, the Heiser Judgment Creditors registered the Judgment with the U.S. District Court for the District of Maryland. (*Id.* at ¶ 11.) On April 27, 2010, the Heiser Judgment Crediters filed a Request for Writ to the Bank of New York in the Maryland District Court. (*Id.* at ¶ 11–12.) This writ was issued on April 30, 2010, and served on the Bank of New York in Maryland on May 3, 2010. (*Id.* at ¶¶ 12–13.)

*4 In addition to the Heisers and the Greenbaums and Acostas, there remain eight other judgment creditor groups that were interpled as third-party defendants. Of these, only 4 have asserted any interest in the Phase One Assets: the Brown, Blan, Silvia and Rubin judgment creditors. (Pls.'s 56.1 Statement at ¶ 22–23; Smith Decl., Exs. 41–43.) With the exception of the

Rubin judgment creditors, none of the other groups have attached or executed against any of the Phase One Assets. (Smith Decl., Ex. 58.) The Rubin judgment creditors have not obtained an order of the court pursuant to 28 U.S.C. § 1610(c) authorizing execution, nor have they moved for a turnover order. (Smith Decl., Ex. 41.)

The New York Banks also filed an interpleader complaint against commercial entities that might have an interest in the Blocked Assets by virtue of their connections to the blocked wire transfers or accounts. *See* Order, January 11, 2010, Docket No. # 33. Commerzbank is the only commercial third-party defendant to have made a claim to any of the Phase One Assets. (Smith Decl., Ex. 50.) However, Commerzbank's claim was withdrawn, and the interpleader complaint dismissed as to Commerzbank by Stipulation and Order of this Court dated July 26, 2010. Therefore, the only parties seeking the Phase One Assets who have attached or executed against them and moved for turnover are the Levin, Heiser, and Greenbaum and Acosta Judgment Creditors.

On July 13, 2010, the Levin Plaintiffs filed a Motion for Summary Judgment that Plaintiffs possess a priority interest in the Phase One Assets and seeking a Turnover Order directing the New York Banks to turn over the specified Phase One Assets. On September 13, 2010, the Heiser Judgment Creditors filed a Cross–Motion for Summary Judgment that the Heisers possess a priority interest in the Phase One Blocked Assets held by Bank of New York, and a Turnover Order directing the Bank of New York to release the Phase One Blocked Assets, as well as a brief in opposition to the Levins' motion. Also on September 13, 2010, the Greenbaum and Acosta Judgment Creditors filed a Cross–Motion for Summary Judgment that they possess a priority interest in the Phase One Blocked Assets held by Citibank and JP Morgan, and moved for a Turnover Order directing those banks to release the Phase One Blocked Assets, as well as a brief in opposition to the Levins' motion. On September 15, 2010, Citibank and JP Morgan Chase filed a joint brief identified as a "Response" to the Plaintiffs' Motion for Summary Judgment. On September 24, 2010, the Levins filed briefs in opposition to the Heiser and the Greenbaum and Acosta motions, and a reply in support of their original Motion for Summary Judgment. On September 29, 2010, oral argument was held before this Court. On October 6, 2010, the Heiser

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

Judgment Creditors filed a supplemental brief addressing the validity of their writ issued by the District Court in Maryland. On October 26, 2010, the Bank of New York Mellon filed a supplemental brief regarding the validity of the Heiser Judgment Creditors' Maryland writ.

*5 For the reasons stated below, the Levins' and the Heisers' Motions for Partial Summary Judgment are denied, and the Greenbaum and Acosta Third–Party Defendants' Motion for Summary Judgment and a Turnover Order is granted.

DISCUSSION

I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on summary judgment to demonstrate that there is no genuine issue of material fact. *F.D.I.C. v. Great American Ins. Co.,* 607 F.3d 288, 292 (2d Cir.2010). When the moving party has met this initial burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on mere allegations or denials of the facts asserted by the movant. *Davis v. State of New York,* 316 F.3d 93, 100 (2d Cir.2002). The Court must "view the evidence in the light most favorable to the non-moving party, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995).

Plaintiffs Jeremy and Dr. Lucille Levin move for partial summary judgment and a turnover order as to Blocked Assets held at Bank of New York, Société Générale, Citibank and JP Morgan and partial summary judgment as to third party defendant Iranian Judgment Creditors, including the Heisers and the Greenbaums and Acostas. The Levins assert that because they have fulfilled the requirements of New York's collection statutes, and are the first party to have served writs of execution on the New York Banks to obtain the Blocked Assets, they have priority over the other Iranian Judgment Creditors. The Levins also contend that they are entitled to a turnover order, because the Blocked Assets in question are subject to execution and include accounts and wire transfers that

originate from Iran or its agencies or instrumentalities or were sent for the benefit of Iran or its agencies or instrumentalities.

The Heiser Judgment Creditors ("The Heisers") oppose the Levins' motion because the Levins failed to obtain an order pursuant to 28 U.S.C. § 1610(c) authorizing them to pursue attachment and execution of the blocked assets, and therefore, the Heisers assert, the Levins writs are void. The Heisers cross-move for summary judgment on the grounds that they hold an unsatisfied judgment against Iran and have executed on the assets held by Bank of New York properly, by obtaining a court order under 28 U.S.C. § 1610(c) prior to obtaining a writ. The Heisers accordingly claim that they hold a first priority lien interest in three blocked wire transfers at Bank of New York. The Levins oppose the Heisers' Motion for Summary Judgment and claim that the Heisers' writ of execution is invalid as to the Bank of New York wire transfers because it was issued by a Maryland District Court and served on the Bank of New York in Maryland.

*6 The Greenbaums and Acostas oppose the Levins' motion on the same primary basis asserted by the Heisers, namely that the Levins' writs are void because the Levins failed to obtain an order pursuant to section 1610(c) prior to serving the writs. The Greenbaums and Acostas also move for summary judgment and a turnover order in their favor on the grounds that their writs are valid because they complied with section 1610(c), and that they therefore have priority to the Phase One Assets held at Citibank and JP Morgan. The Levins oppose the Greenbaum and Acosta motion by asserting that they were not required to obtain an order under 1610(c) in order to execute on the assets held by the New York Banks. They further contend that this Court should use its powers to find, *nunc pro tunc,* that the Levins' writs were in compliance with section 1610(c) at the time they were delivered.

In response to the Levins' motion, Defendants and Third–Party Plaintiffs Citibank and JP Morgan submitted a brief addressing whether the blocked assets sought by the parties are in fact subject to execution. The Heisers and Third Party Plaintiff Bank of New York submitted briefs addressing the validity of the Heiser Writs, which were issued and served in Maryland.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

Resolution of these competing claims implicates two issues; the priority of interest among the parties to the Phase One Assets and the susceptibility of the Phase One Assets to attachment. Because the Judgment Creditors seek to attach different assets, this opinion will first address which of the parties holds a priority interest in which of the Phase One Assets. Then, the opinion will address whether those assets are susceptible to attachment.

II. *Priority of Interest*

The Court must first determine whether the Levin Plaintiffs hold a priority interest in the Blocked Assets held at the New York Banks that entitles them to turnover, or whether their failure to obtain an order of the court pursuant to 28 U.S.C. § 1610(c) renders their writs void as a matter of law.

The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.,* ("FSIA") provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign state defendants, and governs the immunity of a foreign state in United States Courts. *Saudi Arabia v. Nelson,* 507 U.S. 349, 351 (1993); *Weinstein v. Islamic Republic of Iran,* 609 F.3d 43, 47 (2d Cir.2010). The FSIA provides that "where a valid judgment has been entered against a foreign sovereign, property of that foreign state is immune from attachment and execution except as provided in the subsequent sections, sections 1610 and 1611, 28 U.S.C. § 1609." *Weinstein,* 609 F.3d at 48. One exception to foreign sovereign immunity applies where the property to be attached and executed is sought as compensation for personal injury or death resulting from an act of terrorism or the provision of material support or resources for an act of terrorism. 28 U.S.C. § 1605A. In such cases, properly belonging to a foreign state, or to an agency or instrumentality of such state, is not immune from attachment in the aid of execution, or from execution, upon a judgment entered by a court of the United States. 28 U.S.C. § 1610(a), 28 U.S.C. § 1610(b). Moreover, the Terrorism Risk Insurance Act ("TRIA"), codified as a note to section 1610 of the Foreign Sovereign Immunities Act, explains that:

*7 In every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) [FN2] of title 28, United States Code, the blocked assets of

that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

FN2. Repealed and replaced with 28 U.S.C. § 1605A.

TRIA § 201 (codified at 28 U.S.C. § 1610, note.)

While sections 1610(a) and (b) enumerate the exceptions to foreign sovereign immunity, section 1610(c) of the FSIA describes the procedure to be followed by plaintiffs seeking to execute or attach the property of a foreign sovereign or an agency or instrumentality of a foreign sovereign:

No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

28 U.S.C. § 1610(c).

The order referred to in 1610(c) has been found to be mandatory by a number of courts reviewing attachments of the assets of foreign sovereigns. *See First City, Texas Houston, N.A. v. Rafidain Bank,* 197 F.R.D. 250, 256 (S.D.N.Y.2000); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico,* 652 F.Supp. 420, 423 (S.D.N.Y.1987); *Gadsby & Hannah v. Socialist Republic of Romania,* 698 F.Supp. 483, 485 (S.D.N.Y.1988). According to a House Report on the FSIA, the procedures mandated by 1610(c) are in place to ensure that sufficient protection is afforded to foreign states that might be defendants in actions in United States Courts:

In some jurisdictions in the United States, attachment and execution to satisfy a judgment may be had simply by applying to a clerk or a local sheriff. This would not afford sufficient protection to a foreign state. This subsection contemplates that the courts will exercise their discretion in permitting execution. Prior to ordering attachment and execu-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

tion, the court must determine that a reasonable period of time has elapsed following the entry of judgment ... In determining whether the period has been reasonable, the courts should take into account procedures, including legislation, that may be necessary for payment of a judgment by a foreign state, which may take several months; representations by the foreign state of steps being taken to satisfy the judgment; or any steps being taken to satisfy the judgment; or evidence that the foreign state is about to remove assets from the jurisdiction to frustrate satisfaction of the judgment.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 30, *reprinted in* 1976 U.S.Code Cong. & Admin. News 6604, 6629.

**\*8** The Greenbaum and Acosta Judgment Creditors and the Heiser Judgment Creditors both contend that the Levins' writs of execution served on the New York Banks are invalid because the Levins failed to comply with section 1610(c) of the FSIA. The Levins concede that they did not obtain an order of the court pursuant to 1610(c) prior to serving their writs of execution. (Pls.' Mem. in Reply to the Greenbaum and Acosta Mem. in Opp. at 7 n.7; "It is undisputed that the Levins did not obtain a specific court order under § 1610(c) before seeking writs of execution issued by the court.") The Levins contend, however, that they were not required to obtain an order under section 1610(c), first because their judgment was issued pursuant to section 1605(a)(7), and not section 1605A, and therefore sections 1610(a), (b), and (c) do not apply to them. The Levins also contend that they were not required to obtain an order under section 1610(c) because they are pursuing Blocked Assets, the attachment of which, Plaintiffs claim, is governed by section 1610(f)(1)(A), not 1610(c). Further, the Levins argue that they may execute under TRIA, and that such executions are similarly not subject to the requirements of section 1610(c). Finally, the Levins contend that even if they were required to obtain a court order prior to obtaining and serving their writs of execution, this Court should find, nunc pro tunc, that the Levins' writs were in compliance with 1610(c) at the time of their delivery.

A. *Section 1605(a)(7) and Section 1605A*
    The Levins hold a judgment issued pursuant to 28 U.S.C. 1605(a)(7), which was repealed in 2008 and replaced by 28 U.S.C. 1605A. *See* Pub.L. 110–181,

Div. A, § 1083 "Terrorism Exception to immunity." 28 U.S.C. §§ 1610(a) and (b) enumerate the exceptions to foreign sovereign immunity from attachment and execution. The presently enacted sections 1610(a) and (b) list actions brought under 1605A, actions brought for damages resulting from terrorism, as one of the exceptions to foreign sovereign immunity. Prior to the enactment of section 1605A, sections 1610(a) and (b) listed actions brought under 1605(a)(7), the predecessor statute replaced by 1605A, as an exception to foreign sovereign immunity. In both the pre–2008 and the presently enacted versions of sections 1610(a) and (b), the exception for acts of terrorism appears listed at section 1610(a)(7) and section 1610(b)(3). Thus, section 1605A directly replaced section 1605(a)(7) in the statutory scheme governing exceptions to foreign sovereign immunity.

    There are distinctions between actions brought under section 1605A and those brought under 1605(a)(7). "For instance, [§ 1605A] precludes a foreign state from filing an interlocutory appeal under the "collateral order" doctrine, § 1605A(1), and permits a plaintiff to attach property in advance of judgment, § 1605A(g). In addition, § 1605A(c) abrogates *Cicippio–Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C.Cir.2004), by creating a federal right of action against foreign states, for which punitive damages may be awarded." *Simon v. Republic of Iraq,* 529 F.3d 1187, 1190 (D.C.Cir.2008) (reversed on alternative grounds, *Republic of Iran v. Beaty,* 129 S.Ct. 2183).

    **\*9** The Levins claim that because their judgment was entered pursuant to section 1605(a)(7), and not 1605A, they were not required to obtain an court order prior to executing the Blocked Assets held by the New York Banks. This argument fails. Section 1605(a)(7) was repealed and replaced by section 1605A in 2008. Prior to 2008, section 1610 explicitly required plaintiffs proceeding under section 1605(a)(7) to obtain a court order prior to executing foreign assets. 28 U.S.C. 1610(a)(7); 28 U.S.C. 1610(b)(2) (2007). When section 1605(a)(7) was repealed and replaced by section 1605A, Congress updated section 1610 to incorporate section 1605A in the place of 1605(a)(7). There is no indication that this was done for any purpose other than to update the statute. Plaintiffs' argument asserts that while Congress intended that plaintiffs holding judgments pursuant to section 1605(a)(7) obtain court orders prior to the repeal of the statute, upon replacing 1605(a)(7) with 1605A, Congress decided to relieve

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

1605(a)(7) judgment holders of this requirement, but still impose it on terrorist victims pursuing judgments under 1605A. This argument defies logic, and accordingly fails. While plaintiffs holding 1605(a)(7) judgments do not need to convert them to 1605A judgments, such plaintiffs must still obtain court orders under 1610(c) prior to attachment or execution. Congress's interest in affording adequate protection to foreign sovereigns by imposing the requirement of a court order is of identical importance regardless of whether a plaintiff holds a claim under 1605(a)(7) or 1605A.

B. *Section 1610(f)(1)(A)*
    The Levins next contend that the procedure described in section 1610(c) does not apply to their execution because they seek to recover blocked assets. They claim that the attachment and execution of blocked assets is governed by section 1610(f)(1)(A), and not section 1610(c).

    Section 1610(f)(1)(A) provides:

    Notwithstanding any other provision of law ... any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 App. U.S.C. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

    28 U.S.C. § 1610(f)(1)(A).

    When interpreting a statute, the "statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States,* 129 S.Ct. 1558, 1566 (2009). The Levins contend that section 1610(f)(1)(A) permits them to escape the requirements of 1610(c) despite the fact that their 1605(a)(7) claim was specifically subjected to 1610(c)'s requirements in the pre–2008 statutory language.

Reading section 1610(f)(1)(A) in the light of the other subsections of section 1610, as the Court is required to do, establishes that the Levins remain subject to the requirement of section 1610(c), despite the fact that they seek to attach blocked assets. 1610(c) states that "no attachment or execution referred to in sections (a) or (b) of this section shall be permitted until after the court has ordered such attachment and execution ..." As discussed above, sections 1610(a) and 1610(b) did, in fact, refer to attachments or executions pursuant to section 1605(a)(7) prior to the repeal of section 1605(a)(7). Section 1610(f)(1)(A) merely establishes that assets blocked pursuant to regulatory prohibitions on financial transactions are available for execution of any judgment brought under section 1605(a)(7) or 1605A. The fact that section 1610(f)(1)(A) refers to 1605(a)(7) and 1605A indicates that 1610(f)(1)(A) is not itself a stand-alone exception to sovereign immunity, but rather a section targeting the process of executing on assets owned by foreign governments. Section 1610(f)(1)(A) in no way expressly overrides or eliminates the procedural requirements of section 1610(c), and therefore should not be interpreted to do so. Section 1610(f)(1)(A) explains that plaintiffs with claims under 1605(a)(7) or 1605A can proceed to attach or execute blocked assets, as well as other assets held by a sovereign or an agency or instrumentality of a sovereign, provided that they fulfill the requirements of section 1610(c). Thus, Plaintiffs' second argument fails. [FN3]

----

FN3. At oral argument, the Heisers and the Acostas and Greenbaums asserted that section 1610(f)(1)(A) had been waived by President Clinton, and was therefore inapplicable. Tr. of Oral Argument, September 29, 2010 at 32:23–35:24; 46:20–47:16. The Levins contended that TRIA, at § 201(b), imposed a requirement on Presidential waivers of exceptions to immunity from attachment or execution that the President waive exceptions to immunity on an asset by asset basis, and that therefore section 1610(f)(1)(A) is not subject to a blanket waiver. It does appear from a reading of TRIA that the President is now required to issue waivers on an asset by asset basis, and such waivers have not been issued with regard to the assets in question here. However, even if section 1610(f)(1)(A) applies with full force. It does not excuse the Levins from compliance with section 1610(c), as dis-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

cussed herein.

### C. *TRIA*

**\*10** The Levins further contend that section 1610(c) does not apply to them because they are seeking a turnover of blocked assets under TRIA, which is not listed in section 1610(a) or (b) and therefore is not subject to the requirements of 1610(c). This argument fails for the same reason as Plaintiffs' foregoing argument regarding 1610(f)(1)(A). TRIA is codified as a note to section 1610, and must be read in the context of the overarching statutory scheme of the FSIA. *Padilla v. Rurasfeld,* 352 F.3d 695, 721 (2d Cir.2003) ( "No accepted canon of statutory interpretation permits 'placement' to trump text, especially where, as here, the text is clear and our reading of it is fully supported by the legislative history.") To reiterate, section 1610(c), in both its present and pre–2008 incantations, clearly states that "*no* execution or attachment *referred to* in subsections (a) and (b) of this section shall be permitted" without a court order. 28 U.S.C. § 1610(c) (emphasis added). TRIA does not invalidate or override section 1610(c), and does not erase the reference to section 1605(a)(7) in the pre–2008 versions of 1610(a) and (b) or the reference to 1605A in the updated version of the statute. There is no indication in the text of TRIA or 1610 that TRIA was intended to eliminate 1610(c)'s court order requirement in the context of terrorist assets, and no evidence that Congress intended for TRIA to trump section 1610. While the Levins are pursuing attachment under TRIA, their judgment against Iran was obtained via the exception to sovereign immunity found at 1605(a)(7), not in TRIA. Therefore, they remain subject to the requirements of 1610(c), and, since they are not in compliance, their writs are invalid.

### D. *Nunc Pro Tunc*

Finally, the Levins urge the Court to find, nunc pro tunc, that the Levins' Writs were in compliance with 1610(c) at the time of their delivery to the U.S. Marshal on June 19, 2010.

"A nunc pro tunc order is granted only in extreme cases, when 'a court has spent an undue amount of time deliberating and thereby has caused the parties prejudice or harm.' " *Hegna v. Islamic Republic of Iran,* 380 F.3d 1000, 1008 (7th Cir.2004) (citing *Transamerica Ins. Co. v. South,* 975 F.2d 321, 326 at n.2 (7th Cir.1992)). The purpose of a nunc pro tunc order is to correct the record, not to alter substantive rights. *Id.* Nunc pro tunc orders are a form of equitable relief, *Zhang v. Holder,* 617 F.3d 650, 652 (2d Cir.2010), and as such, this Court concerns itself with fairness in determining whether such an order is warranted. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir.1975) (explaining that considerations of fairness are the traditional concern of equity courts.)

This Court declines to find nunc pro tunc that the Levins' writs were in compliance with 1610(c) at the time of their delivery to the U.S. Marshal. The priority of interests among the Levins, the Greenbaums and Acostas and the Heisers is disputed, and in light of the competing interests, it would be inequitable to award a nunc pro tunc order and thereby entitle the Levins to recovery of the assets when they failed to comply with the statutory mandate of section 1610(c).

**\*11** The Levins' writs of execution were served on the New York Banks without previously obtaining a court order permitting such execution as is required under 28 U.S.C. § 1610(c). The Levins' writs are therefore invalid, and any writs served by them without such an order cannot establish their priority of interest over any party that has served a valid, court-ordered writ and thereby executed or attached the Blocked Assets.

### E. *Validity of the Heisers' Maryland Issued Writ*

Having found the Levins' writs to be invalid, the Court will next consider the Heiser Judgment Creditors' writs, the validity of which remains in doubt because they were issued by the United States District Court for the District of Maryland and served on the Bank of New York in Maryland.

The Heisers obtained a default judgment on December 22, 2006, in the amount of $254,431,903 in the United States District Court for the District of Columbia. *Estate of Heiser v. Islamic Republic of Iran,* 466 F.Supp.2d 229, 356 (D.D.C.2006). The D.C. judgment was registered with the United States District Court for the District of Maryland on August 27, 2008, and with the United States District Court for the Southern District of New York on September 8, 2008. (Nevling Supp. Dec., Ex. 1, 2). The Heisers then obtained a modified judgment under 28 U.S.C. § 1605A on September 30, 2009, that increased their total recovery to $591,089,956. (Nevling Supp. Dec., Ex. 3.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

The Heisers have not registered the modified judgment in Maryland or New York and have sought to enforce their original judgment.

On February 7, 2008, the D.C. District Court issued an order pursuant to 28 U.S.C. § 1610(c) permitting the Heiser Judgment Creditors to pursue attachment in aid of execution of the December 2006 judgment. On April 30, 2010, the Heisers obtained a writ of garnishment from the District Court for the District of Maryland and served this writ on the Bank of New York in Maryland on May 3, 2010. (Nevling Supp. Dec., Ex. 4.) Bank of New York served the Heisers with a third-party complaint, and the Heisers filed their amended answer on July 6, 2010.

The Bank of New York contends that the Heiser's writ is invalid, because the Heisers' right to enforce their judgment is governed by the law of New York State. According to the Bank of New York, New York law applies the separate entity rule, which, in this case, would require the Heisers to serve Bank of New York in New York, rather than in Maryland. The Heisers respond that the Blocked EFTs are intangibles with a situs in the United States, and that therefore the Heisers may pursue attachment in any jurisdiction in which the Bank of New York is subject to jurisdiction. The Heisers also contend that the attachment proceeding is governed by Maryland law, and not New York law as the banks assert.

1. *Choice of Law*

In order to determine whether the Heisers' service of writs of garnishment on the Bank of New York in Maryland was valid, the Court must first determine what law governs this dispute This analysis hinges on whether the issue is procedural or substantive. The dispute between the Heisers and the Bank of New York regards whether the Heisers' Maryland-issued writs of execution reach blocked wire transfers that the Bank of New York asserts, contain funds currently held in accounts located in New York, managed by employees who are based in New York. (Hall Dec. ¶ 3, Ex. A.) This issue therefore involves questions of attachment procedure; whether a writ of execution issued and served in one state can reach assets held in another state.

*12 "The FSIA states that when a foreign state is not protected by sovereign immunity, 'the foreign state shall be liable in the same manner and to the

same extent as a private individual under like circumstances,' 28 U.S.C. § 1606. In attachment actions involving foreign states, federal courts thus apply Fed.R.Civ.P. 69(a), which requires the application of local state procedures." *Karaha Bodas Co., LLC. v. Persushaan Pertambangan Minvak Dan Gas Bumi Negara,* 313 F.3d 70, 83 (2d Cir.2002). *See Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.,* 190 F.3d 16, 20 (2d Cir.1999) (applying Rule 69(a), and hence New York law, in an FSIA action). Federal Rule of Civil Procedure 69(a) states, in pertinent part:

A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

Fed.R.Civ.P. 69(a).

Thus, "Rule 69(a) provides that in the absence of an applicable federal statute the procedure in supplementary proceedings to execute a federal court's judgment shall be that of the forum state." *Resolution Trust Corp. v. Ruggiero,* 994 F.2d 1221, 1226 (7th Cir.1993).

The Heisers contend that the application of this rule results in Maryland law "govern[ing] the procedures for executing upon property of a judgment debtor for actions instituted out of the Maryland Court." (Heiser's Suppl. Mem. of Law at 6.) While the writ was issued by the U.S. District Court of Maryland, in this matter the Heisers are applying for a turnover order from this Court in the Southern District of New York. This proceeding is therefore a supplemental proceeding in aid of judgment or execution, and this Court is thus bound to apply the attachment procedures of the state where it is located; New York.

2. *The Separate Entity Doctrine*

Under New York law, "the separate entity rule dictates that each 'branch of a bank be treated as a separate entity for attachment purposes.' " *Allied Maritime, Inc. v. Descatrade, S.A.,* 620 F.3d 70, 74 (2d Cir.2010) (quoting *Bergenske Dampskibsselskab v. Sabre Shipping Corp.,* 341 F.2d 50, 53 (2d Cir.1965)). This means that "the mere fact that a bank

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

may have a branch within [a state] is insufficient to render accounts outside of [that state] subject to attachment." *Allied Maritime*, 620 F.3d at 74. (quoting *John Wiley & Sons, Inc., v. Kirtsaeng*, No. 08 Civ. 7834, 2009 WL 3003242 at *3 (S.D.N.Y. Sept. 15, 2009).

Following this doctrine, service of a writ of attachment on the Bank of New York's Maryland branch is not sufficient to attach assets residing in accounts in New York State. Bank of New York has demonstrated that the Blocked Assets the Heisers seek are maintained in accounts located in New York, managed by employees who are based in New York. (Hall Dec. ¶ 3, Ex. A.) Therefore, the Heisers cannot demonstrate their entitlement to a turnover order issuing from this court on the basis of their Maryland writ of attachment, and their motion for such order is denied.

**F. *The Greenbaum and Acosta Writs***
   **\*13** As discussed, the writs of execution served on the New York Banks by the Levins and the Heisers are invalid for the reasons stated. The Greenbaum and Acosta creditors served writs of execution on Citibank and JP Morgan in New York, after having obtained a court order in this District pursuant to 28 U.S.C. 1610(c) permitting them to proceed with their executions. (Greenbaum and Acosta Mem. in Opp. at 8.) The only other group that has attached and executed against the Phase One Assets are the Rubin judgment creditors, who, like the Levins, have not obtained court order under 28 U.S.C. 1610(c). In addition, the Robins did not perfect their levy within 90 days of service.

Therefore, the Greenbaum and Acosta creditors hold a priority interest in the Phase One Assets held at Citibank and JP Morgan.

**III. *Attachment of the Phase One Assets Held at Citibank and JP Morgan***
   In order to determine whether a turnover order can be issued as to the assets held at Citibank and JP Morgan that are sought by the Greenbaum and Acosta judgment creditors, the Court must first determine whether these assets are subject to attachment.

The Citibank and JP Morgan Phase One Assets include accounts and electronic fund transfers ("EFTs") that have been frozen by the Office of Foreign Asset Control ("OFAC"). In this case, the assets

were blocked by OFAC due to an apparent nexus with the Islamic Republic of Iran, or an agency or instrumentality of the Iranian government. (*See* Smith Decl., Ex. 2.) Iran is the subject of numerous sanctions and blocking programs. 31 C.F.R. Parts 535, 544, 560, 594–597; *See also Bank of New York v. Rubin*, 484 F.3d 149; *In re Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31, 36 n.1 (D.D.C.2009).

Pursuant to the International Emergency Economic Powers Act (50 U.S.C. § 1701, 1702), various Presidents have issued Executive Orders for the purpose of blocking transactions with Iran.[FN4] Pursuant to these Executive Orders, OFAC administers several sanctions schemes regulating the assets of terrorists and state sponsors of terrorism, as well as assets linked to proliferators of weapons of mass destruction ("WMD") and their supporters. (Compl. at ¶ 36.) Such entities are designated by OFAC and placed on OFAC's list of "Specially Designated Nationals" ("SDNs") (Compl. at ¶ 37.) SDNs are defined as "individuals and entities which are owned or controlled by, or acting for or on behalf of, the governments of target countries or are associated with international ... terrorism." *See* United States Treasury Website, *http://www.treasury.gov/re source-center/sanctions/SDN-List/Pages/default.aspx*

FN4. These Orders include: Executive Order No. 12947, 60 Fed.Reg. 5079 (January 23, 1995) (Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process); Executive Order No. 13099, 63 Fed.Reg. 45167 (August 20, 1998) (amending Exec. Order 12947); Executive Order 13224, 66 Fed.Reg. 49079 (September 23, 2001) (Blocking Property and Prohibiting Transactions with Perxons Who Commit. Threaten to Commit or Support Terrorism). (Compl. at ¶ 33.) On June 28, 2005, the President also issued Executive Order No. 13382, 70 Fed.Reg. 38567, (Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters). (Compl. at ¶ 34.)

Rule 69 of the Federal Rules of Civil Procedure designates state law procedure for the enforcement of a judgment as the appropriate procedure, subject to any governing law. Fed.R.Civ.P. 69. The Greenbaum

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

and Acosta Judgment Creditors therefore seek turno-ver orders pursuant to New York Civil Practice Law and Rules ("CPLR") § 5225(b). CPLR § 5225(b) states:

*14 Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is enti-tled to the possession of such property or that the judgment creditor's rights to the property are supe-rior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor, and if the amount to be so paid is insuffi-cient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sher-iff.

CPLR § 5225(b).

In order to issue a turnover order in favor of the Greenbaums and Acostas as to the Citibank and JP Morgan Phase One Assets, this Court must first de-termine that the assets are subject to attachment under governing law, and that the record establishes the Greenbaum and Acosta Judgment Creditors' entitle-ment to a turnover order under § 5225(b). Due to the Second Circuit precedent specifically addressing the attachment of electronic fund transfers ("EFTs"), see Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2d Cir.2009); Export–Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd., 609 F.3d 111 (2d Cir.2010), this opinion will first address the intercepted EFTs, and then discuss the Citibank de-posit accounts.

A. *The Wire Transfers*

The Phase One Assets held at Citibank and JP Morgan primarily consist of the proceeds of blocked EFTs currently held in interest bearing accounts, as required by law. (Smith Decl., Exs. 8–12.). Citibank holds the proceeds of one EFT in the amount of[redacted]associated with the [redacted] (Smith Decl., Ex. 12) JP Morgan holds the proceeds one EFT in the amount of[redacted] associated with [redacted]. (*Id.*)

REDACTED [FN5]

FN5. Citibank also holds three inactive de-posit accounts; (1) an account contain-ing[redacted] in the name of[redacted], (2) an account containing [redacted] held in the name of[redacted], and (3) an account con-taining [redacted] in the name [redacted] [redacted].

In their joint response Memorandum of Law and at oral argument, Citibank and JP Morgan suggest that under the applicable Second Circuit precedent and state law, these intercepted EFTs are not the property of the originator or the beneficiary, and therefore are not susceptible to attachment. (Citibank and JP Mor-gan's Joint Response Mem. of L. at 15–17.)

Two recent Second Circuit decisions, *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir.2009), cert. denied, 130 S.Ct. 1896 (2010) ("Jaldhi") and *Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111 (2d Cir.2010) ("Asia Pulp"), address the issue of whether EFTs residing at intermediary banks in the United States can be attached.

*Jaldhi* involved the attachment of property under Rule B of the Admiralty Rules. In that case, the Court found that in order to attach EFTs under Rule B, the attachment must be of "tangible or intangible prop-erty" that is "the defendant's." *Jaldhi*, 585 F.3d at 66. In order to determine whether the property interest held by the defendant was adequate to render the property "the defendant's," as required by Rule B, the Court looked to state law, concluding that because "there is no federal maritime law to guide our deci-sion, we generally look to state law to determine property rights." *Id.* at 70. The Court applied New York's U.C.C. Article 4 to determine whether EFTs can be considered the defendant's property. *Id.* The Court found that New York state law does not permit the attachment of EFTs that are in the possession of an intermediary bank. *Id.* The Court further found that under New York law, "a beneficiary has no property interest in an EFT because 'until until the funds transfer is completed by acceptance by the bene-ficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach.' " *Id.* at 71 (quoting N.Y. U.C.C. § 4–A–502

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

cmt. 4.) The Court concluded that "[b]ecause EFTs in the temporary possession of an intermediary bank are not property of either the originator or the beneficiary under New York law, they cannot be subject to attachment under Rule B." *Id.*

**\*15** *Asia Pulp* addressed the issue of whether an EFT in the possession of an intermediary bank could be garnished under the Federal Debt Collection Procedures Act ("FDCPA") to satisfy judgment debts owed by either the originator or beneficiary. 609 F.3d at 114–115. The Court in *Asia Pulp* found that *"Jaldhi instructs that whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought." Id.* at 116. The *Asia Pulp* court then went on to examine the FDCPA, and found that the statute authorized the "issuance of writs of garnishment to any person 'in possession, custody or control' of property 'in which the debtor has a substantial nonexempt interest.' " *Id.* The Court then proceeded in a two-step inquiry; first, looking to state law to see what interest the debtor has in the property that the debt collector seeks to reach, and second, looking to federal law, namely the FDCPA, to see if these interests are "substantial interests" such that would allow garnishment. *Id.* at 118. In the first step of the analysis, the Court reached the same conclusion as the *Jaldhi court, and found that under New York state law, mid-stream EFTs are neither the property of the originator or the beneficiary. Id.* at 120.

Judge Marrero of this District recently issued a decision addressing the attachment of EFTs in the context of TRIA. *Hausler v. JP Morgan Chase Bank, N.A.,* No. 09 Civ. 10289, 2010 WL 3817546 (Sept. 13, 2010). The Court in *Hausler* found that TRIA and the underlying federal sanctions regulations (the Cuban Asset Control Regulations, or "CACRs"), considered together, preempted state property law, and therefore the Court did not apply N.Y. U.C.C. Article 4 as had the Courts in *Jaldhi* and *Asia Pulp. Id.* at \*4–\*12. The *Hausler* Court found that TRIA. In conjunction with the CACRs, preempt state law because TRIA explicitly defines "blocked asset" as "any asset seized or frozen by the United States under [§ 5(b)] of the [Trading With the Enemy Act ("TWEA") ] or under sections 202 and 203 of the [International Emergency Economic Powers Act]." TRIA § 201(d)(2). The *Hausler* court concluded that because the CACRs were enacted under § 5(b) of TWEA they should be

considered in tandem with TRIA to determine whether the wire transfers were attachable. *Id.* at \*6. In considering both together, the Court concluded that federal law comprehensively addressed property rights in this context, and therefore preempted state law:

> For decades prior to the passage of TRIA, OFAC regulations have routinely included both property and interests in property among the assets authorized to be blocked. *See, e.g.,* 31 C.F.R. § 575.201 (Iraq); 31 C.F.R. § 535.201 (Iran); 31 C.F.R. § 537.201 (Burma). Therefore, when drafting TRIA, Congress was presumably aware of the types of assets blocked under OFAC regulations ... As noted above, TRIA § 201(d)(2) defines "blocked assets" to include all assets blocked under the CACRs, and without further direction from Congress excepting interests in property from the blocked assets subject to execution, the Court is not persuaded that the word "of" equates to actual ownership or title and thus would operate to so limit the blocked assets subject to turnover proceedings.

**\*16** *Id.* at \*7.

The Court in *Hausler* found further support for its position in the Supreme Court's decision in *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,* 129 S.Ct. 1732, 1739 (2009). In *Elahi,* the Court was considering whether an arbitral judgment awarded to Iran constituted a "blocked asset" subject to execution under TRIA. In making its ruling in *Elahi,* "the Court considered whether Iran had an 'interest in the property' as required by the relevant OFAC regulations." *Hausler,* 2010 WL 3817546 at \*8. Similarly, in *Asia Pulp,* the Second Circuit held that "*Jaldhi* instructs that whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought." *Asia Pulp,* 609 F.3d 111 at 116.

In this case, Plaintiffs are seeking attachment or seizure pursuant to TRIA and 28 U.S.C. § 1610(f)(1)(A)

TRIA states that:

Notwithstanding any other provision of law ... in every case in which a person has obtained a judgment against a terrorist party on a claim based upon

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).

TRIA defines "terrorist party" to mean "a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4). Iran was designated as a state sponsor of terrorism under the Export Administration Act of 1979, and therefore is a terrorist party within the meaning of TRIA. See 49 Fed.Reg. 2836–02 (Jan. 23, 1984) (notice of Secretary of State George P. Schulz, designating Iran as a state sponsor of terrorism).

TRIA then goes on to define blocked assets as, in pertinent part, "(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 or 203 of the International Emergency Powers Act (50 U.S.C. 1701; 1702)."

The language of TRIA is broad, subjecting *any asset* to execution that is seized or frozen pursuant to the applicable sanctions schemes. The breadth of this language is unsurprising in light of TRIA's remedial purpose. *Hausler,* 2010 WL 3817546 at *9. Senator Tom Harkin, a sponsor of the Act, stated the following prior to the law's passage:

*17 The purpose of [TRIA] is to deal *comprehensively* with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. As the conference committee stated. TRIA establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S. and that the executive branch has no statutory authority

to defeat such enforcement under standard judicial processes, except as expressly provided in this act.

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (emphasis added).

As Judge Marrero observed in *Hausler,* TRIA's definition of "blocked assets" defines which assets are subject to attachment by reference to the regulations pursuant to which the assets are blocked, and it is this definition that dictates what interest in property subjects a judgment debtor's property to attachment. *Hausler,* 2010 WL 3817546 at *5. Therefore, in order to determine whether the Phase One Assets held at Citibank and JP Morgan are subject to attachment, the regulations imposing the sanctions on Iranian assets must be considered.

Transactions involving Iranian assets are blocked pursuant to a series of regulations, including 31 C.F.R. § 535, 544, 560, 594–597, 31 C.F.R. § 544, underlies the scheme governing Weapons of Mass Destruction ("WMD") Proliferators Sanctions, and serves to effectuate Executive Order 13382, which freezes assets of proliferators.[FN6]

FN6. Several of the entities linked to the Phase One Assets, namely [redacted] [redacted] [redacted] [redacted], have been designated as WMD proliferators. *See* Office of Foreign Asset Control, Overview of Non–Proliferation Sanctions, available at *http://www.treasury.gov/re source-center/sanctions/Programs/Documen ts/irap.pdf.*

Under 31 C.F.R. § 544.201, "all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, of the following persons are blocked." The regulation then goes on to explain that any entity engaged in the proliferation of weapons of mass destruction is included in the list of "persons" whose property interests are blocked. Section 544.305 defines an "interest in property," as referred to in section 544.201, as "an interest of any nature whatsoever, direct or indirect." *Id.*

Another sanctions scheme blocking Iranian assets

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

is the series of Terrorism Sanctions Regulations found at 31 C.F.R. 595. These regulations block transactions "in property or interests in property of specially designated terrorist[s]." 31 C.F.R. 595.201. The regulation then defines what constitutes an interest in property identically to the non-proliferation sanctions; "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. 595.307.

Thus, pursuant to either the proliferation or terrorist sanctions scheme, any interest in property, of any nature, whatsoever, direct or indirect, held by any of the Iranian entities linked to the Phase One assets, is blocked. This definition of what constitutes a "property interest" is substantially broader than that found under New York law, and evinces a congressional intent to block even property in which a terrorist entity has only a limited interest. Unlike Maritime Rule B in *Jaldhi,* or the FDCPA in *Asia Pulp,* here federal law is not silent on what interest in property would subject the assets to attachment. The property interest required for a terrorist party's assets to be blocked under these schemes is "any interest of any nature whatsoever." Accordingly, the Court finds that TRIA and the applicable sanctions regulations "establish a comprehensive statutory scheme that eschews any need for consideration of state definitions of property." *Hausler, 2010 WL 3817546 at *6.* Therefore, the *Jaldhi* rule regarding EFTs does not apply.

**\*18** Moreover, section 1610(f)(1)(A) of the FSIA contains language very similar to that of TRIA, and provides further indications that Congress intended for all blocked assets in which terrorist entities have an interest to be available for attachment by plaintiffs holding valid judgments. Section 1610(f)(1)(A) states:

Notwithstanding any other provision of law ... any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C.App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including an agency or instrumentality or such state) claiming such property is not immune under section

1605(a)(7) (as in effect before the enactment of section 1605A) or 1605A.

28 U.S.C. § 1610(f)(1)(A).

Even if the blocked EFTs were not subject to attachment under TRIA, they are included in the category of assets section 1610(f)(1)(A) subjects to attachment. The statute states that "any property" with respect to which transactions are prohibited, or even regulated, is subject to execution or attachment in aid of execution of judgments against state sponsors of terror. 28 U.S.C. § 1610(f)(1)(A). All of the Phase One Assets constitute property with respect to which financial transactions are prohibited. Unlike TRIA, there is no "of the terrorist party" language in section 1610(f)(1)(A), clarifying Congress's intent to make blocked assets, regardless of whether they are owned in entirety by terrorist parties, available to victims of terrorism.

It is plainly the intention of TRIA and the FSIA to make blocked assets available to plaintiffs. As *Asia Pulp* states, "whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought." *Asia Pulp,* 609 F.3d 111 at 116. The nature and wording of TRIA and FSIA section 1610(f)(1)(A) indicate that Congress intended all blocked assets be available for attachment by victims of terror. This Court concurs with the *Hausler* Court that in drafting TRIA and 1610(f)(1)(A), Congress was aware of the types of assets that are blocked under the applicable regulations, and therefore understood that by wording the statutes so broadly, it was subjecting all such assets to execution. If Congress wished to exclude EFTs from the variety of assets subject to attachment, it could have done so. Instead, TRIA and the FSIA employ language subjecting *any* blocked assets to attachment in these circumstances.

Based on this Court's reading of TRIA, section 1610(f)(1)(A) and the applicable sanctions regulations, the Phase One blocked EFTs held at Citibank and JP Morgan are subject to attachment.

**\*19** While these blocked assets are susceptible to attachment, the Greenbaum and Acosta motion for turnover must comply with N.Y. CPLR § 5225(b), as required by Fed.R.Civ.P. 69. If the evidence presented is sufficient to demonstrate that the entities whose

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

assets have been blocked are agencies and instru-
mentalities of Iran, and are entitled to the possession
of these funds, but for the blocked nature of the ac-
counts, these assets may be used to satisfy judgments.
*See* *Weininger v. Castro,* 462 F.Supp.2d 457, 499
(S.D.N.Y.2006).

The banks and the Iranian entities served with
process have provided no evidence to indicate that any
of the Iranian entities owning or with interests in the
assets held at Citibank and JP Morgan are not agencies
or instrumentalities of the Iranian government, and
this issue does not appear to be in dispute. It is the
movant's burden on summary judgment, nevertheless,
to demonstrate that there is no issue of material fact as
to the availability of these assets for turnover. *Rodri-
guez v. City of New York,* 72 F.3d 1060–61 (2d
Cir.1995). Therefore, the evidence offered to support
relationship between Iran and the entities whose assets
are sought is summarized briefly below.

The Greenbaums and Accostas largely rely on the
facts as stated by the Levin Plaintiffs regarding the
Iranian interest in these assets. (Greenbaum/Acosta
56.1 Statement at ¶ 10.) The Levins, in turn, rely
heavily on an affidavit presented by Dr. Patrick
Clawson, a Deputy Director for Research of the
Washington Institute for Near East Policy. *See* Affi-
davit of Dr. Patrick Clawson, February 24, 2010.
*Levin v. Bank of New York et. al,* 09 Civ. 5900, ECF #
233 ("Clawon Aff."). Dr. Clawson has extensive ex-
perience researching and consulting with government
officials about Iran, and has published several books
on the subject.

The first asset, held at JP Morgan, is a blocked
EFT sent for the benefit of [redacted] in the amount
of[redacted] (Smith Decl., Ex. 12, 10.) According to
Dr. Clawson, [redacted] is wholly owned by the Is-
lamic Republic of Iran, and is controlled by Iran.
(Clawson Aff at ¶ 27.) In support of this contention,
Dr. Clawson cites several online sources, including
the [redacted] website, which indicates that
the[redacted], owned by the Islamic Republic of Iran,
is the sole owner of [redacted] [redacted] (*Id., See also*
[redacted]

REDACTED [FN7]

> FN7. The Iranian ownership of [redacted] is
> further confirmed by a press release from the

U.S. State Department. Fact Sheet, Treasury
Announces Targets on Iran's Nuclear and
Missile Programs, U.S. Treasury Department
(June 17, 2010), available at *http://www.state
. gov/l/isn/143265.htm.*

The second asset is a blocked EFT held at Citi-
bank, sent for the benefit of the [redacted] in the
amount of[redacted]. Dr. Clawson states that it is
common knowledge that the National Iranian Oil
Company is wholly owned by the Islamic Republic of
Iran, and that the[redacted] [redacted] was established
by the National Oil Company of Iran. (Clawson Aff., ¶
27.) Dr. Clawson also states that the [redacted] is
controlled by Iran. (*Id.*) It has not been disputed that
the [redacted] [redacted] is an agency or instrumen-
tality of Iran.

B. *The Citibank Accounts*
 *20 Three of the assets currently held by Citibank
are funds from inactive correspondent accounts asso-
ciated with certain Iranian banks. (Smith Decl., Ex. 11
p. 5.) These assets include [redacted] at an account
associated with [redacted]; [redacted] in account as-
sociated with [redacted]; and [redacted] in an account
associated with [redacted]. As discussed earlier, TRIA
and the FSIA render any blocked asset linked to a
terrorist party subject to execution or attachment in
order to satisfy judgments held by terrorist victims.

Under CPLR § 5225, Plaintiffs are entitled to a
turnover order of the assets held in these accounts if
Citibank is a "person in possession or custody of
money" in which agencies or instrumentalities of Iran
have an interest. *Weininger v. Castro,* 462 F.Supp.2d
457, 499 (S.D.N.Y.2006). If the evidence presented is
sufficient to demonstrate that three entities linked to
this account are agencies and instrumentalities of Iran,
and are entitled to the possession of these funds, but
for the blocked nature of the secounts, these assets
may be used to satisfy judgments. *Id. at 499.*

Citibank, in its brief jointly submitted with JP
Morgan, explains that

> "[t]he Defendant banks make no independent as-
> sessment of the terrorist status of an account holder
> or wire transfer party that is subject to blocking
> pursuant to these regulations. Rather, they simply
> block (1) any account in their possession where the
> designated name appears, and (2) any wire transfer

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
(Cite as: 2011 WL 812032 (S.D.N.Y.))

when the designated name appear in the string of parties to the wire transfer ."

There is no dispute that these three Citibank accounts are, indeed, blocked accounts subject to TRIA. Therefore, these assets are subject to attachment under TRIA, and can be turned over so long as Plaintiffs have satisfied the procedural requirements of CPLR § 5225 and demonstrated that Iran, the judgment debtor, or agencies and instrumentalities of Iran, have an interest in these assets.

The first account is held in the name of [redacted] [redacted]. Dr. Clawson states that [redacted] is "wholly owned by the Islamic Republic of Iran," and a national bank of Iran. (Clawson Aff. at ¶ 21.) In support of this assertion, Dr. Clawson cites a Treasury Department Press Release [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] among other sources. (Clawson Aff. at ¶ 21.) Dr. Clawson also includes a link to the Central Bank of Iran website, which lists [redacted] as government-owned bank [redacted] [redacted] Moreover, [redacted] conceded that it is an agency or instrumentality of Iran in the [redacted] case. [redacted]

The second account is held in the name of [redacted]. According to Dr. Clawson [redacted] is a wholly owned subsidiary of the Islamic Republic of Iran. (Clawson Aff. at ¶ 22.) "State-owned central banks indisputably are included in the § 1603(b) definition of "agency of instrumentality." *Weininger*, 462 F.Supp.2d at 498. In support of this finding, Dr. Clawson cites the OFAC–SDN List, as well as a Treasury Department Press Release [redacted] [redacted] [redacted] [redacted] [redacted] available at https://     ustreas.gov/press/releases/hp219.htm). (Clawson Aff. at ¶ 22.)

**\*21** The third account is held in the name of [redacted] Dr. Clawson states that it is common knowledge and is his expert opinion that [redacted] is wholly owned by the Islamic Republic of Iran. (Clawson Aff. at ¶ 23.) In support of this statement, Dr. Clawson cites the OFAC–SDN List as well as several Iranian sources. [redacted] has been specifically designated in Executive Order 13882 in October 2007 as a supporter of the proliferation of Weapons of Mass Destruction on behalf of the government of Iran.

In light of this Court's finding that TRIA subjects

all of these Blocked Assets to attachment, and that the record demonstrates that the judgment creditor, Iran, or its agencies or instrumentalities have an interest in these assets, the deposit accounts held in the names of[redacted] at Citibank are subject to attachment.

It has been demonstrated that there is no triable issue of fact as to the Greenbaum and Acosta Judgment Creditors' entitlement to turnover of the Phase One Assets held at Citibank and JP Morgan, they are awarded such judgment as a matter of law. Citibank and JP Morgan are ordered to turnover the above identified assets of[redacted] to the Greenbaum and Acosta creditors in partial satisfaction of their judgment, and are hereby released from claims as to those assets asserted by other parties.

CONCLUSION

Due to their failure to obtain a court order under 28 U.S.C. § 1610(c) prior to serving the writs of execution on the New York Banks, the Levins writs are invalid. In addition, the Heisers' writ is not capable of attaching the Bank of New York assets located in New York state because it was issued by a Maryland court and served on the Bank of New York in Maryland. The Greenbaum and Acosta Judgment Creditors have established that there is no issue of material fact that they hold a priority interest in those Phase One Assets which they have attached at Citibank and JP Morgan, and those assets are subject to attachment. The Greenbaum and Acosta Judgment Creditors are entitled as a matter of law to a grant of partial summary judgment as to those assets.

PARTIAL FINAL JUDGMENT

The Court having determined that there are good grounds for entering a partial judgment immediately, this Opinion and Order constitutes a partial final judgment, within the meaning of Rule 54(b) of the Federal Rules of Civil Procedure, and there is no just reason for delay in the entry of judgment as provided herein. This Opinion and Order presents a controlling question of law which has not previously been decided, namely, the question of whether the requirements of 28 U.S.C. § 1610(c) are applicable to this proceeding. Entry of such partial final judgment will permit the Levin Plaintiffs, who are in their 80s and (in the case of Jeremy Levin) in ill health, to take an immediate appeal. Immediate appeal of this partial judgment will assist in the prompt adjudication of claims brought by the Levin Plaintiffs, the Greenbaum

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)
**(Cite as: 2011 WL 812032 (S.D.N.Y.))**

and Acosta Judgment Creditors, the Heiser Judgment Creditors, among others, to additional blocked assets during Phase Two of the case. An immediate appeal might also provide guidance with regard to the adjudication of other turnover cases, which may involve similar issues, pending before other judges in this District but which have not progressed as far as this action.

**\*22** Notwithstanding the foregoing, this partial judgment shall constitute a final judgment only with respect to the validity of the Levins' claims to the Phase One Assets (identified in Exhibit 12 to the Smith Declaration, which is filed under seal), the validity of the Greenbaum and Acosta Judgment Creditors' claims to the Citibank Phase One Assets and the JP Morgan Phase One Asset, and with respect to the claims of any party to or the rights of any party in the Citibank Phase One Assets or the JP Morgan Phase One Asset.

This judgment, compliance with its terms, and all proceedings to enforce it, shall be stayed pending appeal by the Levin Plaintiffs from the judgment being entered hereby to the United States Court of Appeals for the Second Circuit, on the condition that a notice of appeal is filed in a timely fashion. In view of the Levins' intent to appeal solely on this issue of law, any actions by any parties to this litigation with regard to the Phase One Assets are also stayed pending appeal by the Levin Plaintiffs.

IT IS SO ORDERED.

S.D.N.Y.,2011.
Levin v. Bank of New York
Not Reported in F.Supp.2d, 2011 WL 812032 (S.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ESTATE OF MICHAEL HEISER, et al.,

                                    Petitioners,

             -against-

BANK OF TOKYO MISTUBISHI UFJ, NEW
YORK BRANCH,

                                    Respondent.
-------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

```
+------------------------------------+
| USDS SDNY                          |
| DOCUMENT                           |
| ELECTRONICALLY FILED               |
| DOC #: _____              |
| DATE FILED: 1-29-13                |
+------------------------------------+
```

11 Civ. 1601 (PKC)

<u>MEMORANDUM AND ORDER</u>

  The petitioners are family members and the estates of seventeen U.S. Air Force

servicemembers killed in the 1996 terrorist attacks on the Khobar Towers in Saudi Arabia.

They seek to enforce a judgment against the Islamic Republic of Iran, the Iranian Ministry of

Information and Security, and the Iranian Islamic Revolution Guard Corps, all of which were

found by the United States District Court for the District of Columbia (Hon. Royce C.

Lamberth, U.S.D.J.) (the "District of Columbia Court") to have provided support for the

terrorist attacks.

  Petitioners move for summary judgment and seek an order compelling

respondent Bank of Tokyo Mitsubishi UFJ, New York Branch ("Bank of Tokyo") to turn over

funds that they claim belong to Iran-based entities that function as mere instrumentalities of

the Islamic Republic of Iran. The funds were initially electronic funds transfers ("EFTs") that

were blocked pursuant to directives of the United States Department of Treasury, and now sit

in interest-bearing accounts held by the Bank of Tokyo. The Bank of Tokyo does not oppose

the motion.

The petitioners have come forward with evidence that the funds they seek to attach belong to instrumentalities of the Islamic Republic of Iran, and were lawfully blocked pursuant to presidential orders and Department of Treasury authority.  For reasons that will be explained, such assets may be attached in satisfaction of a judgment.  The petitioners' motion is therefore granted.

BACKGROUND

For the purpose of this motion, the following facts are undisputed, and the record is scrutinized in the light most favorable to the respondent.  See, e.g., Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

The respondent does not dispute the facts set forth by the petitioners, and has submitted no counter-statement in opposition to the petitioners' statement of undisputed facts filed pursuant to Local Rule 56.1.  In its memorandum of law, the respondent states that it "does not oppose the ultimate relief sought by Petitioners in the Motion, namely, the turnover of the Blocked Assets."  (Response Mem. at 1.)  It also describes itself as a "disinterested stakeholder" in the underlying assets.  (Response Mem. at 3.)

A. Proceedings in the District of Columbia Court.

On June 25, 1996, an attack on the Khobar Towers complex in Saudi Arabia killed nineteen U.S. Air Force personnel.  (Pet. 56.1 ¶ 1.)  The petitioners in this case include representatives of the estates for seventeen of those victims.  (Pet. 56.1 ¶¶ 2-4.)

Petitioners were plaintiffs in two actions filed in the District of Columbia Court.  On September 29, 2000, certain of the petitioners filed an action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, et seq. (the "FSIA").  See Heiser v. Iran, 00 Civ. 2329 (D.D.C.) (RCL).  (Pet. 56.1 ¶ 3.)  The FSIA establishes exclusive federal

jurisdiction over actions against foreign states, 28 U.S.C. § 1330, and includes a terrorism

exemption for a foreign state's immunity, 28 U.S.C. § 1605A. Petitioners asserted that the

Islamic Republic of Iran, the Iranian Ministry of Information & Security (the "MOIS") and

the Iranian Revolutionary Guard Corps (the "IRGC") were liable to them for wrongful death

and intentional infliction of emotional distress. (Pet. 56.1 ¶ 3.) Additional petitioners in this

action brought similar claims against the same defendants in a second action filed on October

9, 2001, Campbell v. Iran, 01 Civ. 2104 (D.D.C.) (RCL). (Pet. 56.1 ¶ 4.) The District of

Columbia Court consolidated the two cases. (Pet. 56.1 ¶ 5.)

On December 22, 2006, the District of Columbia Court entered default

judgment against Iran, the MOIS and the IRGC. See Estate of Heiser v. Islamic Republic of

Iran, 466 F. Supp. 2d 229 (D.D.C. 2006). It concluded that the three defendants were jointly

and severally liable for damages totaling $254,431,903. (Pet. 56.1 ¶ 6.)

On January 13, 2009, the District of Columbia Court retroactively applied the

recently enacted section 1605A of the FSIA, 28 U.S.C. § 1605A,[1] and that the petitioners

were entitled to proceed under the new statute. (Pet. 56.1 ¶ 7; Seniawski Dec. Ex. 2.)

Thereafter, on September 30, 2009, that court entered a supplemental judgment under section

1605A of the FSIA, awarding additional damages for lost wages and future earnings totaling

$336,658,063. (Pet. 56.1 ¶ 8; Seniawski Dec. Ex. 3.)

B. Orders Directed to Satisfying the Judgment.

The District of Columbia Court subsequently issued orders directed to the

collection of the two judgments. On February 7, 2008, it concluded that, pursuant to 28

U.S.C. § 1610(c), a period had elapsed following entry of judgment sufficient to authorize an

---

[1] Section 1605A, like its predecessor 28 U.S.C. § 1605(a)(7), exempted from foreign immunity any state that
engaged in terrorism-related activities or provided material support to such activities.

attachment in aid and execution of the December 2006 judgment. (Pet. 56.1 ¶ 9; Seniawski

Dec. Ex. 4.) On May 10, 2010, it reached the same conclusion as to the September 2009

supplemental judgment. (Pet. 56.1 ¶ 10; Seniawski Dec. Ex. 5.)

　　　　On September 8, 2008, the petitioners registered the December 2006 judgment

in this District, pursuant to 28 U.S.C. § 1963. (Pet. 56.1 ¶ 13; M18-302, judgment no.

08,1562; Seniawski Dec. Ex. 7.) Petitioners registered the September 2009 judgment in this

District on December 6, 2010. (Amended Petition ("Pet.") 56.1 ¶ 14; 10 MC 00005,

judgment no. 10,2146; Seniawski Dec. Ex. 8.) Thereafter, pursuant to Rule 69, Fed. R. Civ.

P., and New York CPLR § 5230, the petitioners served writs of execution issued by the Clerk

of this District on the U.S. Marshal. (Pet. 56.1 ¶ 15; Seniawski Dec. Ex. 9 & 10.) The U.S.

Marshal then served the writs on the Bank of Tokyo. (Pet. 56.1 ¶ 16; Seniawski Dec. Ex. 10.)

### C.  Procedural History of the Present Action.

　　　　Petitioners commenced this action by filing a petition for a turnover order

pursuant to Rule 69 and sections 5225 and 5227 of the CPLR. (Docket # 1.) Petitioners

assert that the respondent Bank of Tokyo possesses assets belonging instrumentalities of the

MOIS, the IRGC and the government of Iran. (Pet. ¶¶ 25-26.) The Petition states that the

respondent is named as a defendant pursuant to CPLR § 5225(b), which permits a judgment

creditor to commence a special proceeding against a person in possession or custody of

money owed to a judgment creditor. (Pet. ¶ 6.) The respondent asserts no right to these

assets. (Pet. 56.1 ¶ 27.)

　　　　Petitioners seek to recover funds that were blocked pursuant to Presidential

Executive Orders and directives issued by the Office of Foreign Assets Control ("OFAC"), an

agency of the United States Department of Treasury. These funds are held by entities that

OFAC has designated as Specially Designated Nationals ("SDNs"), and deemed "individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries."[2] Petitioners contend these funds are owned by mere instrumentalities of the Islamic Republic of Iran. They seek an order directing that the following blocked assets be turned over to them, in aid of the judgments entered by the District of Columbia Court: $90,268.80 from Bank Sepah, International, PLC ("BSI"); $4,740 from Azores Shipping Company LL FZE ("Azores"); $61,974 and $99,974 from IRISL Benelux NV; $97,767.50 from the Export Development Bank of Iran; and $2,181.88 from Bank Melli Iran ("Bank Melli") (collectively, the "Iran Entities"). (Seniawski Dec. ¶ 20.) These entities all have been served with notice of petitioners' claims, but have filed no responses and have not appeared in this action. (Seniawski Dec. ¶¶ 21-23.) Each of these entities is listed by OFAC as a "proliferator" of "weapons of mass destruction" or as a global terrorist. (Seniawski Dec. ¶ 24.)

It is undisputed that respondent Bank of Tokyo maintains bank accounts holding the blocked assets of the SDNs listed above. (Pet. 56.1 ¶ 25.) In its memorandum of law, Bank of Tokyo states that it has frozen these assets pursuant to OFAC directive. (Response Mem. at 2.) Under 31 C.F.R. § 595.203, Bank of Tokyo was required to maintain the funds in interest-bearing accounts.

On August 23, 2011, Magistrate Judge Dollinger, to whom this action was referred for general pretrial supervision, signed an order directing service of the Petition and other relevant documents to all third parties, with the documents translated into Farsi. (Docket # 25.) The respondent produced contact information for the Iran Entities. (Pet 56.1 ¶ 22.) Specifically, the service order stated: "Any Third Party who fails to assert a claim to the

---

[2] See http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

Blocked Assets or take any action within sixty (60) days of the date indicated on the Notice of Lawsuit shall be deemed to forever waive any claims that such Third Party may have against the Blocked Assets, or against Respondent or Petitioners with respect to the Blocked Assets." (Docket # 25 ¶ 9.) The deadline for any third party to appear in this matter or to assert a claim has since expired. (Pet. 56.1 ¶ 24.)

      In its response to the present motion, Bank of Tokyo states that it "does not oppose the ultimate relief sought by Petitioners in the Motion, namely, the turnover of the Blocked Assets." (Response Mem. at 1.) The United States also has submitted letter-briefs setting forth its views on the petitioners' summary judgment motion. The United States has neither supported nor opposed the motion.

SUMMARY JUDGMENT STANDARD.

      Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. It is the burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, sufficient to demonstrate that he or she is entitled to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party. Costello, 632 F.3d at 45; accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c)(3). In the absence of any disputed material fact, summary judgment is appropriate. Rule 56(a).

Though the respondent does not oppose the motion, petitioners still must establish that they are entitled to judgment as a matter of law. "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied even if no opposing evidentiary matter is presented.'" Vt. Teddy Bear Co., 373 F.3d at 244 (emphasis in original) (quoting Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001)); see also Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996) (summary judgment "may properly be granted only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.") (quotation marks and citation omitted).

DISCUSSION

The Court first reviews FSIA provisions that permit a successful plaintiff to attach funds that have been blocked pursuant to executive order and OFAC directives. Second, the Court examines presidential authority to block certain international financial

transactions and OFAC's implementation of its blocking regime.  Finally, the Court examines

the evidence submitted by petitioners that the entities from which petitioners seek recovery

are instrumentalities of the Republic of Iran.

> I.    The FSIA Framework for Sovereign Liability and the Execution of
>        Judgment.

The FSIA "provides the exclusive basis for subject matter jurisdiction over all

civil actions against foreign state defendants, and therefore for a court to exercise subject

matter jurisdiction over a defendant the action must fall within one of the FSIA's exceptions

to foreign sovereign immunity."  Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 47 (2d

Cir. 2010). Section 1605(a)(7), which has since been repealed with many of its terms

incorporated into 28 U.S.C. § 1605A,[3] "abrogates immunity for those foreign states officially

designated as state sponsors of terrorism by the Department of State where the foreign state

commits a terrorist act or provides material support for the commission of a terrorist act and

the act results in the death or personal injury of a United States citizen." Weinstein, 609 F.3d

at 48; see also Levin v. Bank of New York, 2011 WL 812032, at *8-9 (S.D.N.Y. Mar. 4,

2011) (discussing relationship between sections 1605(a)(7) and 1605A). Iran has been

designated as a state sponsor of terrorism since 1984, and is subject to jurisdiction under

section 1605A and its predecessor statute, section 1605(a)(7).  See Weinstein, 609 F.3d at 48.

The FSIA defines a "foreign state" to include "a political subdivision of a

foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a). It

defines an "instrumentality" to include "a separate legal person, corporate or otherwise" that

either is "an organ of a foreign state" or a person "whose shares or other ownership interest is

owned by a foreign state or political subdivision thereof," provided that it is not a citizen of

---

[3] See Pub. L. 110-181, Div. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008, 122 Stat. 341.

the United States or "created under the laws of any third country." 28 U.S.C. § 1603(b)(1-3).

The District of Columbia Court concluded that the defendants in that action were subject to

jurisdiction under the then-operative section 1605(a)(7), which provided a terrorism

exemption from a foreign government's immunity against money damages claims in the

United States. 466 F. Supp. 2d at 254-55. It also concluded that those defendants were liable

to the plaintiffs. Id. at 271-356.

The Terrorism Risk Insurance Act of 2002 ("TRIA") provides for attachment

in aid of execution of a judgment. Section 201(a) of TRIA, which is codified as a note to 28

U.S.C. § 1610, states:

> Notwithstanding any other provision of law, and except as
> provided in subsection (b) [of this note], in every case in which a
> person has obtained a judgment against a terrorist party on a claim
> based upon an act of terrorism, or for which a terrorist party is not
> immune under section 1605A or 1605(a)(7) (as such section was
> in effect on January 27, 2008) of title 28, United States Code, the
> blocked assets of that terrorist party (including the blocked assets
> of any agency or instrumentality of that terrorist party) shall be
> subject to execution or attachment in aid of execution in order to
> satisfy such judgment to the extent of any compensatory damages
> for which such terrorist party has been adjudged liable.

Pub. L. 107-297, Title II, § 201(a), (b), (d), Nov. 26, 2002, 116 Stat. 2337, as amended, Pub.

L. 112-158, Title V, § 502(e)(2), Aug. 10, 2012, 126 Stat. 1260. According to the Second

Circuit, it is "beyond cavil that Section 201(a) of the TRIA provides courts with subject

matter jurisdiction over post-judgment execution and attachment proceedings against property

held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is

not itself named in the judgment." Weinstein, 609 F.3d at 50.

Separately, section 1610(g) permits attachment in aid of an execution of a

judgment entered under section 1605A. It provides that "the property of a foreign state

against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of the level of economic control over the property by the government of the foreign state." 28 U.S.C. § 1610(g)(1)(A).  The District of Columbia Court observed that the statute "'expand[s] the category of foreign sovereign property that can be attached; judgment creditors can now reach any U.S. property in which Iran has any interest . . . whereas before they could only reach property belonging to Iran.'"  Estate of Heiser v. Islamic Republic of Iran, 807 F. Supp. 2d 9, 18 (D.D.C. 2011) (quoting Peterson v. Islamic Republic of Iran, 627 F.3d 1117, 1123 n.2 (9th Cir. 2010)).  "Thus, the only requirement for attachment or execution of property is evidence that the property in question is held by a foreign entity that is in fact an agency or instrumentality of the foreign state against which the Court has entered judgment."  Id. at 19.

> II.   Executive Branch Authority over Foreign Transactions and the
>       Blocking Procedures of the Office of Foreign Asset Control ("OFAC").

The International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq. ("IEEPA"), authorizes the President to regulate international economic transactions. Specifically, it permits the executive branch to "investigate, regulate or prohibit . . . transfers of credit or payments . . . by . . . any banking institution, to the extent that such transfers . . . involve any interest of any foreign country . . . [and any] transactions involving . . . any property in which any foreign country . . . has any interest." 50 U.S.C. § 1702(a)(1). Presidents have issued several executive orders under the IEEPA, including Executive Order No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995) (Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process), Executive Order No. 13224, 66 Fed. Reg.

49079 (Sept. 23, 2001) (Blocking Property and Prohibiting Transactions With Persons Who

Commit, Threaten to Commit, or Support Terrorism), and Executive Order No. 13382, 70

Fed. Reg. 38567 (June 28, 2005) (Blocking Property of Weapons of Mass Destruction

Proliferators and Their Supporters), and Executive Order No. 13599, 77 Fed. Reg. 6659 (Feb.

5, 2012) (Blocking Property of the Government of Iran and Iranian Financial Institutions).

OFAC describes itself as "act[ing] under Presidential national emergency

powers, as well as authority granted by specific legislation, to impose controls on transactions

and freeze assets under US jurisdiction."[4]  OFAC has implemented numerous so-called

"blocking" regimes, including the Weapons of Mass Destruction Proliferators Sanction, 31

C.F.R. § 544.101, et seq., and the Terrorism Sanctions Regulation, 31 C.F.R. § 595.101, et

seq.  OFAC requires the blocking of "all property and interests in property that are in the

United States" belonging to SDNs.  31 C.F.R. § 544.201(a).  OFAC defines "interest" as "an

interest of any nature whatsoever, direct or indirect," 31 C.F.R. §§ 544.305, and property as

any "property, real, personal, or mixed, tangible or intangible, or interest or interests therein,

present, future or contingent," id. § 544.308.  OFAC publishes a list of SDNs at

http://www.treasury.gov/sdn, which it frequently updates.

OFAC has designated the following entities as SDNs: Bank Sepah, Bank

Sepah International, PLC ("BSI"); Iranohind Shipping Company ("Iranohind"); Azores

Shipping Company LL FZE ("Azores"); IRISL Benelux NV; Export Development Bank of

Iran ("EDBI"); Bank Melli; and the Islamic Republic of Iran Shipping Lines ("IRISL").

(Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List,

---

[4] http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx

January 24, 2013, at 97, 99, 100, 161, 221, 233.)[5] The petitioners seek to attach funds

belonging to these entities. (Seniawski Dec. Ex. 14.) Respondent Bank of Tokyo has

expressly stated that it blocked these entities' assets pursuant to OFAC directive. (Response

Mem. at 2.) As previously noted, the TRIA provides that "the blocked assets" of a "terrorist

party" "shall be subject to execution or attachment in aid of execution in order to satisfy such

judgment to the extent of any compensatory damages for which such terrorist party has been

adjudged liable." Note, 28 U.S.C. § 1610.

III.    The Petitioners Have Come Forward with Evidence that the Eight Non-
Party Iranian Entities Are Instrumentalities of Iran.

In support of its summary judgment motion, the petitioners have submitted the

affidavit of Patrick L. Clawson, Ph.D, the Director of Research of the Washington Institute

for Near East Policy. Clawson states that he has specialized knowledge concerning financial

accounts, wire transfers and other transactions involving assets blocked by OFAC directives.

(Clawson Aff't ¶ 10.) Clawson also asserts that he is knowledgeable as to bank charters and

ownership, particularly as to Iran's national and state-owned banks. (Clawson Aff't ¶ 10.)

He swears that he closely follows Iran's press and political system and has researched its

economy and commercial enterprises. (Clawson Aff't ¶¶ 9-12.)

Clawson asserts that the following entities are owned at least in part by the

government of the Islamic Republic of Iran:

A.  Bank Melli.

According to Clawson, the Central Bank of Iran expressly recognizes Bank

Melli Iran as a "commercial government-owned bank." (Clawson Aff't ¶ 13.) Bank Melli

---

[5] Available at http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

states in a financial report available on its website that "[t]he capital is completely owned by the Government of the Islamic Republic of Iran." (Clawson Aff't ¶ 13.)[6]

Based on the express statements of Bank Melli, the petitioners have established that Bank Melli is an "instrumentality" of the government of Iran.  28 U.S.C. § 1603(b).

B.  Bank Sepah.

Iran nationalized ownership of Bank Sepah in 1980.  (Clawson Aff't ¶ 14.)  On its website, the Central Bank of Iran describes Bank Sepah as a "commercial government-owned bank."[7]  (Clawson Aff't ¶ 14.)  Clawson states that he is aware of no evidence of any planned changes in ownership or plans to privatize Bank Sepah.  (Clawson Aff't ¶ 14.)

Because the Central Bank of Iran identifies Bank Sepah as a "commercial government-owned bank," petitioners have established that Bank Sepah is an "instrumentality" of the government of Iran.  28 U.S.C. § 1603(b).

C.  BSI.

On January 9, 2007, the Treasury Department concluded that BSI is owned and controlled by Bank Sepah.  (Clawson Aff't ¶ 15.)  BSI's company website states that it "is a wholly-owned subsidiary of Bank Sepah Iran."[8]  (Clawson Aff't ¶ 15.)  Its website also states that it was incorporate to "[take] over the assets, liabilities and business of the London Branch of Bank Sepah, Iran."[9]  (Clawson Aff't ¶ 15.)

As noted, the Central Bank of Iran describes Bank Sepah as a "commercial government-owned bank." As a wholly-owned subsidiary of Bank Sepah operating in

---

[6] See http://www.bmi.ir/Fa/uploadedFiles/FinanceReportFiles/2011_2_13/f97c06b161__2752675b48.pdf .
[7] See http://www.cbi.ir/simplelist/3088.aspx.
[8] See http://www.banksepah.co.uk/downloads/Annual_Report_and_Financial_Statements_31_03_05.pdf.
[9] See http://www.banksepah.co.uk/?page=13.

London, BSI, like its parent company, qualifies as an "instrumentality" of the government of
Iran. 28 U.S.C. § 1603(b).

    D.  EDBI.

    The website of the Central Bank of Iran lists EDBI as a "specialized
government bank."[10] (Clawson Aff't ¶ 16.) Clawson asserts that EDBI is "widely known" as
a "state owned, specialist export and import bank created to increase non-oil exports from Iran
and develop international trade." (Clawson Aff't ¶ 16.) He states that it "is active in
promoting Iran's non-oil exports and trade with Iran's neighbors." (Clawson Aff't ¶ 16.)  On
October 22, 2008, OFAC froze EDBI assets under U.S. jurisdiction.  (Clawson Aff't ¶ 16.)
OFAC identifies EDBI as "one of the leading intermediaries handling Bank Sepah's
financing, including WMD-related payments."[11]

    This Court affords little weight to Clawson's statements about what is "widely
known" about EDBI's operations.  These unsupported statements are not accompanied by any
citation to the record or publicly available factual information.  Nevertheless, the fact that the
Central Bank of Iran lists EDBI as a "specialized government bank" and that OFAC has
deemed EDBI an intermediary in Bank Sepah financing operations is sufficient evidence that
EDBI functions as an instrumentality of the government of Iran. 28 U.S.C. § 1603(b).

    E.  IRISL.

    OFAC recognizes IRISL as under control by the government of Iran, and
acting as the country's "national maritime carrier . . . ."[12]  (Clawson Aff't ¶ 17.)  It has
concluded that IRISL had placed its international network of ships and hubs into the service
of the Iranian military, particularly the arm of its military overseeing ballistic missile

---

[10] http://www.cbi.ir/simplelist/2389.aspx.
[11] http://www.treasury.gov/press-center/press-releases/Pages/hp1231.aspx.
[12] http://www.treasury.gov/connect/blog/pages/No-Safe-Port-for-IRISL.aspx.

development.  We imposed sanctions on IRISL, its corporate network, and its fleet,

prohibiting U.S. persons from dealing with the company." [13]  OFAC also has concluded that

IRISL has created front companies in Panama to conceal the ownership of its vessels, and has

repeatedly repainted, renamed and transferred nominal ownership of vessels.  (Id.)

   As Iran's "national maritime carrier," IRISL functions as an instrumentality of

the government of Iran.  28 U.S.C. § 1603(b).

   F. Azores, Iranohind and IRISL Benelux NV.

   Petitioners assert that Azores, Iranohind and IRISL Benelux NV are all entities

controlled by IRISL, citing to conclusions reached by the United States Treasury, as well as

British and European Union Authorities.

   The United States Treasury has frozen the assets of Azores and announced

restrictions on transactions related to the company. [14]  It identifies Azores as a front company

for IRISL, based in the United Arab Emirates.  Id.  The European Union also has identified

Azores as a "[f]ront company owned or controlled by IRISL or an IRISL affiliate.  It is the

registered owner of a vessel owned or controlled by IRISL." [15]  The European Union

concluded that Azores is controlled by Moghddami Fard, who is the company's director, and

that Fard acts as IRISL's regional director in the United Arab Emirates.  Id.  The EU has

stated that Fard has organized several companies in an attempt to circumvent restrictions on

the IRISL.  Id.  The British government also has imposed restrictions on Azores, citing its

relationship with Fard. [16]  Clawson asserts that the prominent role played by Fard and the

evidence of IRISL ownership suggest that the IRISL controls Azores.  (Clawson Aff't ¶ 18.)

---

[13] http://www.treasury.gov/connect/blog/pages/No-Safe-Port-for-IRISL.aspx .
[14] http://www.treasury.gov/press-center/press-releases/Pages/tg1212.aspx.
[15] http://eurlex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:319:0011:0031:EN:PDF
[16] http://www.hm-treasury.gov.uk/d/finsanc_public_notice_reg1245_021211.pdf

-16-

The United States Treasury has designated Iranohind as engaging in proliferation activities. It has stated that the company was "found to be owned or controlled by or acting or purporting to act for or on behalf of, director or indirectly, IRISL."[17] The Clawson Affidavit summarizes similar findings by the United Nations and the British government, as well as reports by an Indian shipping company and press outlets concerning Iranohind's relationship to IRISL. (Clawson Aff't ¶ 19.)

The United States Treasury has designated IRISL Benelux NV as engaging in proliferation activities, stating that it was "found to be owned or controlled by or acting or purporting to act for or on behalf of, directly or indirectly, IRISL."[18] It stated that entities doing businesses with this and other IRISL entities "may be unwittingly helping the shipping line facilitate Iran's proliferation activities." Id.

Based on the foregoing, this Court concludes that Azores, Iranohind and IRISL Benelux NV functioned as instrumentalities of the government of Iran. 28 U.S.C. § 1603(b). Each is owned or controlled by, or acts on behalf of IRISL, which is Iran's national carrier.

IV.     The Petitioners Are Entitled to Attach the Requested Funds.

Petitioners have come forward with evidence that the Iran Entities are agencies and instrumentalities of Iran. In addition, OFAC has listed each of these entities as SDNs. (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, January 24, 2013, at 97, 99, 100, 161, 221, 233.)[19] Under the FSIA, because the Iran entities are instrumentalities of Iran, the assets of these entities may be attached in aid of execution of judgment. 28 U.S.C. § 1610(g). Section 201 of the TRIA also states that these assets may be subject to attachment in aid of execution of judgment. Note, 28 U.S.C. § 1610.

---

[17] http://www.treasury.gov/press-center/press-releases/Pages/hp1130.aspx.
[18] http://www.treasury.gov/press-center/press-releases/Pages/hp1130.aspx.
[19] http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

Petitioners have submitted a chart produced by the respondent reflecting the EFT transactions, including the transactions' dates, the sending banks and the transactions' originators and beneficiaries. (Seniawski Dec. Ex. 14.) Specifically, the chart reflects that BSI was the intended beneficiary of a $90,628.80 ETF of June 21, 2007; Azores originated a $4,740 EFT of September 29, 2008; IRISL Benelux NV was the intended beneficiary of two EFTs of January 21 and 22, 2009, the first in an amount of $61,974 and the second in an amount of $99,974; EDBI was intended beneficiary of a $97,767.50 EFT of April 24, 2009; and Bank Melli was issuing bank in a $2,181.88 EFT of July 26, 2010. (Seniawski Dec. Ex. 14.) The respondent participated in these transactions, either as the sending bank or the beneficiary's bank. (Seniawski Dec. Ex. 14.) This chart is evidence that the Iran Entities have an interest in the blocked assets that warrant them to attachment in aid of execution of judgment. In addition, the Iran Entities received notice of this action and have failed to appear and assert a claim as to any of the assets.

Pursuant to Rule 69(a), Fed. R. Civ. P., a money judgment is enforced by a writ of execution. "The procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Id. New York CPLR § 5225(b) governs the enforcement of a judgment as to property not in the possession of a judgment debtor. It states in part:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it

as is sufficient to satisfy the judgment, to the judgment creditor and, if
the amount to be so paid is insufficient to satisfy the judgment, to
deliver any other personal property, or so much of it as is of sufficient
value to satisfy the judgment, to a designated sheriff. . . . Notice of
the proceeding shall also be served upon the judgment debtor in the
same manner as a summons or by registered or certified mail, return
receipt requested. The court may permit the judgment debtor to
intervene in the proceeding.

Id. Petitioners have come forward with evidence that respondent Bank of Tokyo is "a person

in possession or custody of money" that belongs to the Iran Entities, a fact that Bank of Tokyo

does not dispute. The named judgment debtors are the Islamic Republic of Iran, the Iranian

Ministry of Information and Security, and the Iranian Islamic Revolution Guard Corps, and

petitioners have come forward with evidence that the Iran Entities function as

instrumentalities of the Islamic Republic of Iran. Pursuant to section 201(a) of the TRIA, as

instrumentalities of the Islamic Republic of Iran, "the blocked assets of that terrorist party

(including the blocked assets of any agency or instrumentality of that terrorist party) shall be

subject to execution or attachment in aid of execution." Note, 28 U.S.C. § 1610. Under

CPLR § 5225(b), "the judgment debtor is entitled to the possession of such property . . . ."

Based on the foregoing, this Court concludes that the petitioners have

established their entitlement to an order attaching the Iran Entities' funds that are possessed

by the respondents and that they have satisfied the procedure set forth by New York CPLR §

5225(b).

V.    This Court and the Parties Accept the Representations of the United
States that No OFAC License Is Required to Authorize Release of the
Blocked Assets.

While the respondent does not oppose the petitioners' motion, it notes

concerns that OFAC must issue a license specific to the blocked assets before they can be

made available for attachment. (Response Mem. at 2-3.) It states that if it were to turn over

the funds without an OFAC license, it could be subject to civil and criminal penalties.
(Response Mem. at 3.)  The IEEPA sets forth civil and criminal penalties for violating the
statute and any related license, order, regulation or prohibition.  50 U.S.C. § 1705.  As
respondent notes, the Department of Treasury also has stated on its website that "[a] license is
an authorization from OFAC to engage in a transaction that otherwise would be prohibited."[20]
Respondent argues that the petitioners should bear any risks or expenses associated with
releasing the blocked funds.  (Resp. Mem. at 3.)

   At the invitation of the Court and in response to the current motion, the United
States submitted a Statement of Interest pursuant to 28 U.S.C. § 517.  The Statement
concludes that "in the event a court determines that blocked assets are subject to TRIA, those
funds may be distributed without a license from OFAC."  (Statement of Interest at 3.)  The
Statement attaches a January 6, 2006 letter addressed to Judge Marrero in Weininger v.
Castro, 05 Civ. 7214 (VM), which asserted in identical terms that if the TRIA applied to the
underlying funds, the funds can be distributed without a license from OFAC.  (Statement of
Interest Ex. E.)  See also Weininger v. Castro, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006)
(quoting same).  Petitioners also state that they have kept OFAC informed of this litigation
and submitted a copy of the present motion to OFAC, as required by 31 C.F.R. § 501.605.
(Seniawski Supp. Dec. ¶¶ 3-4 & Ex. 2.)

   Following the submissions by the government and the petitioners, Bank of
Tokyo now "accepts the representations of counsel for the Petitioners about its
communications with OFAC and accepts the Government's stated position that a turnover
order of this Court would be sufficient" to permit Bank of Tokyo "to disburse the Blocked

---

[20] http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#60.

-20-

Assets without the need for a separate OFAC license." (Response to Statement of Interest ¶ 3.)

This Court is aware of no contrary authority that would require an OFAC license in this instance.  It accepts the Statement of Interest's assertion that no OFAC license is required.

CONCLUSION

The petitioners' motion for summary judgment is GRANTED.  (Docket # 36.) The Clerk is directed to terminate the motion.

Petitioners are directed to submit a proposed order, on notice to the respondent, within 14 days of the date of this Memorandum and Order.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        January 29, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

THE ESTATE OF MICHAEL HEISER, et al.,

      Petitioners,

v.

MASHREQBANK, PSC,

      Respondent.

-------------------------------------------------------------x

11-CV-1609 (SAS) (MHD)

**[PROPOSED] JUDGMENT AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND TURNOVER ORDER PURSUANT TO N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) AND TRIA § 201(a)**

      WHEREAS on February 27, 2012, the Petitioners the Estate of Michael Heiser, *et al.* (collectively, the "Petitioners") filed their Motion for Summary Judgment and Turnover Order Pursuant to N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) and TRIA § 201 (the "Motion") (ECF Dkt. No. 26), which is currently before the Court.

      WHEREAS this matter came before the Court on the Petitioners' Petition for Turnover Order Pursuant to Fed. R. Civ. P. 69 and N.Y. C.P.L.R. §§ 5225 & 5227 (the "Petition") filed on March 8, 2011, as amended on November 21, 2011.

      WHEREAS on December 22, 2006, the United States District Court for the District of Columbia entered judgment in favor of the Petitioners and against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Islamic Revolutionary Guard Corps. (collectively, "Iran"), pursuant to 28 U.S.C. § 1605A, as amended pursuant to a judgment dated September 30, 2009 (collectively, the "Judgment").

      WHEREAS the Judgment remains unsatisfied in the total amount of $591,089,966.00, plus post-judgment interest at the legal rate.



1

Add. 46

WHEREAS the Petitioners subsequently registered the Judgment with this Court pursuant to 28 U.S.C. § 1963 under case numbers M18-302 (judgment number 08,1562) and 10-MC-00005 (judgment number 10,2146).

WHEREAS on February 7, 2008 and May 10, 2010, the Petitioners obtained orders from the United States District Court for the District of Columbia: (1) finding that a reasonable period of time had elapsed following the entry of the Judgment and the giving of notice under 28 U.S.C. § 1608(e) and (2) authorizing the Petitioners to pursue attachment in aid of execution and execution of the Judgment.  In addition, on August 25, 2011, the Petitioners obtained an order from this Court pursuant to 28 U.S.C. § 1610(c), *inter alia*, authorizing the issuance of writs of execution for service on, *inter alia*, the Respondent Mashreqbank PSC (the "Respondent").

WHEREAS on December 10, 2010 and August 27, 2011, the Petitioners delivered writs of execution upon the United States Marshal for the Southern District of New York for service on the Respondent and the U.S. Marshal then levied the writs on the Respondent.

WHEREAS on October 3, 2011, the Court entered an Order Concerning Notice to and Service on Third Parties (the "Service Order") (ECF Docket No. 19): (1) establishing a process for providing notice of the Petition to third parties (the "Third Parties" or a "Third Party") who the Respondent believed may assert a claim in assets held by the Respondent (upon information provided by the United States Department of Treasury's Office of Foreign Assets Control ("OFAC")) in which Iran and/or its agencies and instrumentalities may have an interest that were blocked pursuant to OFAC's sanctions programs, and (2) setting a time period within which such Third Parties must submit a claim to the blocked assets.

WHEREAS the Petitioners have provided notice in accordance with the Court's Service Order, and no Third Parties have appeared or otherwise asserted a claim in this proceeding.

2

Add. 47

WHEREAS on February 27, 2012, the Petitioners filed the Motion establishing that the blocked assets that are set forth in detail in section IV of the Motion filed under seal (the "Blocked Assets"), totaling $123,202.32 plus accrued interest, are subject to turnover pursuant to N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) and the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002), codified at 28 U.S.C. § 1610 note, in partial satisfaction of the Judgment.

NOW, THEREFORE, it is:

ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is **GRANTED**.

2.      Summary judgment is hereby entered in favor of the Petitioners and against the Respondent.

3.      Within five (5) days of the date of this Order, the Respondent shall pay and turn over to the Petitioners the Blocked Assets, plus any accrued interest.

4.      Upon payment and turn over of the Blocked Assets to the Petitioners, the Respondent shall be discharged and released from all liability and obligations of any nature to the Petitioners, the Third Parties, and any other person or entity with respect to the Blocked Assets only.

**IT IS SO ORDERED.**

Dated:     New York, New York
           May 4 , 2012

           _____
           The Honorable Shira A. Scheindlin
           United States District Judge

3

Add. 48

Gibbons                    7/26/2012 4:20:17 PM   PAGE    4/006   Fax Server
Case 1:11-cv-01596-JPO -MHD   Document 45    Filed 08/06/12   Page 1 of 3

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #:                            │
│ DATE FILED: 8/6/12                │
└──────────────────────────────────┘
```

UNITED STATES DISTRICT COURT          ~~FILED UNDER SEAL~~
SOUTHERN DISTRICT OF NEW YORK         ~~(Pursuant to Confidentiality Order~~
                                      ~~Dated October 12, 2011)~~

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ESTATE OF MICHAEL HEISER, et al.,      11-CV-1596 (JPO) (MHD)

     Petitioners.                    [~~PROPOSED~~] JUDGMENT AND
                                            ORDER GRANTING MOTION FOR
v.                                          SUMMARY JUDGMENT AND
                                            TURNOVER ORDER PURSUANT
COMMERZBANK AG,                             TO N.Y. C.P.L.R. § 5225, 28 U.S.C. §
                                            1610(g) AND TRIA § 201(a) AND
     Respondent.                    DISCHARGING RESPONDENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     WHEREAS on February 10, 2012, the Petitioners the Estate of Michael Heiser, *et al.*

(collectively, the "Petitioners") filed their Motion for Summary Judgment and Turnover Order

Pursuant to N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) and TRIA § 201 (the "Motion") (ECF

Dkt. No. 32), which is currently before the Court.

     WHEREAS this matter originally came before the Court on the Petitioners' Petition for

Turnover Order Pursuant to Fed. R. Civ. P. 69 and N.Y. C.P.L.R. §§ 5225 & 5227 (the

"Petition") filed on March 8, 2011, as amended on November 17, 2011.

     WHEREAS on November 16, 2011, the Court entered an Order Concerning Notice to

and Service on Third Parties (the "Service Order") (ECF Docket No. 26): (1) establishing a

process for providing notice of the Petition to third parties (the "Third Parties" or a "Third

Party") who the Respondent believed may assert a claim in assets held by the Respondent (upon

information provided by the United States Department of Treasury's Office of Foreign Assets

Control ("OFAC")) in which Iran and/or its agencies and instrumentalities may have an interest

that were blocked pursuant to OFAC's sanctions programs, and (2) setting a time period within

which such Third Parties must submit a claim to the blocked assets.

Add. 49

WHEREAS, the Petitioners have provided notice in accordance with the Court's Service Order and no Third Parties have appeared or otherwise asserted a claim in this proceeding.

WHEREAS on February 10, 2012, the Petitioners filed the Motion establishing that the blocked assets that are set forth in detail in section IV of the Motion filed under seal (the "Blocked Assets"), totaling $610,821.13 plus accrued interest, are subject to turnover pursuant to N.Y. C.P.L.R. § 5225, 28 U.S.C. § 1610(g) and the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002), codified at 28 U.S.C. § 1610 note, in partial satisfaction of the Petitioners' judgment.

WHEREAS the plaintiffs in an action captioned *Owens, et al. v. Republic of Sudan, et al.* (D.D.C. Civil Action No. 008-cv-01273) (the "Owens Plaintiffs"), have served upon Respondent on or about July 20, 2012 a certain Notice Pursuant to 28 U.S.C. § 1605A(g) of Pending Action of Lien of Lis Pendens (S.D.N.Y. Misc. No. 12-00243).

WHEREAS Respondent has provided notice of this action and of Petitioners' Motion for Summary Judgment and Turnover to the Owens Plaintiffs.

NOW, THEREFORE, it is:

ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is **GRANTED**.

2.      Summary judgment is hereby entered in favor of the Petitioners and against the Respondent.

3.      Within five (5) business days of the date of this Order, the Petitioners shall provide to Respondent wire instructions for payment and turnover of the Blocked Assets; within

EAST\49495066.1                              2                      #1814906 v2
                                                                   103969-73332

Add. 50

five (5) business days of receipt of such wire instructions, Respondent shall pay and turn over to the Petitioners the Blocked Assets, plus any accrued interest.

    4.    Upon payment and turnover of the Blocked Assets to the Petitioners, the Respondent shall be discharged and released from all liability and obligations of any nature to the Petitioners, the Third Parties, and any other person or entity, including without limitation the Owens Plaintiffs, with respect to the Blocked Assets only.

    5.    Upon payment and turnover of the Blocked Assets to the Petitioners, the Petitioners, the Third Parties, and any other person or entity, including without limitation the Owens Plaintiffs, are hereby permanently restrained and enjoined from instituting or pursuing any legal actions or proceedings against the Respondent with respect to the Blocked Assets only.

**IT IS SO ORDERED.**

Dated:    New York, New York
        Aug. 6 , 2012

                          The Honorable J. Paul Oetken
                          United States District Judge

# TERRORIST ASSETS REPORT

## Calendar Year 2007
## Sixteenth Annual Report to Congress
## on
## Assets in the United States
## of Terrorist Countries
## and International Terrorism Program
## Designees



## Office of Foreign Assets Control
## U.S. Department of the Treasury

# TERRORIST ASSETS REPORT
## Calendar Year 2007

**Sixteenth Annual Report to the Congress on Assets
in the United States
of Terrorist Countries and International Terrorism Program Designees**

OFFICE OF FOREIGN ASSETS CONTROL
U.S. DEPARTMENT OF THE TREASURY

## CONTENTS

**Background**

        **A.**    **Economic Sanctions and Terrorism**

        **B.**    **Nature of Blocked Assets**

        **C.**    **Nature of OFAC Information Sources**

        **D.**    **This Report**

**Part I**        **Assets Relating to International Terrorist Organizations**

        **A.**    **Programs**

        **B.**    **Administering and Enforcing the Terrorism Sanctions**

        **C.**    **Impact of Terrorism Sanctions**

        **D.**    **Summary of Blocked Assets of International Terrorist Organizations**

        **E.**    **Real and Tangible Property of International Terrorist Organizations**

        **Exhibit A**    **OFAC Blocked Funds in the United States Relating to SDGT, SDT and FTO Programs**

**Part II**        **Assets Relating to State Sponsors of Terrorism**

        **A.**    **The State Sponsors of Terrorism**

        **B.**    **Reported Assets Relating to States Sponsors of Terrorism**

        **C.**    **Non-Blocked Funds Relating to State Sponsors of Terrorism**

        **D.**    **Real and Tangible Property of State Sponsors of Terrorism**

**Tables**

        **Table 1**    **OFAC Blocked Funds Relating to State Sponsors of Terrorism in the United States**

        **Table 2**    **OFAC Blocked Funds Relating to State Sponsors of Terrorism in Foreign Branches of U.S. Banks**

        **Table 3**    **Non-Blocked Funds Relating to State Sponsors of Terrorism in the United States**

        **Table 4**    **Summary of Funds Relating to State Sponsors of Terrorism Under United States Jurisdiction**

**Attachments**

**Tab 1**      **Statutory Reporting Requirement on Terrorist Assets in United States**

**Tab 2**      **Federal Agencies and Offices Polled for Information**

**Tab 3**      **Executive Order 13224 -- "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," September 23, 2001 (66 *Federal Register* 49079, September 25, 2001)**

**Tab 4**      **Executive Order 13268 – "Termination of Emergency With Respect to the Taliban and Amendment of Executive Order 13224 of September 23, 2001," July 2, 2002 (67 *Federal Register* 44751, July 3, 2002)**

**Tab 5**      **Executive Order 12947 -- "Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process," January 23, 1995 (60 *Federal Register* 5079, January 25, 1995)**

**Tab 6**      **Executive Order 13099 — "Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process," August 20, 1998 (63 *Federal Register* 45167, August 25, 1998)**

**Tab 7**      **Executive Order 13129 – "Blocking Property and Prohibiting Transactions With the Taliban," July 4, 1999 (64 *Federal Register* 36759, July 7, 1999)**

**Tab 8**      **Authorities for Administering State Sponsors of Terrorism Program**

## BACKGROUND

### A. Economic Sanctions and Terrorism

Historically, the U.S. Government has used economic sanctions primarily as a tool to pressure foreign governments and regimes, including state sponsors of terrorism. Since 1995, the U.S. Government has also used targeted economic sanctions as a tool against international terrorists and terrorist organizations. Following the events of September 11, 2001, President Bush issued Executive Order 13224, significantly expanding the scope of then-existing U.S. sanctions against terrorists and terrorist organizations based in the Middle East. The combination of programs targeting international terrorists and terrorist organizations with those targeting terrorism-supporting governments constitutes a wide-ranging assault on international terrorism and its supporters and financiers.

The Department of the Treasury's Office of Foreign Assets Control (OFAC) is the lead office for implementing sanctions with respect to assets of international terrorist organizations and terrorism-supporting countries. OFAC implements these sanctions as part of its general mission *to administer and enforce economic and trade sanctions based on U.S. foreign policy and national security goals.* In administering and enforcing U.S. economic sanctions programs, OFAC focuses on identifying persons for designation; assisting U.S. persons in complying with the sanctions prohibitions through its compliance and licensing efforts; assessing civil monetary penalties against U.S. persons violating the prohibitions; working with other U.S. Government agencies, including law enforcement; and coordinating and working with other nations to implement similar strategies. Currently, OFAC administers sanctions programs targeting international terrorists and terrorist organizations. OFAC also administers sanctions programs relating to the five countries that have been designated as state sponsors of terrorism.

### B. Nature of Blocked Assets

The blocked asset amounts described below represent amounts frozen under U.S. sanctions programs that block all property and interests in property of designated parties. The term "interest" is broadly defined in OFAC's sanctions regulations in Chapter V of Title 31 of the Code of Federal Regulations. An interest in property may be direct or indirect and include property interests short of full ownership. In many instances, the interest may be partial or contingent. Because the blocked assets discussed in this report include assets not actually owned by designated parties, they are described throughout as assets "relating to" a designated party. Many of the assets may be owned by or subject to claims by third parties.

OFAC regulations generally prohibit any form of judicial disposition of blocked property. However, the Terrorism Risk Insurance Act of 2002 (the TRIA) includes a provision making blocked assets of a terrorist party available to satisfy certain judgments against terrorist parties, including judgments based on claims for which sovereign immunity of foreign states is waived by 28 U.S.C. § 1605 (a)(7) (certain claims for personal injury or death).

Some, but not all, of OFAC's sanctions programs relating to terrorism entail the blocking, i.e., freezing, of assets. Implementation of programs targeting international terrorist organizations has resulted in the blocking in the United States of more than $20 million in which there exists an interest of an international terrorist organization or other related designated party.[1]

More than $402 million in assets relating to five designated state sponsors of terrorism have been identified by OFAC as located within U.S. jurisdiction. Of that amount, $315 million in assets are blocked pursuant to economic sanctions imposed by the United States and administered by OFAC. The remaining balance of $87 million in assets represents non-blocked assets of individuals and entities from Iran and Syria.[2] Unless otherwise noted, this report provides data for the calendar year ending December 31, 2007.

## C. Nature of OFAC Information Sources

The sources of information that OFAC uses in this report vary depending on the nature of the sanctions target. With respect to terrorists and terrorist organizations, OFAC relies solely on information that U.S. persons are obligated to report to OFAC with respect to blocked assets. With respect to state sponsors of terrorism, OFAC relies primarily on reports of blocked property when applicable, but also has obtained with respect to certain countries additional information deemed appropriate for inclusion in the report.[3]

## D. This Report

Section 304 of Public Law 102-138, as amended by Public Law 103-236 (22 U.S.C. § 2656g) (hereinafter referred to as Section 304) (Tab 1), requires the Secretary of the Treasury, in consultation with the Attorney General and appropriate investigative agencies, to provide an annual report to the Congress concerning the nature and extent of assets held in the United States by terrorism-supporting countries and organizations engaged in international terrorism. The Department of the Treasury submitted its first Terrorist Assets Report to the Congress in April 1993. The current report, covering calendar year 2007, is the sixteenth successive Terrorist Assets Report.

The Terrorist Assets Report, which is prepared by OFAC based on information reported to it by other Government agencies and non-government parties, is submitted to the Committee on Foreign Relations and the Committee on Finance in the Senate and to the Committee on International Relations and the Committee on Ways and Means in the House of Representatives.

---

[1] This figure does not include amounts reported to OFAC as blocked where the appropriateness of the blocking is under review.
[2] See Part II, Section C, and Table 3, Non-Blocked Funds Relating to State Sponsors of Terrorism.
[3] See Part II, Section C regarding non-blocked assets.

More than 20 Federal agencies and offices were polled in developing this report. These agencies and offices are listed in Tab 2.

Both funds and real and tangible property are included in this report.[4]  Funds are reported in the following exhibits and tables:

- Exhibit A contains figures for OFAC blocked funds in the United States relating to international terrorist organizations.

- Tables 1 and 2 contain figures for OFAC blocked funds relating to state sponsors of terrorism that are held in the United States or in offshore branches or subsidiaries of U.S. banks.

- Table 3 contains figures for non-blocked funds of Iran and Syria as reported to OFAC by the Treasury International Capital Reporting System and the Federal Reserve.

- Table 4 summarizes the amounts reported in Tables 1 through 3.

Descriptions of real and tangible property are reported in Part I, Section E for international terrorist organizations and Part II, Section D for state sponsors of terrorism.

---

[4] For purposes of this report, the term "funds" means financial holdings (e.g., cash accounts, securities, and debt obligations).

3

# PART I     ASSETS RELATING TO INTERNATIONAL TERRORIST ORGANIZATIONS

Section 304 requires that the Department of the Treasury report on assets with respect to "organizations engaged in international terrorism." For the purposes of this report, "organizations engaged in international terrorism" include only those organizations targeted with sanctions under any of the three OFAC-administered sanctions programs relating to terrorist organizations as discussed below.

## A. Programs

### 1. Executive Order 13224 - Specially Designated Global Terrorists (SDGTs)

On September 23, 2001, President Bush declared a national emergency, pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 (IEEPA), and other authorities, in Executive Order 13224 (E.O. 13224), "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism" (Tab 3). E.O. 13224 was issued in response to the grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist acts committed on September 11, 2001, in New York and Pennsylvania and against the Pentagon, and the continuing and immediate threat of future attacks on U.S. nationals and the United States. The terrorist acts of September 11, 2001, were also recognized and condemned in United Nations Security Council Resolutions (UNSCR) 1368 (September 12, 2001), 1373 (September 28, 2001), and 1735 (December 22, 2006).[5] E.O. 13224 imposes economic sanctions on persons who have been determined to have committed or pose a significant risk of committing acts of terrorism, as well as on persons determined to be owned or controlled by such persons or to provide support to such persons or acts of terrorism. It prohibits any transaction or dealing in property or interests in property of any person (i.e., an individual or entity) designated under its authority, including the donation of funds, goods, or services, and it blocks all property in the United States or within the possession or control of a U.S. person in which there is an interest of any designated person.

In the Annex to E.O. 13224, President Bush identified 12 individuals and 15 entities whose assets are subject to blocking (Tab 3). The Taliban and its leader were added to the Annex pursuant to Executive Order 13268 (E.O. 13268) (Tab 4). Subsequently, additional individuals and entities have been designated by the Department of State and the Department of the Treasury. As of December 31, 2007, a total of 478 individuals and entities had been identified or designated and remain listed as "Specially Designated Global Terrorists" or "SDGTs" for having met one or more of the criteria for designation set forth in E.O. 13224.[6]

---

[5] Currently more than 330 individuals and entities designated by the United States Government pursuant to E.O. 13224 have been listed on the UNSCR 1267/1735 Consolidated List.

[6] The 478 SDGTs designated pursuant to E.O. 13224 include 42 Foreign Terrorist Organizations (FTOs) designated by the Secretary of State pursuant to the Antiterrorism and Effective Death Penalty Act of 1996.

4

**2. Executive Orders 12947 and 13099 - Specially Designated Terrorists (SDTs)**

On January 23, 1995, President Clinton declared a national emergency pursuant to IEEPA and other authorities in Executive Order 12947 (E.O. 12947), "Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process" (Tab 5). E.O. 12947 targets terrorists threatening the Middle East peace process (termed "Specially Designated Terrorists," or "SDTs") and prohibits dealings in property or interests in property of any organization or individual designated under its authority, including the donation of funds, goods, or services, and it blocks all property in the United States or within the possession or control of a U.S. person in which there is an interest of any designated person. Twelve terrorist organizations were named in the Annex to E.O. 12947.

On August 20, 1998, President Clinton issued Executive Order 13099 (E.O. 13099) amending E.O. 12947 by adding three individuals and one organization to the Annex of E.O. 12947, including Usama bin Muhammad bin Awad bin Ladin (also known as Osama bin Ladin) and Al-Qaida.

**3. Antiterrorism Act of 1996 – Foreign Terrorist Organizations (FTOs)**

On April 24, 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1247-1258 (the Antiterrorism Act). Section 302 of the Antiterrorism Act (8 U.S.C. § 1189) authorizes the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to designate organizations meeting stated criteria as foreign terrorist organizations, with prior notification to the Congress of the Secretary's intent to designate. Section 303 of the Act (18 U.S.C. § 2339B) makes it a crime for persons within the United States or subject to U.S. jurisdiction to knowingly provide material support or resources to a foreign terrorist organization designated under Section 302. Additionally, except as authorized by the Department of the Treasury, U.S. financial institutions in possession or control of funds in which a foreign terrorist organization or its agent has an interest are required to block such funds and report on the funds to the Department of the Treasury.

As of December 31, 2007, 42 organizations or groups had been designated as FTOs by the Department of State. These 42 FTOs include 12 of the 13 Middle East terrorist organizations previously designated under Executive Orders 12947 and 13099 and 30 other foreign organizations located in South America, Europe, Asia, and Africa. All of these are also designated pursuant to E.O. 13224.

5

## B. Administering and Enforcing the Terrorism Sanctions

Terrorists, terrorist groups and terrorist supporters that are designated pursuant to Executive Orders 12947, 13099 and 13224, or as an FTO, are placed on OFAC's public list and are generically referred to as "Specially Designated Nationals" or "SDNs." In the context of the terrorism programs, they may be known as SDTs, SDGTs, or FTOs, depending on the individual or entity in question.

U.S. persons[7] are prohibited from conducting unauthorized transactions or having other dealings with or providing services to the designated individuals or entities. Any property or property interest of a designated person that comes within the control of a U.S. person is blocked and must be reported to OFAC. Foreign persons may be held liable for effecting such transactions from the United States.

## C. Impact of Terrorism Sanctions

The imposition of sanctions by the United States and its international partners against terrorists, terrorist organizations and their support structures is a powerful tool. Its effects reach far beyond the blocking of terrorist assets. Designating individuals or organizations as SDGTs, SDTs, or FTOs notifies the U.S. public and the world that these parties are either actively engaged in or supporting terrorism or that they are being used by terrorists and their organizations. Notification exposes and isolates these individuals and organizations, denies them access to the U.S. financial system and, in the case of a UN designation, the global financial system. Furthermore, banks and other private institutions around the world frequently consult OFAC's SDN list and report denying listed entities access to their institutions. In addition, the imposition of economic sanctions can assist or complement the law enforcement actions of other U.S. agencies and/or other governments.

## D. Summary of Blocked Assets of International Terrorist Organizations

As of December 31, 2007, assets blocked pursuant to E.O.s 12947, 13099, and 13224 totaled $20,736,920.[8] Total amounts blocked will be subject to change for a number of reasons, including application of the TRIA, which authorizes eligible persons who hold judgments arising out of acts of terrorism to attach certain blocked assets to

---

[7] U.S. persons include: all U.S. citizens, U.S. permanent resident aliens, and foreign nationals present in the United States; U.S. citizens and U.S. permanent resident aliens abroad; corporations organized under U.S. law and foreign companies' branches/subsidiaries located in the United States; and foreign branches of U.S. companies.

[8] Taliban assets are blocked pursuant to E.O. 13224. On July 2, 2002, the President issued E.O. 13268 (**Tab 4**), terminating Executive Order 13129 (**Tab 7**) and the emergency with respect to the Taliban because the U.S. military campaign in Afghanistan ended the Taliban's territorial control. The Taliban and its leader, Mohammed Omar, were added to the Annex to E.O. 13224 pursuant to E.O. 13268. Accordingly, the remaining blocked assets of the Taliban and its leader have been incorporated into the above section of this report dealing with SDGTs. Approximately $261.5 million in Afghan assets were unblocked and turned over to the Afghan Interim Authority between February and April 2002 as the Authority established control over Afghanistan following the United States-led military campaign.

6

satisfy their compensatory damages awards.[9]  Additionally, fluctuation may occur in the value of blocked assets due to the authorized withdrawal of blocked funds under various circumstances consistent with overall sanctions policy.

The increase in blocked terrorist organization assets in 2007 is due to new or additional blockings, interest paid on blocked funds, and increased share price on certain blocked securities.

## E. Real and Tangible Property of International Terrorist Organizations

The U.S. Government has identified and designated organizations inside the United States that are branches of, or have been determined to provide support to or be owned or controlled by, designated terrorist groups or individuals.  The following organizations own blocked real and/or tangible property inside the United States:  the Holy Land Foundation has tangible property in several warehouse locations in the United States; the Benevolence International Foundation (BIF) owns real estate and tangible property in the greater-Chicago area; the Islamic American Relief Agency (IARA) owns tangible property in Missouri; and the Al Haramain Islamic Foundation owns real estate in Missouri.  The specific current values for these real and tangible properties are not known.  OFAC utilizes a government contractor to ensure that blocked tangible property is stored in a safe and secure environment.  Based on long-standing policy, OFAC does not conduct valuations of tangible property or appraisals of real property until the property is to be sold or auctioned.  In some cases, tax assessments for real property are available from a local tax office, but these assessments may not reflect a true market value.

---

[9] Section 201(a) of the TRIA provides:

(a)  IN GENERAL-Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605 (a)(7) of Title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

**EXHIBIT A**

## OFAC Blocked Funds in the United States Relating to SDGT, SDT and FTO Programs[10]

| ORGANIZATION/RELATED DESIGNEES | BLOCKED AS OF 2007 | BLOCKED AS OF 2006 |
|---|---|---|
| AL-QAIDA | $ 11,324,361 | $ 7,764,452 |
| HAMAS | $ 8,658,832 | $ 8,405,981 |
| HIZBALLAH | $ 437,281 | $ 108,176 |
| MUJAHEDIN-E KHALQ ORGANIZATION | $ 111,423 | $ 109,565 |
| NEW PEOPLE'S ARMY | $ 3,750 | $ 3,750 |
| PALESTINIAN ISLAMIC JIHAD | $ 63,508 | $ 19,044 |
| KAHANE CHAI | $ 201 | $ 201 |
| TALIBAN | $ 2,648 | $ 2,648 |
| LIBERATION TIGERS OF TAMIL EELAM (LTTE) | $ 134,916 | $ N/A[11] |
| ***Total assets of SDGTs, SDTs and FTOs*** | $ 20,736,920 | $ 16,413,817 |

[10] Assets reported in Exhibit A as blocked pursuant to the terrorist programs may also include assets attributable to state-sponsors of terrorism to the extent that a state-owned entity was designated on the basis of providing support to one of the listed international terrorist organizations. For administrative purposes, an allocation of blocked assets has been attributed to one terrorist organization in certain cases even though the publicly disclosed basis for designation may link an entity to more than one terrorist organization.

[11] Since LTTE was designated on November 5, 2007, this is the first report for which blocked assets are reportable.

Add. 63

## PART II    ASSETS RELATING TO STATE SPONSORS OF TERRORISM

**A. The State Sponsors of Terrorism**

"Terrorist countries" for purposes of this report are the state sponsors of terrorism designated by the Secretary of State under Section 6(j) of the Export Administration Act (50 U.S.C. App. § 2405) and Section 40(d) of the Arms Export Control Act (22 U.S.C. § 2780(d)).  States currently designated as sponsors of terrorism are:  Cuba, Iran, North Korea, Sudan, and Syria.

**B. Reported Assets Relating to State Sponsors of Terrorism**

The following information describes the nature and extent of assets held in the United States or in offshore branches or subsidiaries of U.S. banks that are blocked or that otherwise relate to countries designated as state sponsors of terrorism.  These assets include funds reported in Tables 1, 2, and 3, as well as real and tangible property described in Section D below.

Tables 1, 2, and 3 include a breakdown of the funds reported to OFAC relating to the five state sponsors of terrorism.  Table 4 is a summary of the amounts reported in Tables 1, 2, and 3.  For each country, the nature of the referenced funds (blocked and non-blocked) is different and the sources of information may vary, as discussed below. Not all of the funds reported in Tables 1, 2, 3, and 4 are physically located in the United States.  A relatively small amount is in foreign branches and subsidiaries of U.S. banks, where such funds are subject to legal requirements of the host country that may conflict with sanctions-related restrictions under U.S. law.

With respect to any blocked assets discussed below, there are changes in value, location, and composition over time consistent with OFAC's receipt of reports from holders of blocked assets identifying additional assets of sanctioned countries; updates of information received from holders of blocked accounts on accrued interest and fluctuating market values; and licensing of various transactions in accordance with United States foreign policy objectives and applicable law.  Additionally, there are circumstances under which blocked assets of state sponsors of terrorism may be subject to vesting to satisfy foreign policy objectives, meet statutory obligations or subject to attachment pursuant to TRIA.

**CUBA**

The fund totals for Cuba, as set forth in Tables 1 and 2, are derived from annual reports of blocked property submitted to OFAC pursuant to OFAC's regulations.  See 31 CFR § 501.603(b)(2).  Because the Cuba sanctions target not only the Government of Cuba, but also its nationals, defined to include entities and individuals, the reported figure includes the blocked assets of all these parties.  Consequently, this figure includes assets associated with blocked wire transfers intended for or sent by Cuban nationals.  It also

9

includes assets owned by third parties that have been blocked due to the indirect or contingent interests of the Cuban government or Cuban nationals.

**IRAN**

Assets reported for Iran include blocked and non-blocked funds, as well as blocked diplomatic and consular property.  The blocked Iranian property includes property of the Government of Iran that has remained blocked, under OFAC's Iranian Assets Control Regulations, 31 CFR part 535, since the hostage crisis was resolved in 1981.  The property blocked in 1981 remains blocked in part because of pending claims before the Iran-U.S. Claims Tribunal.  The blocked Iranian diplomatic and consular real and tangible property is described in Section D below.  Blocked funds in which the Government of Iran has an interest are reported in Table 1, and non-blocked funds associated with Iranian entities and individuals are reported in aggregate form in Table 3.  The blocked funds reported in Table 1 include rental proceeds derived from the diplomatic and consular property; the security deposits of the tenants are included in the reported figure.[12]  The State Department's Office of Foreign Missions, the custodian of the diplomatic and consular real estate, is authorized to use the rental proceeds to maintain the blocked properties in keeping with the treaty obligations of the United States, and certain funds may have been earmarked for these purposes.  In addition to the diplomatic and consular real estate and rental proceeds, there are eleven Government of Iran consular accounts that have been blocked since 1981.

Additionally, other sanctions authorities designed to address national emergencies distinct from terrorism have also resulted in the blocking of assets in which the Government of Iran has an interest.  To the extent that assets have been blocked under such authorities, they are included in Table 1 and Table 2.[13]  The increase in blocked assets reported for Iran in Table 1 is attributable to blockings under these additional authorities.

There is no requirement for U.S. persons to report non-blocked assets to OFAC.  As described in Section C below, however, non-blocked funds may be reported to OFAC by the Treasury International Capital Reporting System and the Federal Reserve, which reflect (i) the total liabilities to individuals and entities located in Iran reported by banking and non-banking institutions in the United States as well as their major offshore branches and subsidiaries, and (ii) the value of U.S. long-term securities held by individuals and entities located in Iran.  These non-blocked funds associated with Iranian individuals and entities are reported in Table 3.

**NORTH KOREA**

The fund totals for North Korea, as set forth in Tables 1 and 2, are derived from annual reports of blocked property submitted to OFAC pursuant to OFAC's regulations.  See 31 CFR § 501.603(b)(2).  Because the North Korea sanctions have targeted not only

---

[12] Of the amount reported for Iran for 2007 in Table 1, $718,724 represents rental proceeds.

[13] As noted above, assets blocked pursuant to the SDT, SDGT, and FTO terrorist programs may also include assets attributable to state-sponsors of terrorism.

the Government of North Korea, but also its nationals, defined to include entities and individuals, the reported figure may include the blocked assets of all these parties. The fund totals include funds owned by third parties that have been blocked due to indirect or contingent interests of the North Korean government or North Korean nationals. Because nearly all prospective transactions in which the Government of North Korea or North Korean nationals have an interest have been authorized since June 2000, no additional North Korean assets have been blocked pursuant to the Foreign Assets Control Regulations, 31 CFR Part 500, since that time. There is no requirement for U.S. persons to report non-blocked assets to OFAC.

Sanctions authorities designed to address national emergencies distinct from terrorism have also resulted in the blocking of assets in which the Government of North Korea has an interest. To the extent that assets have been blocked under such authorities, they are also included in Table 1 and Table 2.

**SUDAN**

The fund totals for Sudan, as set forth in Tables 1 and 2, are derived from annual reports of blocked property submitted to OFAC pursuant to OFAC's regulations. See 31 CFR § 501.603(b)(2). While the Sudan sanctions primarily target the Government of Sudan, the blocked funds totals also include assets owned by third parties that have been blocked due to indirect or contingent interests of the Government of Sudan. There is no requirement for U.S. persons to report non-blocked assets to OFAC.

**SYRIA**

Although the Syrian Sanctions Regulations, 31 CFR part 542, entail the blocking of property of individuals and entities designated pursuant to the criteria in Executive Order 13338 of May 11, 2004,[14] no assets of the individuals and entities presently targeted by such sanctions have been reported to OFAC.

There is no requirement for U.S. persons to report non-blocked assets to OFAC. As described in Section C below, however, non-blocked funds are reported to OFAC by the Treasury International Capital Reporting System and the Federal Reserve, which reflect (i) the total liabilities to individuals and entities located in Syria reported by banking and non-banking institutions in the United States as well as their major offshore branches and subsidiaries, and (ii) the value of U.S. long-term securities held by individuals and entities located in Syria. These non-blocked funds associated with Syrian individuals and entities are reported in Table 3.

---

[14] In Executive Order 13338, President Bush declared a national emergency to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States posed by the actions of the Government of Syria in supporting terrorism, continuing its occupation of Lebanon, pursuing weapons of mass destruction and missile programs, and undermining United States and international efforts with respect to the stabilization and reconstruction of Iraq.

**C. Non-Blocked Funds relating to State Sponsors of Terrorism**

The non-blocked funds referenced above in the discussions of Iran and Syria and contained in Table 3 are derived from the Department of the Treasury's reporting systems on U.S. international capital movements and portfolio investment. These systems are designed primarily to collect information in aggregate form concerning the U.S. balance of payments and international investment position. The information provided to the Department of the Treasury through these reporting systems, together with the Federal Reserve System's data on assets and liabilities of U.S. banks' large foreign offices, represent comprehensive U.S. surveys of bank liabilities and portfolio investment gathered on individuals and public and private entities located in foreign countries. There are statutory restrictions on the use of the data to preserve the anonymity of reporters and asset holders. Data on non-blocked assets held in large offshore branches and subsidiaries of U.S. banks are taken from quarterly reports to the Federal Reserve System.

**D. Real and Tangible Property of State Sponsors of Terrorism**

Based on available information, each of the state sponsors of terrorism, except North Korea, owns diplomatic and consular real property in the United States. Cuba owns six blocked properties located in New York and Washington, D.C. Syria owns four non-blocked properties located in New York and Washington, D.C. Sudan owns six blocked properties located in New Jersey, New York, Virginia and Washington, D.C. Iran owns eleven blocked properties located in California, Illinois, Maryland, New York, Texas and Washington, D.C.

In addition, a Government of Iran bank owns property in New York that was blocked in connection with the bank's designation in 2007 under a sanctions authority which addresses a national emergency distinct from terrorism.

Based on long-standing policy, OFAC does not conduct valuations of tangible property or appraisals of real property until the property is to be sold or auctioned. In some cases, tax assessments for real property are available from a local tax office, but these assessments may not reflect a true market value.[15]

In regard to tangible property, Iran has laid claim before the Iran-U.S. Claims Tribunal to miscellaneous blocked and non-blocked military and non-military property that it asserts was in the possession of private entities in the United States when the hostage crisis was resolved in 1981. In response, the United States has asserted, among other arguments, that Iran has failed to identify the property, to establish that the property was in existence in 1981, to prove that it owned the property, to show that pre-

---

[15] The value of Iran's diplomatic and consular property, together with the remaining diplomatic and consular furnishings, had been reported in past years in the Terrorist Assets Report as $23.2 million. In last year's report, OFAC determined that the continued use of this figure may not provide an accurate reflection of the value of this property given the general fluctuation in property values in recent years. Because a current valuation for Iran's diplomatic and consular property is not available, OFAC has chosen not to include a figure in recent reports with respect to the value of this property.

existing liens have been satisfied, and/or to demonstrate that, due to physical deterioration, obsolescence, or other reasons, the property had anything more than a nominal or negligible value.  These issues are pending before the Tribunal.

**TABLE 1**

| OFAC Blocked Funds 1/ Relating to State Sponsors of Terrorism in the United States<br>(Amounts in millions of U.S. dollars) | | | | |
|---|---|---|---|---|
| **Country** | **2007** | **2006** | | **Source*** |
| | | | | |
| **CUBA** | $218.1 | $196.1 | | |
| | | | | |
| **IRAN** | $16.8 | $1.1 | | |
| | | | | |
| **NORTH KOREA** | $31.8 | $31.7 | | |
| | | | | |
| **SUDAN** | $48.2 | $80.6 | | |
| | | | | |
| **SYRIA** | $0.0 | $0.0 | | |
| | | | | |
| **TOTAL** | **$314.9** | **$309.5** | | |
| | | | | |
| *Table Source:  Office of Foreign Assets Control, unless otherwise noted | | | | |

1/ The value of real and tangible property is excluded from the amounts report in Table 1 and is discussed separately in Part II, Section D.

**TABLE 2**

| OFAC Blocked Funds Relating to State Sponsors of Terrorism in Foreign Branches of United States Banks<br>(Amounts in millions of U.S. dollars) | | | | |
|---|---|---|---|---|
| **Country** | **2007** | **2006** | | **Source*** |
| | | | | |
| **CUBA** | $0.3 | $0.3 | | |
| **NORTH KOREA** | $0.2 | $0.2 | | |
| **SUDAN** | $0.1 | $0.1 | | |
| | | | | |
| **TOTAL** | **$0.6** | **$0.6** | | |
| *Table Source:  Office of Foreign Assets Control, unless otherwise noted | | | | |

14

## TABLE 3

| Non-Blocked Funds Relating to State Sponsors of Terrorism in the United States (Amounts in millions of U.S. dollars) | | | | |
|---|---|---|---|---|
| **Country** | **2007** | **2006** | | **Source** |
| | | | | |
| **IRAN** | $28.0 | $44.0 | | Treasury International Capital Reporting System and Federal Reserve System 1/ |
| | $7.0 | $7.0 | | Survey of Foreign Holdings of U.S. Securities (Treasury International Capital Reporting System) 2/ |
| | ($0.0) | ($0.0) | | Treasury International Capital Reporting System and Federal Reserve System 3/ |
| ***Net Iranian Assets*** | **$35.0** | **$51.0** | | |
| | | | | |
| **SYRIA** | $37.0 | $34.0 | | Treasury International Capital Reporting System and Federal Reserve System 1/ |
| | $19.0 | $19.0 | | Survey of Foreign Holdings of U.S. Securities (Treasury International Capital Reporting System) 2/ |
| | ($4.0) | ($2.0) | | Treasury International Capital Reporting System and Federal Reserve System 3/ |
| ***Net Syrian Assets*** | **$52.0** | **$51.0** | | |
| | | | | |
| **TOTAL** | **$87.0** | **$102.0** | | |

1/ Total liabilities to individuals and entities located in Iran/Syria reported by banks in the United States, by non-banking institutions in the U.S., and by large offshore branches and subsidiaries of United States banks as of September 30, 2007.

2/ Total United States long-term securities held by individuals and entities located in Iran/Syria reported by U.S.-resident custodians and issuers as of June 30, 2006. Final numbers as of June 30, 2007, were not available at the time this information was assembled.

3/ Net purchases by individuals and entities located in Iran/Syria of United States long-term securities reported by U.S.-resident banks, securities brokers and dealers, and other market participants, July 1, 2006 to September 30, 2007.

## TABLE 4

| Summary of Funds Relating to State Sponsors of Terrorism Under United States Jurisdiction (Amounts in millions of U.S. dollars) | | | |
|---|---|---|---|
| | **2007** | **2006** | |
| | | | |
| TABLE 1: OFAC Blocked Funds in the United States | $314.9 | $309.5 | |
| TABLE 2: OFAC Blocked Funds in Foreign Branches of U.S. Banks | $0.6 | $0.6 | |
| TABLE 3: Non-Blocked Funds in the United States | $87.0 | $102.0 | |
| | | | |
| ***Total State Sponsor of Terrorism funds within U.S. jurisdiction*** | **$402.5** | **$412.1** | |